IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:      THE HONORABLE GARY S. KATZMANN, JUDGE

| | | |
|---|---|---|
| SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, and EDF RENEWABLES, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Court No. 20-03941 |
| UNITED STATES, *ET AL.*, | ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' MOTION TO DISMISS

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

TARA K. HOGAN
Assistant Director

STEPHEN C. TOSINI
Senior Trial Counsel

JOSHUA E. KURLAND
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 616-5196
Email: stephen.tosini@usdoj.gov

March 1, 2021                           Attorneys for Defendants

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE

_____
|
SOLAR ENERGY INDUSTRIES    )
ASSOCIATION, NEXTERA ENERGY, INC.,    )
INVENERGY RENEWABLES LLC, and EDF    )
RENEWABLES, INC.,    )
    )
    Plaintiffs,    )
    )
    v.    )    Court No. 20-03941
    )
UNITED STATES, *ET AL.*,    )
    )
    Defendants.    )
_____)

## <u>ORDER</u>

On consideration of defendants' motion to dismiss and all other pertinent papers, it is hereby

ORDERED that the motion is granted; and, it is further

ORDERED that this action is dismissed pursuant to Rule 12(b)(6) of the Rules of this Court.


Dated: _____                _____
     New York, NY                           JUDGE

## <u>TABLE OF CONTENTS</u>

BACKGROUND ........................................................................................................1

    I.     Initial Section 201 Proceedings And Proclamation 9693 .......................1

    II.    *Invenergy* Litigation And *April Withdrawal* ...................................4

    III.    The President's Section 204 Midterm Proceeding And *Proclamation 10101* ....................................................................6

    IV.    Plaintiffs' Complaint ..............................................................9

SUMMARY OF THE ARGUMENT .......................................................................10

ARGUMENT ........................................................................................................12

    I.     Standard Of Review ..............................................................12

        A.    Failure To State A Claim ........................................12

        B.    Challenge To Presidential Action ............................12

    II.    The President's Restoration Of Safeguard Duties On Bifacial Panels Was A Permissible Modification Under Section 204(b)(1)(B) ...............13

    III.    USTR's Exclusion Of Bifacial Panels Did Not Result in a "Termination" Of The "Action" Under Section 203(c)(7) ...................19

    IV.    Plaintiffs Misconstrue Sections 201, 202, And 204 ...............................22

CONCLUSION .....................................................................................................24

# TABLE OF AUTHORITES

**Cases**                                                                        **Page(s)**

*Am. Ass'n of Exps. & Importers-Textile & Apparel Group v. United States,*
    751 F.2d 1239 (Fed. Cir. 1985) ................................................................. 16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................... 12

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................... 12

*Brown v. Gardner,*
    513 U.S. 115 (1994) ........................................................................... 22

*Corus Grp. PLC v. Int'l. Trade Comm'n,*
    352 F.3d 1351 (Fed. Cir. 2003) ............................................................... 13

*Florsheim Shoe Co., Div. of Interco, Inc. v. United States,*
    744 F.2d 787 (Fed. Cir. 1984) ................................................................. 17

*Invenergy Renewables LLC v. United States,*
    422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ........................................... 4, 5

*Maple Leaf Fish Co. v. United States,*
    762 F.2d 86 (Fed. Cir. 1985) ........................................................... *passim*

*Motion Sys. Corp. v. Bush,*
    437 F.3d 1356 (Fed. Cir. 2006) ............................................................... 13

*Platt v. Union Pacific R.R. Co.,*
    99 U.S. 48 (1879) ............................................................................. 13

*Russello v. United States,*
    464 U.S. 16 (1983) ........................................................................... 22

*Sierra Club v. Trump,*
    929 F.3d 670 (9th Cir. 2019) ................................................................. 18

*Silfab Solar, Inc. v. United States,*
    892 F.3d 1340 (Fed. Cir. 2018) ......................................................... 12, 17

*Sneaker Circus, Inc. v. Carter,*
    457 F. Supp. 771 (E.D.N.Y. 1978), *aff'd,* 614 F.2d 1290 (2d Cir. 1979) ................ 17

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of State,*
    658 F. Supp. 2d 105 (D.D.C. 2009) ........................................................................ 18

*United States Cane Sugar Refiners' Ass'n v. Block,*
    683 F.2d 399 (CCPA 1982)....................................................................................... 17

*United States v. George S. Bush & Co.,*
    310 U.S. 371 (1940) ........................................................................................... 12, 13

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ................................................................................................. 18

**Statutes**

5 U.S.C. § 553 ................................................................................................................... 4

19 U.S.C. § 2171(c)(1)(J) .............................................................................................. 18

19 U.S.C. § 2251 .................................................................................................... *passim*

19 U.S.C. § 2252 .................................................................................................... *passim*

19 U.S.C. § 2253 .................................................................................................... *passim*

19 U.S.C. § 2254 .................................................................................................... *passim*

19 U.S.C. § 2481(6) ............................................................................................... 13, 15

**Regulations**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other
    Products: Monitoring Developments in the Domestic Industry Institution and Scheduling
    Notice for the Subject Investigation,*
    84 Fed. Reg. 37,674 ................................................................................................... 6

*Determination on the Exclusion of Bifacial Solar Panels from the Safeguard Measure on Solar
Products,*
    85 Fed. Reg. 21,497 (USTR Apr. 17,2020) ............................................................. 5

*Exclusion of Particular Products From the Solar Products Safeguard Measure,*
    83 Fed. Reg. 47,393 (USTR Sept. 19,2018) ......................................................... 22

*Procedures To Consider Retention or Withdrawal of the Exclusion of Bifacial Solar Panels
From the Safeguard Measure on Solar Products,*
    85 Fed. Reg. 4,756 (USTR Jan. 27, 2020) .............................................................. 5

*Proclamation 9693 of January 23, 2018, To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells and for Other Purposes,*
    83 Fed. Reg. 3,541 (Jan. 23, 2018) ...................................................................................3, 18

*Proclamation 10101: To Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products),*
    85 Fed. Reg. 65,639 (Oct. 10, 2020) ................................................................................ 9, 18

*Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure,*
    84 Fed. Reg. 54,244 (USTR Oct. 9, 2019) …………………………………………………..4

## Other Authorities

H.R. Conf. Rep. 100-576, 1988 U.S.C.C.A.N. 1547 ................................................................. 14

*Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products),*
    Inv. No. TA-201-75, USITC Pub. 4739 (Nov. 1, 2017) ................................................. *passim*

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry,*
    Inv. No. TA-201-075, USITC Pub. 5021 (Feb. 2020) ............................................................ 6

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, and EDF RENEWABLES, INC.,<br><br>     Plaintiffs,<br><br>     v.<br><br>UNITED STATES, *ET AL*.,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Court No. 20-03941<br>)<br>)<br>)<br>)<br>) |

## **DEFENDANTS' MOTION TO DISMISS**

Pursuant to Rule 12(b)(6) of the Rules of the Court, defendants, the United States, *et al*., respectfully request that the Court dismiss the complaint for failure to state a claim.  In their challenge to Presidential Proclamation No. 10101, plaintiffs have not set forth a plausible showing that the President's determination involves a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority.  Indeed, the President acted lawfully and fully within his authority under the safeguard statute by closing a loophole that the President determined had been undermining the effectiveness of the safeguard measure on solar products.  Accordingly, plaintiffs' complaint should be dismissed.

## **BACKGROUND**

### I.   **Initial Section 201 Proceeding And Proclamation 9693**

To address the serious injury to the domestic solar industry caused by increased imports, the President implemented a "safeguard measure" under Section 201 of the Trade Act of 1974 (19 U.S.C. § 2251, *et seq.*), to protect the domestic industry from serious injury suffered due to a

"explosive" increase in imports of solar products for which the antidumping and countervailing

duty laws were ill suited to provide relief.  *See Crystalline Silicon Photovoltaic Cells (Whether*

*or not Partially or Fully Assembled into Other Products)*, Inv. No. TA-201-75, USITC Pub.

4739 (Nov. 2017), available at < https://www.usitc.gov/publications/safeguards/pub4739-

vol_i.pdf >.

During the initial section 201 proceeding, the International Trade Commission (ITC)

investigated crystalline silicon photovoltaic (CSPV) cells, whether or not partially or fully

assembled into other products, such as solar modules (solar products).  *Id*. at 13.  Solar products

have been the subject of multiple antidumping and countervailing duty proceedings, in which the

ITC has identified material injury to the domestic industry stemming from unfair pricing and

subsidization in China and Taiwan.  *Id*. at 24.  As the ITC explained, the effect of the

antidumping and countervailing orders has been to cause foreign producers and exporters to

move production to other countries and to continue to export their products in increasing

amounts at low prices.  *Id*. at 40-41, 44-45.

After completing its investigation, the ITC made an affirmative determination of serious

injury pursuant to 19 U.S.C. § 2252(b).  USITC Pub. 4739 at 1.  The ITC unanimously

concluded that increased imports were a substantial cause of serious injury, or threat thereof, to

the domestic CSPV industry.  *Id*.  Based on the data collected for the five year period of

investigation from 2012 and 2016, the ITC found that the United States had seen "explosive,"

increased demand for CSPV solar products.  *Id*. at 33, 37, 43.  Yet, despite these "extremely

favorable demand conditions" during this period, "dozens of U.S. facilities closed their

operations," and the domestic industry as a whole suffered net losses of hundreds of millions of dollars.  *Id*. at 33-35.

The ITC further determined that the domestic industry was unable to compete with imports resulting from global overcapacity—where imports increased during the investigation period by 492.4 percent—after the United States had become a focal point for the diversion of exports.  Id. at 21, 41, 43, 48-49.  Thus, analyzing, among other things, industry data, written submissions, and public testimony by domestic and foreign companies, industry groups, and Government representatives, the ITC found that increased imports were a substantial cause of serious injury.  *Id*. at 7-8, 50; 19 U.S.C. § 2252(b)(1)..

To provide relief to the domestic industry from the explosive increase in imports and to allow the industry to adjust to increased import competition, the President issued *Proclamation 9693*, in which he established additional duties on imports of solar products.  The President also delegated to the Office of the United States Trade Representative (USTR) authority to grant the "exclusion of a particular product from the safeguard measure" if "the USTR determines, after consultation with the Secretaries of Commerce and Energy, that a particular product should be excluded."  *Proclamation 9693 of January 23, 2018*, *To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes*, 83 Fed. Reg. 3,541 (Jan. 23, 2018) ¶ 12.  As in *Proclamation 10101*, the proclamation at issue in this case, the President set the effective date of *Proclamation 9693* at 15 days after he signed the proclamation.  *Id*. at Annex I.

Subsequently, USTR published procedures for interested persons to seek product-specific exclusions from the safeguard measure.  *Procedures to Consider Additional Requests for*

*Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6,670-72 (USTR Feb. 14, 2018) (*Exclusion Procedures*).

Certain interested persons requested exclusion of "bifacial" solar panels, which consist of cells that convert sunlight into electricity on both the front and back of the cells.  *See Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1268 (Ct. Int'l Trade 2019) (*Invenergy I*).  After USTR granted the exclusion, certain domestic producers of solar products objected, arguing the exclusion would cause harm by allowing increased imports, and requested that USTR withdraw the exclusion.  USTR did not publish a notice that it was considering withdrawal of the exclusion.  *Id.*  USTR ultimately determined to withdraw the exclusion. *Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measur*e, 84 Fed. Reg. 54,244-45 (USTR Oct. 9, 2019) (*October Withdrawal*)).

## II.    ***Invenergy* Litigation And *April Withdrawal***

Invenergy Renewables LLC, a purchaser of imported bifacial panels for installation in utility-scale solar projects, joined by other solar industry plaintiffs (collectively, Invenergy), filed a lawsuit and sought a preliminary injunction to enjoin the *October Withdrawal*.  *See generally Invenergy I*, 422 F. Supp. 3d 1355.

The Court granted a preliminary injunction on December 5, 2019, holding that Invenergy had satisfied the four factors for preliminary injunctive relief.  With regard to the likelihood of success factor, the Court reasoned that USTR's exclusion decisions under Section 201, including the decision to withdraw an exclusion, constituted rulemaking subject to the Administrative Procedure Act (APA), 5 U.S.C. § 553, because "[t]he President delegated the authority to USTR to decide its procedures for the implementation of exclusions [and] USTR then published its procedures in the Federal Register, inviting 'interested persons to submit comments identifying a

4

particular product for exclusion from the safeguard measure and providing reasons why the product should be excluded.'"  *Invenergy I*, 422 F. Supp. 3d at 1285 (quoting *Exclusion Procedures*, 84 Fed. Reg. at 6,671).  The Court held that USTR did not follow certain APA procedures and, thus, Invenergy possessed a reasonable likelihood of success on the merits in their challenge to the *October Withdrawal*.

USTR subsequently sought to correct the procedural deficiencies that the Court had identified in its order and requested "public comment on whether [it] should maintain the exclusion of bifacial solar panels from the safeguard measure, withdraw the exclusion, or take some other action within [its] authority with respect to this exclusion." *Procedures To Consider Retention or Withdrawal of the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 4,756 (USTR Jan. 27, 2020) (*January Notice*).  USTR identified the criteria for determining whether to retain, withdraw, or take other action with respect to the bifacial exclusion, set forth a schedule for interested persons to submit comments and rebuttal comments to USTR, and allowed for the submission and protection of business confidential evidence during the proceeding.  *Id*. at 4,757.

USTR published the final results of that notice and comment proceeding in the Federal Register.  *Determination on the Exclusion of Bifacial Solar Panels from the Safeguard Measure on Solar Products*, 85 Fed. Reg. 21,497 (USTR Apr. 17, 2020) (*April Withdrawal*).  In response to Invenergy's request to set aside the *April Withdrawal*, among other things, the Court amended its preliminary injunction "to preserve the *status quo* during the pendency of the appeal and until final resolution of this case on the merits."  *Invenergy Renewables LLC v. United States*, slip op. 20-144, 18 (Ct. Int'l Trade Oct. 15, 2020) (*Invenergy IV*).  This separate cause of action remains pending.

**III.    The President's Section 204 Midterm Proceeding And *Proclamation 10101***

Under section 204 of the safeguard statute, the ITC monitors the effectiveness of any

safeguard measure applied by the President.  19 U.S.C. § 2254(b)(1).  When, as here, the initial

period of the safeguard measure is more than three years, the ITC is responsible for submitting

"a report on the results of the monitoring . . . to the President and to the Congress not later than

the date that is the mid-point of the initial period" of the safeguard.  19 U.S.C. § 2254(a)(2).  The

ITC published its notice of initiation of its section 204(a) proceeding on August 1, 2019.

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other*

*Products: Monitoring Developments in the Domestic Industry Institution and Scheduling Notice*

*for the Subject Investigation*, 84 Fed. Reg. 37,674 (ITC Aug. 1, 2020).  The ITC set a schedule

for briefing and a public hearing, making the post-hearing briefs due on December 12, 2019.  *Id*.

at 37,675.

Among other things, the ITC received comments and heard testimony regarding the

domestic solar industry's ability to adjust to import competition in light of increasing imports of

bifacial solar products.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or*

*Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry*,

Investigation No. TA-201-075, USITC Pub. 5021 (Feb. 2020), available at

<https://www.usitc.gov/publications/other/pub5021.pdf>.  The ITC submitted its mid-term

monitoring report to the President on February 8, 2020.

In its monitoring report, the ITC highlighted domestic solar products producers'

statements that certain factors had impaired the United States solar manufacturing industry's

adjustment to import competition, including "the exclusion in June 2019 of bifacial CSPV

modules from the safeguard measure."  *Id*. at 7; *see also id.* at VI-4–5 ("Several firms also

pointed to the exclusion of bifacial panels as a major factor influencing CSPV module prices.").
The ITC acknowledged record evidence or reached conclusions relating to the effect of imports
of bifacial products on the United States market, as well as the domestic solar industry's ability
to adjust to the increased import competition from such imports:

> "Global production of bifacial solar cells and modules accounted
> for a relatively small share of production in 2018, but is projected
> to rapidly increase." *Id.* at I-74;

> "The conversion from production of monofacial PERC cells and
> modules to bifacial cells and modules is relatively straightforward,
> as it requires only minor changes in cell and module materials and
> production processes." *Id.* at I-75;

> "Most research firms anticipate that bifacial module shipments will
> rapidly increase over the next three years, though the extent to
> which they are projected to grow varies." *Id.*;

> "National Renewable Energy Lab . . . calculated the production
> cost of comparable monofacial and bifacial PERC modules
> manufactured in Asia at $0.287 and $0.289 per watt, respectively."
> *Id.* at I-76;

> Suniva, a domestic manufacturer emerging from bankruptcy,
> "stated that it would require an investment of less than $10 million
> and would take 100 days to restart production once it obtains the
> necessary capital investment.  The restarted company would have
> 450 MW of monofacial PERC cell capacity or 540 MW of bifacial
> PERC capacity." *Id.* at III-4;

> "Several firms also pointed to the exclusion of bifacial panels as a
> major factor influencing CSPV module prices. [One company]
> reported that domestic prices decreased in the immediate months
> following the USTR announcement of a bifacial module exclusion
> to the safeguard measure." *Id.* at VI-4–5.

In response to a request from the USTR under 19 U.S.C. § 2254(a)(4), the ITC issued an
additional report on the "probable economic effect on the industry concerned of any reduction,
modification, or termination of" Proclamation 9693 under 19 U.S.C. § 2254(b)(4). *Crystalline*
*Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products:*

*Advice on the Probable Economic Effect of Certain Modifications to the Safeguard Measure*,
Investigation No. TA-201-075, USITC Pub. 5032 (Mar. 2020), available at
<https://www.usitc.gov/publications/other/pub5032.pdf>.

The ITC concluded that the "exclusion for imports of bifacial modules . . . is likely to
have significant effects on prices and trade in both modules and cells." *Id*. at ES-3.  The ITC
further explained that "bifacial modules are likely to account for a growing share of the market
over the next few years and can substitute for monofacial products in all market segments.
Imports of bifacial modules that are exempt from safeguard tariffs put significant price pressure
on U.S. module producers, as these modules can be produced at virtually the same cost as
monofacial modules." *Id*. at III-4.  Important to the viability of a United States solar
manufacturing industry, "lower-priced bifacial modules will likely drive down U.S. market
prices for modules." *Id*. at III-5; *see also id.* at ES-4–5, I-4–5, II-9–10, II-15–18, III-1, III-4–7,
D-7–10 (also discussing issues caused by bifacial exclusion).

Section 204 authorizes the President to take certain actions with respect to safeguard
measures implemented under Section 203 of the Trade Act.  Of relevance to this challenge, the
President may, after receiving the ITC's midterm report, modify, reduce or terminate a safeguard
measure, if certain conditions are met.  19 U.S.C. § 2254(b)(1).

Following receipt of the ITC's reports, the President issued *Proclamation 10101*, in
which he noted the ITC's findings and conclusions that "bifacial modules are likely to account
for a greater share of the market in the future and can substitute for monofacial products in the
various market segments, such that exempting imports of bifacial modules from the safeguard
tariff would apply significant downward pressure on prices of domestically produced CSPV
modules." *Proclamation 10101: To Further Facilitate Positive Adjustment to Competition From*

*Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products)*, 85 Fed. Reg. 65,639, 65,640 (Oct. 16, 2020).  Similarly, the President acknowledged the ITC's conclusion "that the exclusion of bifacial modules from the safeguard measure will likely result in substantial increases in imports of bifacial modules if such exclusion remains in effect, and that such modules will likely compete with domestically produced CSPV products in the United States market."  *Id*.

After taking into account the ITC's reports, "receiving a petition from a majority of the representatives of the domestic industry," and finding that "that the domestic industry has begun to make positive adjustment to import competition," the President decided to revoke the bifacial exclusion.  *Id*.  The President reasoned that "the exclusion of bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action proclaimed in *Proclamation 9693*."  *Id*.   The President thus concluded "that it is necessary to revoke that exclusion and to apply the safeguard tariff to bifacial panels."  *Id*.

After the Court denied plaintiffs' motion to supplement their complaints in the *Invenergy* litigation to add counts challenging *Proclamation 10101*, *Invenergy Renewables LLC v. United States*, slip op. 20-166 (Ct. Int'l Trade Nov. 19, 2020) (*Invenergy V*), SEIA and other solar industry plaintiffs initiated this new action.

### IV.   Plaintiffs' Complaint

Plaintiffs allege that *Proclamation 10101* must be set aside based upon three alleged errors.

The first count alleges that the President violated section 204(b)(1)(B), 19 U.S.C. § 2254(b)(1)(B), which allows the President to implement a mid-term "reduction, modification, or termination" of an existing safeguard measure.  According to plaintiffs, the words "reduction,

modification, or termination" in section 204(b)(1)(B) "authorize[] modifications of a safeguard measure in response to an industry petition only if they are trade liberalizing," and thus re-imposition of the safeguard tariff on bifacial solar products and increase in the last year's rate of duty violates this provision.  Compl. ¶ 57.

Second, plaintiffs contend that the President's withdrawal of the exclusion for bifacial products violates section 203 because section 203(e)(7), 19 U.S.C. § 2253(e)(7), "does not permit a safeguard measure to be re-imposed on an article for a period of two years after the prior measure terminated."  Compl. ¶ 64.

Third, plaintiffs allege that *Proclamation 10101* violated section 201, 19 U.S.C. § 2251(a), based upon their contention that "the President failed to consider and did not make any determination regarding the relative economic and social benefits and costs before modifying the safeguard measure."  Compl. ¶ 70.

## **SUMMARY OF THE ARGUMENT**

The President fully complied with all of the statutory requirements under section 204. First, he obtained the necessary reports from the ITC.  Second, after taking into account the ITC's reports, receiving a petition from a majority of the representatives of the domestic industry, and concluding that that the domestic industry has begun to make positive adjustment to import competition, the President decided to modify the safeguard measure on solar products by revoking the bifacial exclusion.  The President followed the law and, thus, the Court should dismiss the complaint for failure to state a claim; specifically, the complaint fails to set forth a plausible showing that the President's determination involves a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority.

The first count fails because the plain language of section 204(b)(1)(B) allows the President to impose a "reduction, *modification*, or termination" of an existing safeguard measure. A modification in this context necessarily means some change to the measure beyond a "reduction" or "termination" and, thus, revocation of the bifacial exclusion falls squarely within the plain meaning of "modification."  Plaintiffs' claim that the President violated the statute requires the Court to adopt a definition of the term "modification" limited only to a "reduction" or a "termination."  Such an interpretation is unreasonable, because it would render the word "modification" superfluous, in contravention of a well-established canon of statutory interpretation.

Plaintiffs' allegation that the President violated section 203 by withdrawing the exclusion fares no better.  Plaintiffs misidentify the relevant section 201 "article," which consists of all solar products and not merely bifacial panels.  Additionally, the existing safeguard measure was never "terminate[d]" with respect to bifacial panels.  Instead, bifacial panels were excluded from application of the additional duties under the ongoing safeguard measure, subject to withdrawal of that exclusion.

Lastly, the third count misconstrues the plain language of sections 201, 202, and 204, attempting to impose a requirement on midterm reviews that exists only for initial determinations.  Specifically, plaintiffs seek to compel the President to revisit his initial conclusion under section 203(a)(1) that the safeguard measure on solar products will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs.  However, the President already made this determination in association with his initial imposition of the safeguard measure and the statute does not require him to re-conduct this analysis during a midterm review proceeding.

11

## ARGUMENT

## I.   Standard Of Review

### A.   Failure To State A Claim

In deciding a motion to dismiss for failure to state a claim, the Court assesses whether the facts alleged would entitle the plaintiff to the relief requested.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." *Id*.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

### B.   Challenge To Presidential Action

When Presidential action is challenged, "'[t]he President's findings of fact and the motivations for his action are not subject to review.'" *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1349 (Fed. Cir. 2018) (quoting *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 88 (Fed. Cir. 1985)).  Indeed, "'the judgment of the President . . . on the facts . . . is no more subject to judicial review . . . than if Congress itself had exercised that judgment.'" *Id*. (quoting *United States v. George S. Bush & Co.*, 310 U.S. 371, 379-80 (1940)).

The circumstances when the Court may set aside Presidential action are "limited." *Id*. at 1346. The Court may review "to determine whether the President 'clear[ly] misconstru[ed]' his statutory authority." *Id*. (quoting *Corus Grp. PLC v. Int'l. Trade Comm'n*, 352 F.3d 1351, 1356 (Fed. Cir. 2003)); *see also id*. ("[C]ourts may consider whether "the President has violated an explicit statutory mandate.") (quoting *Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (*en banc*)). But, "'[f]or a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority.'" *Id*. (quoting *Maple Leaf Fish*, 762 F.2d at 89).

## II.     The President's Restoration Of Safeguard Duties On Bifacial Panels Was A Permissible Modification Under Section 204(b)(1)(B)

Plaintiffs contend that section 204(b)(1)(B) allows only "liberalizing" of safeguard measures, and that the restoration of the additional duties on bifacial panels exceeded this limitation. Compl. ¶ 57 (citing 19 U.S.C. §§ 2254(b)(1)(B), 2481(6)). This argument fails as a matter of law because section 204(b)(1)(B) explicitly allows "modification" *in addition to* "reduction" or "termination." To limit "modification" only to actions that reduce safeguard protections would make "modification" coterminous with another action authorized by section 204, "reduction", and therefore render "modification" superfluous Indeed, "a legislature is presumed to have used no superfluous words. Courts are to accord a meaning, if possible, to every world in a statute." *Platt v. Union Pacific R.R. Co*., 99 U.S. 48, 58 (1879). This argument also fails because the President did not "increase" the safeguard measure – *Proclamation 10101* merely reinstated the application section 201 duties to bifacial panels, as originally contemplated.

In addition to the complaint's failure to give meaning to the word "modification," that term appears only in subparagraph (B) of paragraph 204(b)(1) and not in subparagraph (A). The omission of the term "modification" from subparagraph (A) and inclusion in subparagraph (B) is

13

an intentional act by Congress that carries meaning.  The logical meaning here is that when the conditions specified in subparagraph (B) exist, the President may make a "modification" that neither reduces nor terminates the measure.

The structure of section 204 confirms this conclusion.  It begins by calling for the ITC to "monitor developments with respect to the domestic industry, including the progress and specific efforts made by workers and firms in the domestic industry to make a positive adjustment to import competition."  19 U.S.C. § 2254(a)(1).  The use of words "progress" and "specific efforts" are instructive, indicating the expectation that, during the planned duration of the safeguard measure, the domestic industry will be moving toward a complete "positive adjustment to import competition."  Subsection (b) applies only when, at the midpoint of the expected duration of the measure, the ITC issues a report on its monitoring.  In this context, the three options under section 2254(b)(1) correspond to three possible situations that may arise at the midpoint of the measure:  (1) the domestic industry has completed its adjustment to import competition, such that "termination" is appropriate; (2) the domestic industry's "progress" is better than expected, such that import restrictions remain necessary, subject to an appropriate "reduction"; and (3) the domestic industry has made some (or no) progress to date, such that a "modification" to the measure is necessary to complete its adjustment to import competition.  This common sense reading gives meaning to all parts of the statute.

Moreover, section 204's legislative history confirms that congress did not intend modification to be a one-way downward ratchet.  Indeed, an earlier Senate amendment stated that, upon receipt of the "ITC monitoring report, the President may reduce, modify (*but not increase*), or terminate any action . . ."  H.R. Conf. Rep. 100-576, 687, 1988 U.S.C.C.A.N. 1547,

14

1720 (emphasis added).  This limitation was absent from section 204 as enacted.  19 U.S.C. § 2254(b)(1).

This analysis highlights the flaw in plaintiffs' argument that section 204(b)(1)(B) is limited to circumstances in which the "protections of the original safeguard measure are no longer necessary."  Compl. ¶ 4.  The provision of "reduction" or "modification" of the safeguard measure in section 204(b)(1)(B) imply that safeguard protections *remain* necessary, albeit with some change.  The statutory instruction for the ITC to report at the measure's midpoint on the industry's "progress" and "efforts" to make a "positive adjustment" would be superfluous if the President could take action only when the industry had completed its positive adjustment.  Reading the statute in that way would deprive the President of the flexibility accorded by the statute to adjust a safeguard measure to account for changes in the situation faced by the industry.   The express authorization to "modification" in addition to "reduction" or "termination" emphasizes that Congress intended to confer sufficient flexibility on the President to respond to the evolving situation as appropriate.

Likewise, plaintiffs' citation to 19 U.S.C. § 2481(6)'s definition for "modification," Compl. ¶ 57, does not help their cause.  That definition merely notes that the "term 'modification', as applied to any duty or other import restriction, includes the elimination of any duty or other import restriction."  This makes clear that a "modification," in addition to the ordinarily understood increase or decrease, is broad enough to include the elimination of the duty.  Accordingly, that definition's inclusion of "elimination" within its bounds demonstrates congressional intent for the definition of "modification" to be read broadly.

Neither of plaintiffs' remaining contentions are persuasive.  First, plaintiffs challenge the President's statement that the domestic industry has "*begun to* make" a positive adjustment to

import competition as failing to meet a statutory requirement.  *See* Compl. ¶ 60.  Second,

plaintiffs appear to dispute whether the President received input from the domestic industry and

made relevant findings.  *See id*. ¶ 61 (contending that President had not made statutory findings).

Plaintiffs' contention, at paragraph 60 of the complaint, that the President's actions are

unlawful because he stated that the domestic industry "has begun to" make (as opposed to "has

made") a positive adjustment, is of no moment.  The distinction that plaintiffs attempt to draw

hinges entirely on their incorrect assertion that section 204(b)(1)(B) applies only where

safeguard protections are no longer necessary.  As explained above, the plain language of section

204(b)(1)(B) readily disposes of that argument.

Further, paragraph 61 of the complaint, in which plaintiffs allege upon information and

belief that the President did not receive an adequate domestic industry petition, identifies no

actionable error because *Proclamation 10101* states that he did receive such a petition.  85 Fed.

Reg. at 65,640 ¶ 9.  Section 204 contains no requirement that the President disclose or publicize

the petition he received before he may act on the petition.  Plaintiffs identify no statute or law

that imposes the requirements it seeks before the President may act.  The Federal Circuit

cautioned against imposing extra-statutory procedural requirements on the President in *Am.*

*Ass'n of Exps. & Importers-Textile & Apparel Group v. United States*, 751 F.2d 1239, 1247

(Fed. Cir. 1985).  After concluding that the relevant statute imposed "no procedural requirements

nor limitations" on the President's administration of the textile trade program, the court found

"no basis, either within [the statute] itself, the overall statutory scheme, or the legislative history,

to add more to the statute than meets the eye."  *Id*.  So, here too, there is no basis for the Court to

mandate disclosure of the petition or evidence to support the President's fact-finding.

Here, the President made the finding required by the statute to support his action.  Section 204(b)(1)(B) authorizes the President, upon petition from a majority of the representatives of the domestic industry, to reduce, modify, or terminate an action taken under section 203 of the Trade Act when the President determines that the domestic industry has made a positive adjustment to import competition.  The President proclaimed that he had "receiv[ed] a petition from a majority of the representatives of the domestic industry" and that he had "determined that the domestic industry has begun to make positive adjustment to import competition, shown by the increases in domestic module production capacity, production, and market share."  *Proclamation 10101*, 85 Fed. Reg. at 65,640 ¶ 9.  Nothing more is required for the President to exercise his authority under Section 204.

Nor may the Court accept the plaintiffs' invitation to inquire further.  The Court "must assume that if the President said he [made the requisite findings and considerations under the trade statute] . . . then he in fact considered them."  *Sneaker Circus, Inc. v. Carter*, 457 F. Supp. 771, 793 (E.D.N.Y. 1978), *aff'd*, 614 F.2d 1290 (2d Cir. 1979).  On this basis, the Federal Circuit has consistently rejected requests to "go behind" the text of the President's Proclamation or Executive Order.  *See*, *e.g.*, *Florsheim Shoe Co., Div. of Interco, Inc. v. United States*, 744 F.2d 787, 797 (Fed. Cir. 1985); *Silfab*, 892 F.3d at 1349; *see also United States Cane Sugar Refiners' Ass'n v. Block*, 683 F.2d 399, 404 (CCPA 1982).

In these circumstances, this Court's limited scope of judicial review does not include the "authority to determine whether the President's statement is factually accurate."  *Silfab*, 892 F.3d at 1347-48 (citing *Maple Leaf Fish*, 762 F.2d at 89).  For example, in *Silfab*, the President determined that "imports of CSPV products from . . . Canada . . . account for a substantial share of total imports."  892 F.3d at 1344 (citing *Proclamation 9693*).  The plaintiffs alleged that the

President lacked authority under the NAFTA Implementation Act to impose safeguards on imports from Canada because imports from Canada were only two percent of total imports. *Id.* at 1348. But the Federal Circuit held that judicial review was not available because "[t]he question regarding substantial share is factual, and we have no authority to review the President's factual determinations." *Id.* at 1349. So, too, the Court's inquiry to ensure compliance with the statute is satisfied by the statement of the President that he received a petition from "a majority of the representatives of the domestic industry with respect to [the relevant modification]." *Proclamation 10101*, 85 Fed. Reg. 65,640 ¶ 9.

Lastly, even if section 204(b)(1)(B) did not explicitly authorize the President to revoke the exclusion, he still possessed authority to do so. Contrary to plaintiffs' view that presidential action is presumptively *invalid* unless the President identifies a specific statute that allows that action, the Court must sustain presidential action if there is an "'act of Congress to which [the Court's] attention has been directed from which such a power can *fairly be implied*.'" *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)) (emphasis added).

Indeed, the President's power to revoke the exclusion previously granted by USTR can be implied from his delegation of authority to USTR to grant exclusions in the first instance, as well as to "modify or terminate any such [exclusion] determination." *Proclamation 9693*, 83 Fed. Reg. 3,541 at Annex I (delegation to USTR). USTR, as the President's delegee, possessed the power to grant or withdraw exclusions. *See*, *e.g.*, 19 U.S.C. § 2171(c)(1)(J) (among other things, the Trade Representative shall "be responsible for such other functions as the President may direct."); *Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009) (declining to enjoin cross-border oil pipeline under APA because "the State

Department is acting solely on behalf of the President, and in doing so, it is exercising purely presidential prerogatives.").  The President did not disclaim authority to exclude additional products or revoke existing exclusions under his independent and undelegated authority to modify a safeguard measure.

Accordingly, the Court should dismiss count I of the complaint for failure to state a claim.

### III.   USTR's Exclusion Of Bifacial Panels Did Not Result in a "Termination" Of The "Action" Under Section 203(c)(7)

Plaintiffs next allege that revocation of the exclusion violated section 203(c)(7).  Compl. ¶¶ 64-67, Section 203(c)(7) precludes the President from taking new presidential action on "an article" immediately "after the previous action [covering that article] terminates."  The statute provides:

> If an article was the subject of an action under subparagraph (A), (B), (C), or (E) of subsection (a)(3), no new action may be taken under any of those subparagraphs with respect to such article for—
>
>> (i) a period beginning on the date on which the previous action terminates that is equal to the period in which the previous action was in effect, or
>>
>> (ii) a period of 2 years beginning on the date on which the previous action terminates,
>
> whichever is greater.

19 U.S.C. § 2253(c)(7)(A).

The "article" is the group of imported products in question, as defined in the ITC's serious injury determination, while the "action" is defined by the President and may apply different remedies for different products that fall within the definition of the "article."  Plaintiffs' argument is premised on misidentifying the statutory "article" as bifacial panels, rather than the

solar products subject to the safeguard measure.  Compl. ¶¶ 65-66.  The term "article" as used in

section 203 refers back to the foundational authority of section 201, which states:

> If the [ITC] determines under section 2252(b) of this title that *an*
> *article* is being imported into the United States in such increased
> quantities as to be a substantial cause of serious injury, or the
> threat thereof, to the domestic industry producing an article like or
> directly competitive with the imported article, the President, in
> accordance with this part, shall take all appropriate and feasible
> action within his power which the President determines will
> facilitate efforts by the domestic industry to make a positive
> adjustment to import competition and provide greater economic
> and social benefits than costs.

19 U.S.C. § 2251(a) (emphasis added).  Similarly, section 202(b)(1)(a) directs the ITC "to

*determine whether an article* is being imported into the United States in such increased quantities

as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry

producing *an article like or directly competitive with the imported article*."  19 U.S.C.

§ 2252(b)(1)(A) (emphasis added).  Section 203(a)(1) instructs the President, upon receipt of an

affirmative determination of serious injury, to "take all appropriate and feasible action within his

power which the President determines will facilitate efforts by the domestic industry to make a

positive adjustment to import competition and provide greater economic and social benefits than

costs."  19 U.S.C. § 2253(a)(1).  Section 203(a) specifies that the action may include a "duty,"

"tariff-rate quota," or "quantitative restriction" on "the article."  Thus, the "article" that "was the

subject of an action under subparagraph (A), (B), (C), or (E) of subsection (a)(3)," is the *group*

of products that the ITC found were imported in increased quantities, such that they were a

substantial cause of serious injury to the domestic producers of a like or directly competitive

product.

     In this case, the ITC determined that "crystalline silicon photovoltaic cells (whether or

not partially or fully assembled into other products) are being imported into the United States in

such increased quantities as to be a substantial cause of serious injury to the domestic industry producing *an article* like or directly competitive with *the imported article*." *Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products)*, Investigation No. TA-201-75, USITC Pub. 4739 (Nov. 2017) at 1, available at <https://www.usitc.gov/publications/safeguards/pub4739-vol_i.pdf> .  The ITC further specified that its finding of serious injury applied to a single "like product" consisting of "domestically manufactured CSPV cells, whether or not partially or fully assembled into other products."  *Id*. at 13.  In proclaiming the safeguard, the President adopted the ITC's definition of the article subject to the determination.  *See Proclamation 9693*, 83 Fed. Reg. at 3,541.

The "action" taken with respect to "an article" may apply differently to subcategories of products within the broader group of that "article."  For example, there is a tariff on imports of solar modules but a tariff-rate quota (TRQ) on imports of solar cells, such that the first 2.5 gigawatts enter duty-free and any excess is subject to the same duty as imported modules.  This does not mean that the safeguard measure is "terminated" with respect to cells imported within the 2.5 gigawatt tariff-free quantity.  They remain subject to the "action," albeit with a different tariff rate than other products.

Because the "article" in question was all CSPV products covered by the ITC's injury determination, USTR's exclusion of bifacial panels did not terminate the "action" with respect to that "article," and did not trigger the limitations of section 203(c)(7).  The exclusion meant only that bifacial panels – like solar cells within the TRQ – would not be subject to the additional safeguard duties, so long as the exclusion remained in force.

The terminology adopted in *Proclamation 9693* confirms this conclusion.  In recital 12 of the proclamation, the President stated that, if the conditions set out in section 204(b)(1) exist, "I

shall reduce, modify, or *terminate* the action established in this proclamation accordingly." 83
Fed Reg. at 3,542. The President did not delegate this authority. Instead, he authorized the
Trade Representative to "*modify* the HTS provisions created by Annex 1 to this Proclamation to
*exclude* such particular product from the safeguard measure." *Id.* at 3,544 (emphasis added).
This distinction between "terminate" and "exclude" signifies that the two terms have different
meanings. As with statutes, "[w]here [the President] includes particular language in one section
of a [proclamation] but omits it in another section of the same Act, it is generally presumed that
[the President] acts intentionally and purposely in the disparate inclusion or exclusion." *Brown
v. Gardner*, 513 U.S. 115, 120 (1994) (quoting *Russello v. United States*, 464 U.S. 16, 23
(1983)).

Lastly, treating each "exclusion" as "terminating" a safeguard measure with respect to the
"article" covered by the exclusion would result in multiple mini-ITC investigations into separate
subsets of the original "article." Under this reasoning, products excluded from the safeguard
measure at the time of its original adoption would have become eligible for a new safeguard
measure in February 2020. The six products excluded in September 2018 would have become
eligible on September 19, 2020. *See Exclusion of Particular Products From the Solar Products
Safeguard Measure*, 83 Fed. Reg. 47,393 (USTR Sept. 19, 2018). And bifacial panels would be
eligible on June 13, 2021. Congress did not intend such a piecemeal approach to the protections
of the safeguard statute.

## IV.    Plaintiffs Misconstrue Sections 201, 202, And 204

Finally, relying on provisions found elsewhere in the statute, plaintiffs contend that
section 204 requires the President to make an express statement that he weighed social costs and
benefits of any reduction, modification, or termination. Compl. ¶¶ 69-71. Specifically, they cite

sections 201(a) and 203(a)(2), which direct the President to consider the economic and social

costs and benefits in making the initial decision to impose a safeguard measure.  However, those

same provisions make clear that this is an inquiry *additional* to the evaluation of whether the

measure will facilitate the industry's positive adjustment to import competition.  *See* 19 U.S.C.

§ 2251(a) (authorizing President to take action that "the President determines will facilitate

efforts by the domestic industry to make a positive adjustment to import competition and provide

greater economic and social benefits than costs"); 19 U.S.C. § 2253(a)(2) ("the President shall

consider . . . (D) the probable effectiveness of the actions . . . to facilitate positive adjustment to

import competition; [and] (E) the short- and long-term economic and social costs of the actions

. . . relative to their short- and long-term economic and social benefits").  Thus, Congress's

exclusion of a reference to economic and social costs and benefits in section 204 means that the

President is not required to reweigh the overall costs and benefits before reducing, modifying, or

terminating a safeguard measure.

Moreover, the President already determined in *Proclamation 9693*, 83 Fed. Reg. at 3,542,

that the economic and social benefits of the solar safeguard measure outweighed the economic

and social costs.  Section 204 does not require the President to repeat this analysis in a midterm

review.  And in any event, the President determined in "that the exclusion of bifacial panels from

application of the safeguard tariff has impaired and is likely to continue to impair the

effectiveness of the action I proclaimed in *Proclamation 9693*."  *Proclamation 10101*, 85 Fed.

Reg. at 65,640 ¶ 9(a).  In sum, the President concluded that the bifacial exclusion had "impaired"

action previously taken to "facilitate efforts by the domestic industry to make a positive

adjustment to import competition and provide greater economic and social benefits than costs"

and corrected this impairment.  *Proclamation 9693*, 83 Fed. Reg. at 3,542.  Accordingly, there is

no "clear misconstruction of the governing statute."  *Maple Leaf Fish*, 762 F.2d at 89.

## **CONCLUSION**

For these reasons, we respectfully request that the Court dismiss the complaint for failure

to state a claim.

<div style="margin-left:40%">

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/  TARA K. HOGAN
Assistant Director

/s/  STEPHEN C. TOSINI
Senior Trial Counsel
/s/  JOSHUA E. KURLAND
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 616-5196
Email: stephen.tosini@usdoj.gov

</div>

March 1, 2021                                    Attorneys for Defendants

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chambers Procedure 2(B)(2) of the United States Court of International Trade, I certify that this motion contains 6,843 words, excluding those portions that do not count toward the word limitation and, thus, complies with the Court's Chambers Procedures.

<u>/s/ Stephen C. Tosini</u>