**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| SOLAR ENERGY INDUSTRIES ASSOCIATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )   Court No. 20-03941 <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS AND PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to U.S. Court of International Trade ("USCIT") Rule 7(d), Plaintiffs the Solar Energy Industries Association, NextEra Energy, Inc., Invenergy Renewables LLC, and EDF Renewables, Inc. ("Plaintiffs") hereby respond to Defendants' Motion to Dismiss, ECF No. 17. Plaintiffs also hereby cross-move for summary judgment pursuant to USCIT Rule 56.

Plaintiffs' Complaint, ECF No. 2, alleges that Presidential Proclamation 10101 is unlawful, because President Trump bypassed several statutory requirements and, instead, increased trade restrictions on various crystalline silicon photovoltaic ("CSPV") products by executive fiat. In particular, President Trump violated Sections 201, 203, and 204 of the Trade Act of 1974 when he modified the safeguard measure on CSPV products to re-impose safeguard duties on bifacial CSPV panels and to increase the safeguard duty rate for all covered CSPV products during the fourth year of the safeguard measure. For the reasons explained in the brief supporting this response and cross-motion, Plaintiffs not only state a plausible claim for relief, but are entitled to summary judgment on all claims based on the undisputed material facts in this case. Therefore, in addition to responding to Defendants' Motion to Dismiss, Plaintiffs hereby

1

move for summary judgment pursuant to USCIT Rule 56 and the Court's April 28, 2021 scheduling order, ECF No. 27.

Because Proclamation 10101 violates the Trade Act for the reasons explained in the accompanying brief, we respectfully request that the Court deny Defendants' Motion to Dismiss, grant Plaintiffs' Cross-Motion for Summary Judgment, declare Proclamation 10101 unlawful and therefore null and void, and order the refund, with interest, of all additional duties imposed by reason of Proclamation 10101 to all Plaintiffs who are legally entitled to such refunds.  A proposed order is included with this response and cross-motion.

Respectfully Submitted,

/s/ Amanda Shafer Berman
John Brew
Larry Eisenstat
Amanda Shafer Berman
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500
aberman@crowell.com

Frances Hadfield
**CROWELL & MORING LLP**
590 Madison Ave, 20th Floor
New York, NY 10022
(212) 803-4040

*Counsel to Invenergy Renewables, LLC*

/s/ Matthew R. Nicely
Matthew R. Nicely
James E. Tysse
Daniel M. Witkowski
Devin S. Sikes
Julia K. Eppard
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K Street, N.W.
Washington, D.C. 20006
(202) 887-4000
mnicely@akingump.com

*Counsel to SEIA and NextEra Energy, Inc.*

/s/ Kevin M. O'Brien
Kevin M. O'Brien
Christine M. Streatfeild
**BAKER & MCKENZIE LLP**
815 Connecticut Ave, NW
Washington, DC 20006
(202) 452-7000
kevin.obrien@bakermckenzie.com

May 7, 2021

*Counsel to EDF Renewables, Inc*

**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

|  |  |
|---|---|
| SOLAR ENERGY INDUSTRIES ASSOCIATION, et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| UNITED STATES, et al., | ) ) ) |
| Defendants. | ) ) ) |

**BRIEF IN SUPPORT OF RESPONSE TO DEFENDANTS' MOTION TO DISMISS AND
IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

John Brew
Larry Eisenstat
Amanda Shafer Berman
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500
aberman@crowell.com

Frances Hadfield
**CROWELL & MORING LLP**
590 Madison Ave, 20th Floor
New York, NY 10022
(212) 803-4040

*Counsel to Invenergy Renewables, LLC*

Matthew R. Nicely
James E. Tysse
Daniel M. Witkowski
Devin S. Sikes
Julia K. Eppard
**AKIN GUMP STRAUSS HAUER &
FELD LLP**
2001 K Street, N.W.
Washington, D.C. 20006
(202) 887-4000
mnicely@akingump.com

*Counsel to SEIA and NextEra Energy, Inc.*

Kevin M. O'Brien
Christine M. Streatfeild
**BAKER & MCKENZIE LLP**
815 Connecticut Ave, NW
Washington, DC 20006
(202) 452-7000
kevin.obrien@bakermckenzie.com

*Counsel to EDF Renewables, Inc*

May 7, 2021

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................3
I.      LEGAL FRAMEWORK .........................................................................3
II.     STATEMENT OF FACTS .......................................................................6
        A.    Issuance of the Solar Safeguard Measure ...............................6
        B.    Exclusion of Bifacial CSPV Modules ....................................7
        C.    USTR's Attempts to Withdraw the Bifacial CSPV Module
              Exclusion .................................................................................8
        D.    Proclamation 10101 ................................................................9

SUMMARY OF THE ARGUMENT ................................................................10

ARGUMENT ....................................................................................................11
I.      STANDARD OF REVIEW ....................................................................11
II.     PROCLAMATION 10101 VIOLATES SECTION 204 OF THE
        TRADE ACT ..........................................................................................12
        A.    The President Did Not Receive the Petition Required to Take
              Action Under Section 204(b)(1)(B) of the Trade Act .............13
              1.    The Petitions Produced by Defendants Do Not Meet the
                    Statutory Requirements ...............................................13
              2.    The Court Has the Authority to Determine Whether the
                    Petitions Meet the Statutory Requirements ................17
        B.    The President Did Not Find that the Domestic Industry Has
              Made a Positive Adjustment to Import Competition, As
              Required by Section 204(b)(1)(B) of the Trade Act .............21
        C.    Section 204(b)(1)(B) of the Trade Act Does Not Authorize an
              Increase in Trade Restrictions ...............................................23
              1.    The Text and Structure of Section 204(b)(1)(B) and the
                    Broader Safeguard Statute Do Not Authorize an
                    Increase in Trade Restrictions .....................................24
              2.    Defendants Fail to Show that Interpreting Section
                    204(b)(1)(B) as Authorizing Increases in Trade
                    Restrictions Is Reasonable ..........................................28
        D.    Defendants Cannot Rely on Authority Other than Section
              204(b)(1)(B) as Authorizing Proclamation 10101 ...............32
III.    PROCLAMATION 10101 VIOLATES SECTION 203 OF THE
        TRADE ACT ..........................................................................................33
IV.     PROCLAMATION 10101 VIOLATES SECTION 201 OF THE
        TRADE ACT ..........................................................................................39

CONCLUSION .................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Guam v. United States*,
  578 F.3d 1318 (Fed. Cir. 2009)..................................................................................12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................................................12

*Bostock v. Clayton Cty., Georgia*,
  140 S. Ct. 1731 (2020)................................................................................................30

*Cambridge v. United States*,
  558 F.3d 1331 (Fed. Cir. 2009)..................................................................................12

*Corus Grp. PLC v. Int'l Trade Comm'n*,
  352 F.3d 1351 (Fed. Cir. 2003)............................................................................11, 18

*Demko v. United States*,
  216 F.3d 1049 (Fed. Cir. 2000)..................................................................................12

*Florsheim Shoe Co. v. United States*,
  744 F.2d 787 (Fed. Cir. 1984)...............................................................................20, 32

*Invenergy Renewables LLC v. United States*,
  422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ...............................................................8

*Invenergy Renewables LLC v. United States*,
  476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) ..........................................................8, 9

*Keene Corp. v. United States*,
  508 U.S. 200 (1993)....................................................................................................23

*King v. Burwell*,
  576 U.S. 473 (2015)....................................................................................................24

*Maple Leaf Fish Co. v. United States*,
  762 F.2d 86 (Fed. Cir. 1985)............................................................................. *passim*

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803)......................................................................................19

*Michael Simon Design, Inc. v. United States*,
  609 F.3d 1335 (Fed. Cir. 2010)..............................................................................18, 22

*Motion Sys. Corp. v. Bush*,
 437 F.3d 1356 (Fed. Cir. 2006) (en banc)........................................................11, 18

*PrimeSource Bldg. Prod., Inc. v. United States*,
 No. 20-00032, 2021 WL 1248956 (Ct. Int'l Trade Apr. 5, 2021) ...........................18

*Russello v. United States*,
 464 U.S. 16 (1983).................................................................................................23

*Schwegmann Bros. v. Calvert Distillers Corp.*,
 341 U.S. 384 (1951).................................................................................................36

*Sierra Club v. Trump*,
 929 F.3d 670 (9th Cir. 2019) ...................................................................................32

*Silfab Solar, Inc. v. United States*,
 892 F.3d 1340 (Fed. Cir. 2018).......................................................................11, 18, 19

*Sneaker Circus, Inc. v. Carter*,
 457 F. Supp. 771 (E.D.N.Y. 1978) .....................................................................19, 20

*Transpacific Steel LLC v. United States*,
 466 F. Supp. 3d 1246 (Ct. Int'l Trade 2020) .........................................................18

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
 484 U.S. 365 (1988).................................................................................................24

*United States Cane Sugar Refiners' Association v. Block*,
 683 F.2d 399 (CCPA 1982) ......................................................................................20

*United States v. George S. Bush & Co.*,
 310 U.S. 371 (1940).................................................................................................19

*United Steelworkers of Am. v. Weber*,
 443 U.S. 193 (1979).................................................................................................36

*Whitman v. Am. Trucking Ass'ns, Inc.*,
 531 U.S. 457 (2001).................................................................................................38

*Young v. UPS*,
 135 S. Ct. 1338 (2015).............................................................................................36

## Statutes

19 U.S.C. § 2251(a) ............................................................................................ *passim*

19 U.S.C. § 2251(b)(1) ...................................................................................................3, 22

19 U.S.C. § 2252............................................................................................................4

19 U.S.C. § 2252(h)(2) ................................................................37

19 U.S.C. § 2253(a)(1)(A) ............................................................4

19 U.S.C. § 2253(a)(2) ............................................................40, 41

19 U.S.C. § 2253(a)(3)(A) ...........................................................29

19 U.S.C. § 2253(e) ....................................................................4

19 U.S.C. § 2253(e)(1)(B) .........................................................5, 23

19 U.S.C. § 2253(e)(5) .................................................................4

19 U.S.C. § 2253(e)(7) .......................................................... *passim*

19 U.S.C. § 2254(a)(3) ..................................................................5

19 U.S.C. § 2254(b) ....................................................................15

19 U.S.C. § 2254(b)(1)(A) ........................................................5, 6, 25

19 U.S.C. § 2254(b)(1)(B) ...................................................... *passim*

19 U.S.C. § 2254(b)(3) .................................................................30

19 U.S.C. § 2254(c) ..............................................................4, 5, 23

19 U.S.C § 2481(6) ....................................................................29

19 U.S.C. § 3512(d) ...................................................................27

19 U.S.C. § 3538(a)(4) .................................................................30

Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100-418, 102 Stat.
1119 (1988) ...................................................................16, 27

**Other Authorities**

134 Cong. Rec. 7197 (1988) ..........................................................15

*China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual
Property, and Innovation*, 83 Fed. Reg. 32,181 (July 11, 2018) ...........................39

*China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual
Property, and Innovation*, 83 Fed. Reg. 47,236 (Sept. 18, 2018).........................39

*China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual
Property, and Innovation*, 84 Fed. Reg. 58,427 (Oct. 31, 2019) ...........................39

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry Institution and Scheduling Notice for the Subject Investigation*, 84 Fed. Reg. 37,674 (Aug. 1, 2019), *available at* https://www.govinfo.gov/content/pkg/FR-2019-08-01/pdf/2019-16363.pdf .........................15

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products:  Monitoring Developments in the Domestic Industry*, Inv. No. TA-201-075, USITC Pub. 5021 (Feb. 2020), *available at* https://www.usitc.gov/publications/other/pub5021.pdf....................................................10, 15

*Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 21,497 (Apr. 17, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-04-17/pdf/2020-08189.pdf ...........................8

*Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84 Fed. Reg. 27,684 (June 13, 2019), *available at* https://www.govinfo.gov/content/pkg/FR-2019-06-13/pdf/2019-12476.pdf .................7, 8, 34

H. Comm. on Ways & Means, H.R. Rep. No. 103-826 (1994) .....................................................34

*Conference Report to Accompany H.R. 3*, H.R. Rep. No. 100-576 (1988) .................................31

Presidential Proclamation 9693 of January 23, 2018, *To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes*, 83 Fed. Reg. 3541 (Jan. 25, 2018), *available at* https://www.govinfo.gov/content/pkg/FR-2018-01-25/pdf/2018-01592.pdf ......................................................................................................... *passim*

Presidential Proclamation 10101 of October 10, 2020, *To Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products)*, 85 Fed. Reg. 65,639 (Oct. 16, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-10-16/pdf/2020-23108.pdf ................. *passim*

*Procedures To Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6670 (Feb. 14, 2018), *available at* https://www.govinfo.gov/content/pkg/FR-2018-02-14/pdf/2018-03048.pdf........................................................................................7

*Statement of Administrative Action to Accompany the Uruguay Round Agreement*, H.R. Rep. No. 103-316 (1994)......................................................................... *passim*

*Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure*, 84 Fed. Reg. 54,244 (Oct. 9, 2019), *available at* https://www.govinfo.gov/content/pkg/FR-2019-10-09/pdf/2019-22074.pdf ...........................8

# INTRODUCTION

After this Court twice enjoined the Trump Administration from unlawfully imposing new trade restrictions on solar energy products imported or used by members of Plaintiff Solar Energy Industries Association and by Plaintiffs NextEra Energy, Inc., Invenergy Renewables LLC, and EDF Renewables, Inc., the Government tried a new tactic:  invoking the President's authority to respond to a domestic industry petition under Section 204(b)(1)(B) of the Trade Act of 1974.  *See* Presidential Proclamation 10101 of October 10, 2020, *To Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products)*, 85 Fed. Reg. 65,639 (Oct. 16, 2020) (Proclamation 10101).  But the third try is most definitely not the charm.

Under the safeguard statute, Congress delegated to the Executive Branch certain enumerated powers to take safeguard measures in order to protect injured or threatened domestic industries for a limited period and give them time to positively adjust to import competition.  But in exchange, Congress imposed strict limits on how those authorities were exercised.  As relevant here, Congress allowed the President to modify a safeguard measure only after a very specific predicate condition is met:  a "majority of the representatives of the domestic industry" must submit a petition to the President requesting a modification after the industry "has made a positive adjustment to import competition."

But there is no genuine dispute that this clear condition was never satisfied:  (i) the President never received a petition from a "majority" of the industry; (ii) the letters he received did not claim that the industry had "made" a positive adjustment; and (iii) the President never made such a finding in any event (only that the domestic industry had "begun" to do so).  Defendants' primary response is essentially to tell the Court to pay no attention to what's behind the curtain—i.e., because President Trump *said* that the condition was satisfied, this

Court's job is at an end, regardless of whether the President actually complied with the law.  But as numerous decisions of this Court, the Federal Circuit, and the Supreme Court make clear, this Court is no rubber stamp; it plainly has the power (as Defendants elsewhere concede) to ensure that President Trump complied with the statutory predicates for action.

Beyond the Government's failure to satisfy that clear statutory prerequisite, the text, structure, and history of the safeguard statute—not to mention the statute's entire rationale— make clear that President Trump did not have the power to increase trade restrictions under the provision he invoked.  By authorizing the President to adjust safeguard measures only *after* the domestic industry had already "made a positive adjustment" to competition, Congress plainly was not giving the President unfettered license to impose *new* restrictions in that circumstance; instead, the modification provision operates as a one-way ratchet.  By contrast, Defendants' contrary position—that the President is free to invoke his Section 204 "modification" authority to impose unlimited new restrictions by fiat—has no limiting principle and would invite effortless circumvention of the carefully calibrated limits on the Executive Branch's authority found throughout the safeguard statute.

Not only did President Trump violate Section 204 in issuing Proclamation 10101, he also violated Section 203(e)(7) of the Trade Act by re-imposing safeguard duties on bifacial panels only sixteen months after such duties had been lifted with respect to those panels, despite the statute prohibiting such duties from being re-imposed on a product for a two year period.  And he violated the fundamental requirement in Section 201(a) that the economic and social benefits of action taken under the safeguard statute outweigh the economic and social costs.  President Trump failed to give any consideration to the economic and social costs of the changes to the safeguard measure made by Proclamation 10101.

Because President Trump violated the Trade Act in multiple ways, the Court should deny Defendants' Motion to Dismiss and grant Plaintiffs' Cross-Motion for Summary Judgment.

## BACKGROUND

## I.    LEGAL FRAMEWORK

Under Section 201 of the Trade Act of 1974, Congress delegated to the President the power to impose a safeguard measure if "an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article."  19 U.S.C. § 2251(a).  No finding of "unfair" trade is required.  As such, the goal of the safeguard statute is not to remedy and eliminate unfair trading practices.  Rather, the purpose of a safeguard measure is to "facilitate efforts by the domestic industry to make a positive adjustment to import competition."  19 U.S.C. § 2251(a).  A "positive adjustment to import competition" occurs when the domestic industry is "able to compete successfully with imports" without the protections provided by the safeguard measure or "experiences an orderly transfer of resources to other productive pursuits," and "dislocated workers in the industry experience an orderly transition to productive pursuits."  19 U.S.C. § 2251(b)(1).  The safeguard statute also evidences an intent by Congress to strike a balance between facilitating the efforts by a domestic industry to adjust to presumptively fairly traded import competition, on one hand, and the negative ramifications of trade restrictions on downstream users of the imported product, consumers, and U.S. trading partners on the other hand.  Section 201(a) therefore directs the President to take action that "will facilitate efforts by the domestic industry to make a positive adjustment to import competition *and provide greater economic and social benefits than cost*s."  19 U.S.C. § 2251(a) (emphasis added).

To accomplish that balance, Congress imposed a number of procedural requirements that must be met before trade restrictions can be imposed or modified, listed factors the President must take into account that weigh against trade restrictions, and placed limits on the nature and duration of safeguard measures.  For example, before a safeguard action is imposed, the International Trade Commission ("ITC" or "Commission") must conduct an investigation.  *See* 19 U.S.C. § 2252.  Only if the ITC finds that increased imports are a substantial cause of serious injury (or threat thereof) to the domestic industry can the President impose a safeguard measure. 19 U.S.C. § 2253(a)(1)(A).  Then, in deciding whether to take action, and what that action should be, the President is required to weigh the economic and social costs and benefits of the potential action as well as consider a list of enumerated factors.  19 U.S.C. § 2253(a)(1)(A), (a)(2).  Those factors include the recommendation and report of the Commission, the efforts being made by the domestic industry to adjust to import competition, the probable effectiveness of the action, the short- and long-term economic social costs of the action, the effect of action on consumers and on competition in domestic markets for articles, and the impact on U.S. industries and firms as a result of international obligations regarding compensation to trading partners for imposing a safeguard action.  *Id.*

The statute further places a number of substantive limitations on the amount, duration, and frequency of the trade restrictions that the President can impose.  19 U.S.C. § 2253(e).  One of these limitations includes the requirement that action that extends beyond a year be phased down at regular intervals, which evidences Congressional intent that safeguard measures be progressively trade liberalizing.  19 U.S.C. § 2253(e)(5).  A safeguard measure can be extended by the President, but only after an investigation by the ITC, in which interested parties may participate.  19 U.S.C. § 2254(c).  The President can then extend the measure only if the ITC finds that the safeguard measure "continues to be necessary to prevent or remedy serious injury"

and that "there is evidence that the industry is making a positive adjustment to import competition." 19 U.S.C. § 2254(c)(1); 19 U.S.C. § 2253(e)(1)(B)(i).  A safeguard measure therefore cannot be extended if it has already served its purpose (it no longer "continues to be necessary") or is not serving a purpose (despite the measure, the domestic industry is not making a positive adjustment to import competition).  These provisions act as substantive and procedural checks to ensure that the balance does not swing too far in favor of imposing trade restrictions to the detriment of other political, economic, and social interests.

With respect to potential modifications to safeguard actions under Section 204(b)(1), the President may not take action until he receives a monitoring report from the ITC. 19 U.S.C. § 2254(b)(1).  When the President acts pursuant to Section 204(b)(1)(A), the statute requires him first to take into account "any report or advice submitted by the Commission" pursuant to the Commission's monitoring obligations, and seek the advice of the Secretary of Commerce and the Secretary of Labor.  19 U.S.C. § 2254(b)(1)(A).  Interested persons are entitled to participate in proceedings before the ITC prior to the ITC issuing its report to the President.  19 U.S.C. § 2254(a)(3).  Like the procedures in original safeguard investigations and extension proceedings, these monitoring procedures ensure that the President is receiving expert advice prior to making any changes to the safeguard measure and that consideration is given to the potential negative effects of trade restrictions.

Within this broader statutory framework of procedural and substantive checks and balances falls Section 204(b)(1)(B), the provision pursuant to which President Trump issued Proclamation 10101.  Although the President must wait for the ITC to issue its monitoring report before making changes to the safeguard measure, the President is *not* required (unlike in Section 204(b)(1)(A)) to take account of the ITC's monitoring report or any other advice provided by the ITC, and he is not required to consult with the Secretaries of Labor or Commerce before taking

action.  *Compare* 19 U.S.C. § 2254(b)(1)(A)*, with* 19 U.S.C. § 2254(b)(1)(B).  Section

204(b)(1)(B) allows the President to reduce, modify, or terminate a safeguard action "if the

President determines, after a majority of the representatives of the domestic industry submits to

the President a petition requesting such reduction, modification, or termination on such basis,

that the domestic industry has made a positive adjustment to import competition."  19 U.S.C.

§ 2254(b)(1)(B).  In other words, the focus under this provision is that a positive adjustment has

already been made by the domestic industry and that industry approves of changes in the

safeguard measure as a result of such adjustment.

## II.     STATEMENT OF FACTS

Plaintiffs challenge Presidential Proclamation 10101 as unlawful.  No genuine dispute

exists over the facts material to the resolution of this case; rather, this case raises purely legal

issues that can be decided now.[1]

### A.     Issuance of the Solar Safeguard Measure

On January 23, 2018, President Trump issued Proclamation 9693, which imposed a

safeguard measure on certain crystalline silicon photovoltaic ("CSPV") products.  Presidential

Proclamation 9693, *To Facilitate Positive Adjustment to Competition From Imports of Certain*

*Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other*

*Products) and for Other Purposes*, 83 Fed. Reg. 3541, 3541-51 (Jan. 25, 2018).  President

Trump issued Proclamation 9693 after the ITC found that CSPV products were being imported

into the United States in such increased quantities as to be a substantial cause of serious injury,

---

[1] Pursuant to USCIT Rule 56.3, Plaintiffs have also set forth this statement of facts in numbered paragraphs in an annex to this brief.  Internet addresses for the agency and Presidential documents related to the solar safeguard measure cited herein are included in the table of authorities included in Plaintiffs' brief.

or threat of serious injury, to the domestic industry producing a like or directly competitive

article.  *See id.* at 3541.  Pursuant to Proclamation 9693, President Trump imposed a tariff rate

quota ("TRQ") on CSPV cells and an additional duty on CSPV modules at the following rates:

> If entered during the period from
> February 7, 2018 through February 6, 2019 . . . . . . . . . 30%
>
> If entered during the period from
> February 7, 2019 through February 6, 2020 . . . . . . . . . 25%
>
> If entered during the period from
> February 7, 2020 through February 6, 2021 . . . . . . . . . 20%
>
> If entered during the period from
> February 7, 2021 through February 6, 2022 . . . . . . . . . 15%

*Id.* at 3548.

## B.    Exclusion of Bifacial CSPV Modules

Proclamation 9693 also authorized the U.S. Trade Representative ("USTR") to establish

a process to exclude certain products from the solar safeguard measure.  *Id.* at 3543-44.  On

February 14, 2018, USTR published a notice setting out the procedures to request an exclusion.

*Procedures To Consider Additional Requests for Exclusion of Particular Products From the*

*Solar Products Safeguard Measure*, 83 Fed. Reg. 6670 (Feb. 14, 2018).  USTR stated that it

would "evaluate each request on a case-by-case basis" and "grant only those exclusions that do

not undermine the objectives of the safeguard measures."  *Id.* at 6671.  The notice did not state

that USTR would or could modify or withdraw a granted exclusion at a later date.  *Id.*

Following receipt of exclusion requests from various parties, USTR published a notice on

June 13, 2019 granting a prospective exclusion from the safeguard action for "bifacial solar

panels that absorb light and generate electricity on each side of the panel and that consist of only

bifacial solar cells that absorb light and generate electricity on each side of the cells" ("the

Exclusion").  *Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84

Fed. Reg. 27,684, 27,685 (June 13, 2019).  USTR stated that it had evaluated the factors laid out

in the February 14, 2018 notice, including the requirement that the exclusion not undermine the

objectives of the safeguard measures.  *Id.* at 27,684.  USTR's notice did not contain any

indication that it would or could revisit, modify, or withdraw the Exclusion in the future.  *Id.*

### C.     USTR's Attempts to Withdraw the Bifacial CSPV Module Exclusion

Approximately four months later, USTR published notice that it would withdraw the

Exclusion effective October 28, 2019.  *Withdrawal of Bifacial Solar Panels Exclusion to the

Solar Products Safeguard Measure*, 84 Fed. Reg. 54,244 (Oct. 9, 2019) ("October USTR

Notice").  The withdrawal of the Exclusion was not subject to any formal notice and comment.

*See id.*

Various parties immediately challenged USTR's attempted withdrawal in litigation

before this Court.  *See Invenergy Renewables, LLC et al. v. United States et al.*, Court No. 19-

00192 (Ct. Int'l Trade).  On December 5, 2019, the Court issued a preliminary injunction

prohibiting the withdrawal of the Exclusion "until entry of final judgment as to Plaintiffs' claims

against Defendants in this case."  *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d

1255, 1295 (Ct. Int'l Trade 2019).  The Court concluded that USTR had likely violated the

Administrative Procedure Act ("APA") in withdrawing the Exclusion.  *Id.* at 1287-88.  The

Court eventually held that the October USTR Notice violated the APA and vacated that notice.

*Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1340 (Ct. Int'l Trade 2020).

In April 2020, USTR attempted to withdraw the Exclusion anew.  *See Determination on

the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed.

Reg. 21,497 (Apr. 17, 2020) ("April USTR Notice").  Although USTR had provided some notice

and taken comment before doing so, this Court concluded that the April USTR Notice also likely

violated the APA and therefore modified its original preliminary injunction to cover the April

USTR Notice. *Invenergy Renewables*, 476 F. Supp. 3d at 1352.  Litigation on the merits remains ongoing in that dispute.

### D.    Proclamation 10101

President Trump issued Proclamation 10101 on October 10, 2020.  85 Fed. Reg. 65,639. Proclamation 10101 had three primary effects.  First, it re-imposed safeguard duties on bifacial modules, taking the action that USTR had been enjoined from taking.  *Id.* at 65,640, 65,642. Second, it increased safeguard tariffs on imported CSPV products (including but not limited to bifacial CSPV modules) in year four of the solar safeguard measure (February 7, 2021 through February 6, 2022) from 15 percent to 18 percent.  *Id.* at 65,642.  Third, it modified the HTSUS to reflect the re-imposition of safeguard duties on bifacial CSPV modules and the increase in the duty rate for year four of the safeguard measure.  *Id.* at 65,640-42.  Proclamation 10101 had an effective date of October 25, 2020.  *See id.* at 65,641.

As authority for the actions taken in Proclamation 10101, the President cited Section 204(b)(1)(B) of the Trade Act of 1974, 19 U.S.C. § 2254(b)(1)(B), which allows the President to reduce, modify, or terminate Section 201 safeguard measures if he "determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification or termination on such basis, that the domestic industry has made a positive adjustment to import competition."  The President asserted that he had received a petition from the domestic industry requesting the modifications to the safeguard measure, and he found that the domestic industry "has begun to make positive adjustments to import competition."  85 Fed. Reg. at 65,640.  The President did not identify or make available the petition to which he referred.  *See id.*

Plaintiffs, as parties negatively impacted by the increase in safeguard duties declared by Proclamation 10101, initiated this action on December 29, 2020.  ECF Nos. 1-2 (Dec. 29, 2020).

Following Plaintiffs' Motion for Expedited Discovery and to Compel Production of Petition, ECF No. 19 ("Motion to Compel"), Defendants produced three letters that Defendants identified as the petitions giving rise to Proclamation 10101.  ECF No. 23 at Attachs. A-C (Apr. 15, 2021).  The so-called petitions were submitted by just six companies.  *See id.*  These six companies comprise less than a majority of the 20 firms with domestic operations that the ITC identified in its February 2020 monitoring report.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products:  Monitoring Developments in the Domestic Industry*, Inv. No. TA-201-075, USITC Pub. 5021 (Feb. 2020), at I-40, Table I-10.  Moreover, only one of the "petitions," signed by just two companies, requested the modifications announced in Proclamation 10101—i.e., the withdrawal of the Exclusion and the increase of the safeguard duty rate in the fourth year of the safeguard measure.  *See* ECF No. 23 at Attachs. A-C.  None of the documents state that the domestic industry has made a positive adjustment to import competition.  *See id.*

## SUMMARY OF THE ARGUMENT

The Court should deny Defendants' Motion to Dismiss because Plaintiffs have identified a plausible claim for relief.  In fact, in light of the absence of a genuine dispute over the material facts, the Court should enter summary judgment in favor of Plaintiffs and find that President Trump's actions leading to and reflected in Proclamation 10101 are *ultra vires* for three independent reasons.

First, Proclamation 10101 violates Section 204(b)(1)(B) of the Trade Act, 19 U.S.C. § 2254(b)(1)(B), which President Trump cited as the basis for the modifications to the solar safeguard measure declared in Proclamation 10101.  The President did not receive the petition from a majority of the representatives of the domestic industry required by the statute before action can be taken pursuant to Section 204(b)(1)(B); he failed to make the finding required by

Section 204(b)(1)(B) in order to modify a safeguard measure; and he made changes to the safeguard measure that are not permitted by Section 204(b)(1)(B).

Second, Proclamation 10101 violates Section 203(e)(7) of the Trade Act, 19 U.S.C. § 2253(e)(7).  That provision prevents safeguard duties from being reapplied to a product for at least two years following the termination of the safeguard measure with respect to that product.  By withdrawing the Exclusion, Proclamation 10101 re-imposed safeguard duties on bifacial panels as of October 25, 2020, which was only sixteen months after safeguard duties had been removed with respect to bifacial panels.

Third, President Trump violated Section 201(a) of the Trade Act.  Section 201(a) requires the President to weigh the economic and social costs versus the benefits of actions taken pursuant to the safeguard statute.  The President failed to weigh the costs and benefits of withdrawing the Exclusion and increasing the safeguard duty rate during the fourth year of the solar safeguard measure.

## ARGUMENT

### I.    STANDARD OF REVIEW

Courts may review a President's action under the safeguard statute for a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority."  *See Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985).  In particular, courts have the authority to determine whether Presidential action conflicted with the governing statute, including because the President failed to meet statutory prerequisites for such action.  *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018) (courts may set aside Presidential action if the President "acts beyond his statutory authority"); *Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc) (courts may consider whether "the President has violated an explicit statutory mandate"); *Corus Grp.*

*PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1356 (Fed. Cir. 2003) (review is available to determine whether the President "misconstru[ed]" his statutory authority).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a). Plaintiffs assert that Proclamation 10101 is unlawful because it violates Sections 201(a), 203(e)(7), and 204(b)(1)(B) of the Trade Act of 1974, 19 U.S.C. §§ 2251(a), 2253(e)(7), 2254(b)(1)(B). Compl. ¶¶ 54 - 71, (Dec. 29, 2020), ECF No. 2. The issue of whether a President's action is consistent with a statute is a question of law appropriate for summary disposition, which the court reviews "completely and independently." *See, e.g., Demko v. United States*, 216 F.3d 1049, 1052 (Fed. Cir. 2000).

With respect to Defendants' Motion to Dismiss, the court will dismiss a complaint for failure to state a claim if it fails to allege facts "plausibly suggesting (not merely consistent with)" a showing that entitles the party to relief. *Bank of Guam v. United States*, 578 F.3d 1318, 1326 (Fed. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). In deciding a motion to dismiss, the court "must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009).

## II.    PROCLAMATION 10101 VIOLATES SECTION 204 OF THE TRADE ACT

In promulgating Proclamation 10101, President Trump violated Section 204 in at least three separate ways. First, President Trump did not receive the petition from a majority of the representatives of the domestic industry that is required for the President to act under Section 204(b)(1)(B). Second, President Trump did not make the finding required by Section 204(b)(1)(B)—that the domestic industry has made a positive adjustment to import competition. Third, President Trump unlawfully utilized Section 204(b)(1)(B) to increase, rather than

decrease, trade restrictions.  Each of these violations of Section 204(b)(1)(B) are discussed in turn.

> ### A.      The President Did Not Receive the Petition Required to Take Action Under Section 204(b)(1)(B) of the Trade Act

The modifications to the solar safeguard measure made by Proclamation 10101 were not authorized by Section 204(b)(1)(B), because the President did not receive a petition that meets the requirements in the statute that would allow him to take action under that provision. Proclamation 10101 should therefore be set aside under the standard the parties agree this Court should apply, because the Proclamation results from a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Maple Leaf Fish*, 762 F.2d at 89; *see also* Mot. to Dismiss at 13.

> #### 1.      The Petitions Produced by Defendants Do Not Meet the Statutory Requirements

Section 204(b)(1)(B) allows the President to reduce, modify, or terminate a safeguard action if the President:

> determines, *after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis*, that the domestic industry has made a positive adjustment to import competition.

19 U.S.C. § 2254(b)(1)(B) (emphasis added).  By the statute's plain terms, before the President may take action, the domestic industry must submit a petition with three features.  First, the petition must be submitted by "a majority of the representatives of the domestic industry." Second, by the use of the language "*such* reduction, modification, or termination," the petition must request the reduction, modification, or termination that the President ultimately adopts. Third, by the use of the language "on *such* basis," the petition must request the reduction,

modification, or termination on the basis that "the domestic industry has made a positive adjustment to import competition."  None of these criteria were met.

On April 15, 2021, Defendants produced three letters to USTR that they describe as the "petitions" that support Proclamation 10101.  *See* Defs.' Resp. to Plfs.' Mot. for Discovery, ECF No. 23.  The letters consist of:

- A letter from Auxin Solar, SolarTech Universal, and Mission Solar Energy, dated July 11, 2019, requesting withdrawal of the Exclusion.  *See* ECF No. 23, Attachment C ("July 2019 Letter").

- A letter from LG Electronics USA, Inc. ("LGEUS"), dated June 24, 2020, requesting an increase to the safeguard duty rate in the fourth year of the safeguard measure and an increase in the TRQ on CSPV cells.  *See* ECF No. 23, Attachment A ("LGEUS Letter").

- A letter from Hanwha Q CELLS and Auxin Solar, dated June 25, 2020, requesting, *inter alia*, withdrawal of the Exclusion and an increase to the safeguard duty rate in the fourth year of the safeguard measure.  *See* ECF No. 23, Attachment B ("Hanwha/Auxin Letter").

Defendants claim that these documents constitute "all requested documents" by Plaintiffs' Motion to Compel.  Defs.' Resp. to Plfs.' Mot. for Discovery, ECF No. 23 at 1; *see also* Motion to Compel.

Section 204(b)(1)(B) refers to "a petition" in the singular, which the "domestic industry submits *to the President*."  19 U.S.C. § 2254(b)(1)(B) (emphasis added).  Defendants rely on an amalgamation of three letters submitted to USTR, which is facially inconsistent with the statute. This should be sufficient for the Court to hold Proclamation 10101 unlawful, as it was not supported by "a petition" from the domestic industry that was "submit[ted] to the President."

Even if multiple documents submitted to USTR may be considered collectively as a petition submitted to the President, the letters produced by Defendants do not meet the criteria for a valid petition in Section 204(b)(1)(B) in any event.

14

As a preliminary matter, one of the three letters may not, as a matter of law, constitute a "petition" because it was submitted before the ITC published the results of its mid-term review of the solar safeguard measure. The July 2019 letter is dated just one month after announcement of the Exclusion, and it pre-dates even the initiation of the Commission's mid-term review. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry Institution and Scheduling Notice for the Subject Investigation*, 84 Fed. Reg. 37,674, 37,675 (Aug. 1, 2019). The ITC did not issue its monitoring report until February 2020. *See generally* USITC Pub. 5021 (Feb. 2020). Section 204(b) of the Trade Act prohibits action under that provision until *after* the President receives the Commission's monitoring report following the mid-term review. 19 U.S.C. § 2254(b). Given that requirement, Congress could not have contemplated that the President would treat letters sent in July 2019 complaining about an exclusion granted in June 2019 as a "petition" under a provision of the law that was not triggered until the Commission's report was issued in February 2020. The July 2019 letter therefore should not be considered in determining whether the requirements for the petition are met.

With regard to the remaining two letters, neither is a petition that meets the statutory criteria. The Hanwha/Auxin Letter is from only two companies, a number that falls well short of a majority of the representatives of the domestic CSPV product manufacturing industry. *See* USITC Pub. 5021 (Feb. 2020) at I-40, Table I-10 (listing 20 U.S. firms with CSPV product manufacturing plants open as of December 31, 2019). Moreover, the Hanwha/Auxin letter said nothing about whether the companies had made a positive adjustment to import competition. Section 204(b)(1)(B) requires that the petition request the modifications "on such basis"—the "basis" being that the domestic industry has made a positive adjustment to import competition. 19 U.S.C. § 2254(b)(1)(B); *see also* 134 Cong. Rec. 7197 (1988) (summary of conference

15

agreement for H.R.3)[2] (explaining that President would be authorized to reduce, modify, or terminate safeguard action if "the domestic industry requests it on the basis that it has made a positive adjustment").  The Hanwha/Auxin Letter does not state that the domestic industry has made (or has even begun to make) a positive adjustment to import competition,[3] much less identify such positive adjustment as the basis for their request to modify the safeguard measure as required by the statute.  Nor does it state that the domestic industry has achieved any of the indicators listed in Section 201(b) as reflecting a positive adjustment.

Meanwhile, the LGEUS Letter was signed by only one company, also well short of a majority, and requested only an increase in the duty rate in the fourth year of the safeguard measure.  It said nothing about withdrawing the Exclusion, nor did it mention that the basis for its request was that it had made (or begun to make) a positive adjustment to import competition.

The June 2019 Letter—which should not be considered in any event given that it pre-dates the ITC mid-term report—was filed by only four companies[4] and only included a request to withdraw the Exclusion; it did not request an increase in the duty rate during the fourth year of the safeguard measure, and said nothing about adjusting to import competition.

Finally, even if the Court treated the letters in the aggregate as a petition, the result would be no different, because a majority of the representatives of the industry did not request the

---

[2] Section 2 of the Omnibus Trade and Competitiveness Act of 1988 adopted the legislative history regarding H.R. 3 of the 100th Congress as the legislative history for H.R. 4848, which was ultimately enacted as the Omnibus Trade and Competitiveness Act of 1988.  Pub. L. 100-418, 102 Stat. 1119 (1988).

[3] President Trump based Proclamation 10101 on a finding that the domestic industry "has begun to make a positive adjustment," which is insufficient to justify action under Section 204(b)(1)(B).  *See* Section II.A.2, *infra*.  The insufficiency of that finding to justify action under Section 204(b)(1)(B) aside, none of the letters produced by Defendants make even the more limited representation that the domestic industry "has begun to make a positive adjustment."

[4] One of those companies was Auxin Solar, who also signed the Hanwha/Auxin Letter.

specific modifications at issue, and none requested modifications on the basis of a positive adjustment to import competition. Only the LGEUS and Hanwha/Auxin Letters requested a change in the duty rate, meaning that only three companies requested that change. Regarding the withdrawal of the Exclusion, even if the July 2019 Letter were considered, only five companies asked for the Exclusion to be withdrawn; if that letter is excluded, then only the Hanwha/Auxin Letter, signed by just two companies, requested the withdrawal. Thus, neither modification was requested by a majority of the representatives of the domestic industry. And as noted above, no letter suggested that the domestic industry "has made a positive adjustment to import competition"; in fact, just the opposite. *See* Hanwha/Auxin Letter and July 2019 Letter, ECF No. 23, Attachments B & C (requesting modifications because the industry had not made such adjustments).

In sum, because President Trump did not receive a petition that meets *any* of the three statutory requirements that would authorize him to modify the safeguard measure, he misconstrued the statute, committed a significant procedural violation, and acted beyond his delegated authority in issuing Proclamation 10101, which should therefore be set aside. *See Maple Leaf Fish*, 762 F.2d at 89.

### 2.    The Court Has the Authority to Determine Whether the Petitions Meet the Statutory Requirements

Defendants argue in their Motion to Dismiss that the Court is not even permitted to review the President's factual determinations. Mot. to Dismiss at 16-18. According to Defendants, because the President said he received the petition required by statute, the Court cannot look behind that statement to determine if the President actually received a petition meeting the statutory requirements. *Id.* at 17-18. Defendants are wrong, for multiple reasons.

As an initial matter, Defendants' argument conflates presidential fact-findings with presidential compliance with statutory predicates.  Binding precedent makes clear, as Defendants acknowledge (*see* Mot. to Dismiss at 13), that this Court may determine whether the President complied with the governing statute, including by meeting any statutory prerequisites for taking action.  *Silfab*, 892 F.3d at 1346 (courts may set aside Presidential action if the President "acts beyond his statutory authority"); *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1343 (Fed. Cir. 2010) (noting that courts may examine whether the President complied with an "independent predicate to Presidential action" and determining that no such predicate cabined his discretionary choice); *Motion Sys.*, 437 F.3d at 1361 (courts may consider whether "the President has violated an explicit statutory mandate"); *Corus Grp.*, 352 F.3d at 1356 (review is available to determine whether the President "clear[ly] misconstru[ed]" his statutory authority); *Maple Leaf Fish*, 762 F.2d at 89 (a court may "interpose" where there is "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority").  Indeed, as Defendants are well aware, the Court has undertaken this very sort of review in several recent cases—including in holding a Presidential action unlawful because it was performed without a mandatory statutory predicate.  *Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246, 1254-55 (Ct. Int'l Trade 2020) (holding that that the President "acted without a proper report and recommendation by the Secretary on the national security threat posed by imports of steel products from Turkey"); s*ee, e.g.*, *PrimeSource Bldg. Prod., Inc. v. United States*, No. 20-00032, 2021 WL 1248956, at *4 (Ct. Int'l Trade Apr. 5, 2021) (declaring Presidential Proclamation 9980 invalid because President failed to comply with timing requirements in statute.  The President may not act under Section 204(b)(1)(B) until "*after* a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, that the domestic industry

18

has made a positive adjustment to import competition."  19 U.S.C. § 2254(b)(1)(B) (emphasis added).  The Court has authority to review whether this predicate to action by the President was met.

Allowing the President to "find" that he complied with the law, followed the relevant procedures, and acted within the scope of his authority, and treating that "finding" as binding upon the courts, would completely eviscerate these well-settled principles of judicial review of Presidential action.  The essence of Defendants' argument is that a Presidential action must be treated by the courts as lawful as long as the President has said that his action is lawful.  Not only does that contradict clear authority from this Court and the Federal Circuit reviewing Presidential action, it conflicts with the fundamental proposition that "[i]t is emphatically the province and duty of the Judicial Department to say what the law is."  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

None of the cases cited by Defendants, *see* Mot. to Dismiss at 12, 17-18, prevent the Court from determining whether President Trump complied with the governing statutes.  Unlike the arguments raised in this dispute, many of the cases cited by Defendants involved challenges to the President's fact-findings or exercise of judgment in making a discretionary determination specifically authorized by statute.  *See United States v. George S. Bush & Co.,* 310 U.S. 371, 379-80 (1940) (addressing a "judgment" by the President that a change in duty rate was "necessary"); *Silfab*, 892 F.3d at 1348-49 (addressing challenge to President's factual finding that Canadian imports of CSPV products accounted for a "substantial share" of total imports); *Maple Leaf Fish*, 762 F.2d at 87, 89-90 (addressing challenge to the ITC's "ultimate factual determination that there was injury to domestic frozen mushroom producers); *Sneaker Circus,*

*Inc. v. Carter*, 457 F. Supp. 771, 793-95 (E.D.N.Y. 1978) (addressing President's weighing of factors in making discretionary determination).[5]

The other two cases cited by Defendants, *Florsheim Shoe Co. v. United States*, 744 F.2d 787 (Fed. Cir. 1984) and *United States Cane Sugar Refiners' Association v. Block*, 683 F.2d 399 (CCPA 1982), likewise fail to show that the Court is precluded from determining whether the petitions received by the President met the statutory criteria.  In those cases, the court refused to inquire into allegations that the President subjectively relied on statutory provisions other than the ones that he cited in the challenged Executive Order and Proclamation.  *See Florsheim Shoe Co.*, 744 F.2d at 796-97; *Cane Sugar*, 683 F.2d at 404.  Plaintiffs in this case are not alleging that the statutory (or policy) basis that President Trump relied upon differs from what is reflected in Proclamation 10101.  Plaintiffs rather seek to hold the President to the requirements of Section 204(b)(1)(B), the very provision on which he relied.

In fact, *Cane Sugar* actually supports Plaintiffs' argument.  There, the President was authorized to act to "carry out . . . any trade agreement" under the Trade Expansion Act of 1962, and the Presidential Proclamation cited the Geneva (1967) Protocol of the General Agreement on Tariffs and Trade as the relevant trade agreement.  *See* 683 F.2d at 401-02.  Instead of treating the President's citation of the Geneva Protocol as a conclusive finding that the Geneva Protocol is a "trade agreement," the court determined *for itself* whether the prerequisite to Presidential action (i.e., that he was carrying out a "trade agreement") had been met by *independently* analyzing whether the Geneva Protocol is a "trade agreement."  *See id.* at 402-03.  Plaintiffs are asking the

---

[5] Plaintiffs note that in *Sneaker Circus*, the district court actually reviewed evidence extraneous to the Proclamation itself to confirm that the President actually did consider the relevant factors. *See* 457 F. Supp. at 793-95.

Court to do the same thing in this case by independently ensuring that the prerequisite to Presidential action—i.e., receipt of the petition meeting the criteria in the statute—has been met.

Regardless, even if Defendants were correct that the Court cannot "go behind" the text of Proclamation 10101 and must accept the President's statements at face value, Mot. to Dismiss at 17, President Trump did not actually state that he received the statutorily required petition in any event.  President Trump stated only that he received "a petition from a majority of the representatives of the domestic industry with respect to each of the following modifications."  85 Fed. Reg. at 65,640.  Proclamation 10101 nowhere indicates that the President received a petition from the domestic industry stating that the domestic industry had made a positive adjustment or that their request to modify the safeguard measure was made on that basis.  *See id.*  In fact, as discussed above, no such petition exists.  As such, the Court must ultimately conclude that there was no petition meeting *all* of the statutory criteria.  Thus, Proclamation 10101 lacked a critical statutory prerequisite and thus should be set aside as an invalid exercise of authority under Section 204(b)(1)(B).

**B.    The President Did Not Find that the Domestic Industry Has Made a Positive Adjustment to Import Competition, As Required by Section 204(b)(1)(B) of the Trade Act**

Proclamation 10101 is also unlawful for the separate reason that it is not supported by the finding that Section 204(b)(1)(B) requires.  Section 204(b)(1)(B) authorizes the President to reduce, modify, or terminate a safeguard action only "*if the President . . . determines . . . that the domestic industry has made a positive adjustment to import competition*."  19 U.S.C. § 2254(b)(1)(B) (emphases added).  In Proclamation 10101, President Trump found only that "the domestic industry has begun to make positive adjustment to import competition."  85 Fed. Reg. at 65,640.  "Has made" and "has begun to make" do not mean the same thing.  For example, the statement "Tom has made a cake" indicates that there is a cake, while the statement

21

"Tom has begun to make a cake" indicates that there is currently no cake.  Because authority to take action under Section 204(b)(1)(B) is predicated on the President finding that the domestic industry "*has made*" the adjustment, and the President did not so find, President Trump acted outside of his statutory authority and Proclamation 10101 must be set aside.  *See Michael Simon Design*, 609 F.3d at 1343 (stating that courts may examine whether the President complied with independent predicate to Presidential action).

Section 201(b) of the safeguard statute explains that a "positive adjustment to import competition" occurs when (a) the domestic industry "is able to compete successfully with imports" absent safeguard relief or "experiences an orderly transfer of resources to other productive pursuits" and (b) "dislocated workers in the industry experience an orderly transition to productive pursuits."  19 U.S.C. § 2251(b)(1).  If the domestic industry "has made" the adjustment, the factors above would be present.  However, consistent with the President's finding that the industry has only "begun to make" the adjustment, the President's findings in paragraph 9 of Proclamation 10101 confirm that he did not conclude that the industry "is able to compete successfully with imports" absent safeguard relief or that the industry had transferred resources to other productive pursuits.  *See* 85 Fed. Reg. at 65,640.

The structure of the safeguard statutory scheme likewise confirms that Congress intended for the President to act under Section 204(b)(1)(B) only if the domestic industry "has made" the adjustment to import competition, not if the domestic industry merely "has begun to make" the adjustment.  The phrase "has begun to make" connotes that the domestic industry "is making" the adjustment—indeed, they are synonyms.  Other provisions of the safeguard statute use the language "is making."  Under Section 204(c), during an investigation as to whether a safeguard measure should be extended, the Commission is directed to determine whether the safeguard measure "continues to be necessary to prevent or remedy serious injury and whether there is

evidence that the industry *is making a positive adjustment* to import competition." 19 U.S.C. § 2254(c) (emphasis added). And under Section 203(e)(1)(B), if the Commission makes an affirmative finding in the extension investigation, the President may extend the safeguard measure if he "determines that—(I) the action continues to be necessary to prevent or remedy the serious injury; and (II) there is evidence that the domestic industry *is making a positive adjustment* to import competition." 19 U.S.C. § 2253(e)(1)(B) (emphasis added). Thus, when Congress intended for action to be based on a finding that the domestic industry "is making a positive adjustment to import competition," it knew how to say so. Congress, however, did *not* use that language for Section 204(b)(1)(B). "[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). By using the language "has made" instead of "is making" in Section 204(b)(1)(B), it is clear that Congress did not consider a finding that the domestic industry "is making" a positive adjustment to import competition to be sufficient to authorize action under Section 204(b)(1)(B). The President's finding that the domestic industry "has begun to make" a positive adjustment means that it is only in the process of making a positive adjustment, which is not enough to justify a modification of the safeguard measure under Section 204(b)(1)(B). Because the President failed to find that the domestic industry "has made" a positive adjustment to import competition, Proclamation 10101 was issued without statutory authority.

C.    **Section 204(b)(1)(B) of the Trade Act Does Not Authorize an Increase in Trade Restrictions**

Proclamation 10101 is also unlawful because it restricts, rather than liberalizes, trade. Proclamation 10101 made two modifications to the safeguard measure, both of which increased

restrictions on trade.  First, the Proclamation expanded the coverage of the safeguard measure by re-imposing safeguard duties on bifacial panels.[6]  Second, the Proclamation increased the applicable duty rate to all covered CSPV products from 15 percent to 18 percent during the fourth year of the safeguard measure.  Neither modification is permissible under Section 204(b)(1)(B) because, properly interpreted, that section is a one-way ratchet that does not allow an increase in trade restrictions.  Proclamation 10101 must therefore be set aside as an "action outside delegated authority."  *Maple Leaf Fish*, 762 F.2d at 89.

1.  **The Text and Structure of Section 204(b)(1)(B) and the Broader Safeguard Statute Do Not Authorize an Increase in Trade Restrictions**

The text and structure of Section 204(b)(1)(B) and the safeguard statute more broadly make it clear that Section 204(b)(1)(B) does not permit Proclamation 10101.  *See King v. Burwell*, 576 U.S. 473, 492-98 (2015) (declining to adopt interpretation of statutory provision that would undermine broader statutory scheme); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").  Action under Section 204(b)(1)(B) is predicated on the President finding "that the domestic industry *has made* a positive adjustment to import competition," along with a majority of the

---

[6] Defendants argue that the "the President did not 'increase' the safeguard measure – *Proclamation 10101* merely reinstated the application [of] section 201 duties to bifacial panels, as originally contemplated."  Mot. to Dismiss at 13.  But Proclamation 10101 itself refers to the withdrawal of the Exclusion as a "modification" to the safeguard measure.  85 Fed. Reg. at 65,640, 65,642.  That change was to broaden—i.e., increase—the scope of the measure.  Proclamation 10101 also raised the duty rate on covered CSPV products during the fourth year of the safeguard measure, which is clearly an increase.  *Id.*  Defendants' unsupported arguments that Proclamation 10101 did not increase the safeguard measure should be summarily dismissed.

representatives of the domestic industry requesting modification to the safeguard measure on that basis.  19 U.S.C. §  2254(b)(1)(B) (emphasis added).  Accordingly, Section 204(b)(1)(B)'s reference to the President's power to reduce, modify, or terminate a trade action must be construed as permitting only trade-liberalizing modifications, not new or increased actions.

Defendants' position, by contrast, defies logic.  A finding that the domestic industry has already "made" a positive adjustment indicates that the original safeguard relief has served its intended purpose, and thus the trade protection originally ordered is no longer necessary.  It runs counter to logic and congressional intent to *increase* trade restrictions when "the domestic industry has made a positive adjustment to import competition."

Defendants' position would also upset the broader statutory scheme.  The goal of a safeguard measure is to "facilitate efforts by the domestic industry to make a positive adjustment to import competition" while providing "greater economic and social benefits than costs."  19 U.S.C.  § 2251(a).  As described above, to strike that balance, the statute contains an intricate framework of investigations, consultations, reports, weighing of factors, and progressive liberalizing of trade.

In taking action under Section 204(b)(1)(B) instead of Section 204(b)(1)(A), the President is *not* required to take account of the ITC's monitoring report or any other advice provided by the ITC, and he is not required to consult with the Secretaries of Labor or Commerce before taking action.[7]  *Compare* 19 U.S.C. § 2254(b)(1)(A)*, with* 19 U.S.C.

---

[7] Defendants argue that "the statutory instruction for the ITC to report at the measure's midpoint on the industry's 'progress' and 'efforts' to make a 'positive adjustment' would be superfluous if the President could take action only when the industry had completed its positive adjustment." Mot. to Dismiss at 15.  Defendants ignore the fact that the President is *not* required under Section 204(b)(1)(B) to take into account the ITC's report regarding developments with respect to the domestic industry.  It is precisely because the President does not have to take such information into account that Section 204(b)(1)(B) should be read as authorizing only the liberalization of trade relief with the acquiescence of a majority of the representatives of the domestic industry.

§ 2254(b)(1)(B).  Moreover, if Defendants are to be believed, the President is not even required to give any consideration to the economic and social costs of the proposed modification when acting pursuant to this provision.[8]  Mot. to Dismiss at 23.  The clear intent of Congress was to (i) strike a balance between the interests of the domestic industry and other interests that are adversely affected by trade restrictions and (ii) provide meaningful procedural protections before trade restrictions are imposed.  The only way that Section 204(b)(1)(B) can be interpreted harmoniously with this intent is for Section 204(b)(1)(B) to authorize only trade-*liberalizing* modifications.  Otherwise, trade restrictions could be increased based on nothing more than a request from the domestic industry for more trade restrictions.  That interpretation provides no protection to the competing interests that Congress otherwise ensured were protected throughout the safeguard statute.

The only reasonable interpretation of Section 204(b)(1)(B) is that it allows for the trade restrictions originally imposed by the President to be eased with the acquiescence of a majority of the representatives of the domestic industry.  This interpretation balances the interest in trade relief by the domestic industry with the other legitimate interests identified elsewhere in the safeguard statute and places a *meaningful* procedural constraint on the President's authority to modify the safeguard measure, given the lack of other procedural constraints specifically identified in Section 204(b)(1)(B).  In contrast, Defendants interpret Section 204(b)(1)(B) to allow the President to increase trade restrictions merely because the domestic industry has asked him to do so.  This would completely undermine the balance struck and the procedural

---

Otherwise, the balance and the procedural protections reflected throughout the statute would be completely undermined.

[8] As explained in Section IV, *infra*, Plaintiffs believe that the requirement to consider costs and benefits carries through to any action taken pursuant to the safeguard statute.

protections provided for in the remainder of the safeguard statute that are intended to ensure that safeguard measures provide greater economic and social benefits than costs, and it is logically at odds with the finding the President is supposed to make.

Furthermore, the Statement of Administrative Action ("SAA") that accompanied the Uruguay Round Agreements Act[9] confirms that the safeguard statute intends modifications to a safeguard measure to be trade liberalizing. The SAA explains that, in negotiating the Uruguay Round Agreement on Safeguards, "the United States sought to ensure that when WTO members apply safeguards measures they are transparent, temporary, 'degressive' and subject to review and termination when no longer needed." *Statement of Administrative Action to Accompany the Uruguay Round Agreement*, H.R. Rep. No. 103-316, at 286 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4262. These negotiating objectives had previously been set by Congress in Section 1101(12) of the Omnibus Trade and Competitiveness Act of 1988. *See* Pub. L. No. 100-418, 102 Stat. 1107, 1124 (1988). This is the same Act that added the language that is now found in Section 204(b)(1)(B) of the Trade Act. It would make little sense for Congress to have instructed trade negotiators to create an international obligation that safeguard measures be degressive (i.e., trade-liberalizing) while simultaneously authorizing an increase in trade restrictions merely because the domestic industry has petitioned for the increase—particularly when the industry has already made a positive adjustment to import competition.

The SAA further explains that "[t]he Uruguay Round Agreement on Safeguards (the Agreement) incorporates many concepts taken directly from section 201. These include criteria

---

[9] The SAA is to be "regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements Act] in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

regarding . . . 'degressivity' (progressive liberalization of safeguards restrictions)."  H.R. Rep.

No. 103-316, at 286, 1994 U.S.C.C.A.N. at 4262.  Among those provisions that the United States

successfully negotiated into the WTO Agreement on Safeguards is Article 7.4, which provides

that "the Member applying the measure shall progressively liberalize it at regular intervals

during the period of application."  That Article also provides that if the measure is in place for

longer than three years, "the Member applying such a measure *shall review the situation not*

*later than the mid-term of the measure and*, if appropriate, *withdraw it or increase the pace of*

*liberalization*."  *Id.* (emphases added).  This provision does not allow for an increase in trade

restrictions following mid-term reviews.  The Agreement on Safeguards that the United States

successfully negotiated *to reflect U.S. law* and the SAA's discussion regarding that Agreement

constitute further evidence that Congress understood and intended for any modification to a

safeguard measure to be trade liberalizing.  That bars action increasing a previously imposed

safeguard measure halfway through its lifespan, especially if the industry has already adjusted to

import competition.

## 2.    Defendants Fail to Show that Interpreting Section 204(b)(1)(B) as Authorizing Increases in Trade Restrictions Is Reasonable

Defendants argue that treating "modification" in Section 204(b)(1)(B) as prohibiting an

increase in trade restrictions would render "modification" superfluous, because Section

204(b)(1)(B) separately authorizes the "reduction" or "termination" of the measure.  *See* Mot. to

Dismiss at 11, 13.  Defendants misunderstand the law.

First, the President can "modify" action taken under Section 203 in a manner that is trade

liberalizing without "reducing" or "terminating" the action.  Section 203(a)(3) lists several

different kinds of "action" that the President can take at the conclusion of a safeguard

investigation.  For example, "an increase in . . . any duty on the imported article" (i.e., the

imposition of safeguard duties) is an "action" under Section 203(a)(3). 19 U.S.C.

§ 2253(a)(3)(A). A "reduction" of that particular kind of action would lower the safeguard duty

rate originally proclaimed by the President. The President could later "modify" the action by

changing its form from a duty to a TRQ, whereby a certain amount of imports would enter duty

free before the additional rate of duty is applied. This would decrease trade barriers, but the

original action—i.e., the safeguard duty rate—is not reduced, nor would the action be

terminated; it would merely be modified.

Second, there are also certain circumstances in which use of the term "reduction" may

not accurately reflect a trade-liberalizing intent. For example, in order to liberalize a quota or

TRQ, one would not use the term "reduce." In fact, the LGEUS Letter and the Hanwha/Auxin

Letter requested an "increase" to the CSPV cell TRQ, which would have liberalized trade by

allowing more cells to enter the United States without safeguard duties. ECF No. 23,

Attachments A & B. Applying the term "modification," but interpreting it to mean only a trade-

liberalizing modification, would allow quota restrictions to be loosened—i.e., *increasing* the

quota.

Third, Defendants' argument is premised on their belief that "modification" is only given

meaning to the extent that it means "increase," as all other meanings would already be covered

by "reduction" or "termination." *See* Mot. to Dismiss at 11, 13. But the safeguard statute and

the legislative history specifically contemplates that "modification" would mean a reduction in

trade barriers. The definitions set forth in Section 601(6) of the Trade Act of 1974 explain that

for purposes of the Act, which would include Sections 201 through 204, "[t]he term

'modification,' as applied to any duty or other import restriction, includes the elimination of any

duty or other import restriction." 19 U.S.C § 2481(6). This provision further supports the

conclusion that "modifications" under the Act were intended by Congress to be trade liberalizing,

rather than trade restricting.  Section 204(b)(3) also authorizes the President to "reduce, modify, or terminate action" after receiving a Commission determination under 19 U.S.C. § 3538(a)(4). *See* 19 U.S.C. § 2254(b)(3).  Commission determinations under 19 U.S.C. § 3538(a)(4) are made after a U.S. trading partner has successfully challenged a safeguard determination at the WTO. Given that the goal is to rectify the WTO violation, it does not make any sense for Congress to have intended for the President to remedy the situation by *further increasing* trade restrictions. "Modify" in the context of Section 204(b)(3) logically means some sort of trade-liberalizing change to the safeguard measure, despite the fact that the President may also "terminate" or "reduce" the action.

Defendants also argue that the legislative history of Section 204(b)(1)(B) supports an interpretation of "modification" in Section 204(b)(1)(B) that would allow an increase in trade. Mot. to Dismiss at 14-15.  The Court need not resort to this legislative history, because Section 204(b)(1)(B) is susceptible to only one reasonable interpretation in light of the finding required to take action under Section 204(b)(1)(B) and the broader purpose and structure of the safeguard statute.  *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1749 (2020) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it." (internal quotation marks and citation omitted)).  To the extent the Court considers the legislative history, it fails to show that Congress intended for trade restrictions to be increased pursuant to Section 204(b)(1)(B) when an industry has already made a positive adjustment to import competition.  If anything, the legislative history supports interpreting Section 204(b)(1)(B) as authorizing only trade-liberalizing modifications.

When the provision authorizing a reduction, modification, or termination of the safeguard measure on the basis of a petition from the domestic industry was originally proposed in the Senate, it was accompanied by a specific limitation that modification would not include the

ability to "increase" the measure, which reflects how Congress originally understood that this provision would be used.  *See* H.R. Rep. No. 100-576, at 687 (1988) (Conf. Rep.), *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1720 (noting that "modify" in Senate version of the bill originally containing this provision did not allow an "increase" of the action).  The text of the Senate version of the bill, however, changed after it emerged from conference to resolve disagreements between the House and Senate versions of the bill.  *See* Mot. to Dismiss at 14-15.

But context is key.  The resulting text combined the provision in the Senate version described above with provisions in the House version that allowed modifications, terminations, and reductions on the basis of changed economic circumstances.  H.R. Rep. No. 100-576, at 688, 1988 U.S.C.C.A.N. at 1721.  Thus, the decision to drop the "but not increase" language is most naturally explained by either the need to accommodate the reductions, modifications, and terminations that would be justified on the basis of changed economic circumstances, or to avoid unnecessarily constraining the trade-liberalizing changes the President can make under Section 204(b)(1)(B).  As noted above, an "increase" in a quota or TRQ would be trade liberalizing, and limiting the potential actions under Section 204(b)(1) to a "reduction" or "termination" might preclude an increase of a quota or TRQ, even though an "increase" in that context would be trade liberalizing.  The language as enacted continued to premise action under Section 204(b)(1)(B) on a finding "that the domestic industry has made a positive adjustment to import competition," which was always understood as justifying only the loosening of trade restrictions and would not logically justify an increase in trade restrictions.  Notably, nowhere in the legislative history did Congress affirmatively state that it intended to give the President the power to *increase* trade restrictions on the basis that the domestic industry has made a positive adjustment to import competition.  That would be patently illogical, and Congress should not be presumed to have had illogical and internally contradictory intentions absent clear statutory text that can be read no

other way.  The Court therefore should not rely on the legislative history cited by Defendants to create a logical tension within Section 204(b)(1)(B) and to undermine the broader safeguard statutory scheme.

> **D.     Defendants Cannot Rely on Authority Other than Section 204(b)(1)(B) as Authorizing Proclamation 10101**

Defendants argue that even if the provision the President actually relied upon (Section 204(b)(1)(B)) did not authorize the action taken, the President nevertheless possessed the authority to withdraw the Exclusion.  Mot. to Dismiss at 18-19.  Defendants' argument lacks merit for several reasons.

First, Defendants fail to cite any authority that would allow the Court to find a separate basis of authority for the President's action besides the one that he specifically invoked. Defendants assert that "the Court must sustain presidential action if there is an 'act of Congress to which the Court's attention has been directed from which such a power can be fairly implied.'"  *Id.* at 18 (quoting *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019)).  Case law, such as *Sierra Club*, that criticizes the Government for failing to identify *any* statutory authority for the action taken does not mean that the Government can justify Presidential action on the basis of statutory provisions other than the one the President specifically cited.  Other case law cited by Defendants in their Motion to Dismiss explains that the lawfulness of Presidential action must be assessed on the legal basis cited by the President himself.  In *Florsheim Shoe Co.*, plaintiffs asserted that Presidential action had actually been based on a different statutory provision than the one the President cited in the challenged Executive Order.  744 F.2d at 796-97. The court held that "the courts may not go behind the Executive Orders to search for the 'actual' basis for the President's action."  *Id.* at 797.  Here, Defendants' argument would require the

Court to speculate as to the President's "real" reasons and basis for action, which the Court is not empowered to do under *Florsheim Shoe Co*.

Second, Defendants cite no other act of Congress that would authorize the President's action. Defendants allege that the President delegated the authority to USTR to withdraw exclusions and then assert that "[t]he President did not disclaim authority to exclude additional products or revoke existing exclusions *under his independent and undelegated authority to modify a safeguard measure*." Mot. to Dismiss at 18-19 (emphasis added). But Section 204(b)(1)(B) specifically addresses the "modification" of safeguard measures, and Defendants do not argue that the "modifications" to the safeguard measure declared by President Trump, Proclamation 10101 ¶ 9, were authorized under any other provision.

Finally, Defendants' argument, even if valid, would only apply to the withdrawal of the Exclusion. Proclamation 10101 also increased the safeguard duty rate during the fourth year of the solar safeguard measure. Defendants do not posit any theory upon which that modification could be upheld if it was not authorized by Section 204(b)(1)(B).

## III.   PROCLAMATION 10101 VIOLATES SECTION 203 OF THE TRADE ACT

By re-imposing safeguard duties on bifacial panels less than two years after such duties were lifted by the Exclusion, Proclamation 10101 violated Section 203(e)(7)(A) of the Trade Act, 19 U.S.C. § 2253(e)(7)(A). The Court therefore should find Proclamation 10101 unlawful and set it aside.

Section 203(e)(7)(A) provides:

(A) If an article was the subject of an action under subparagraph (A), (B), (C), or (E) of subsection (a)(3), no new action may be taken under any of those subparagraphs with respect to such article for—

> (i) a period beginning on the date on which the previous action terminates that is equal to the period in which the previous action was in effect, or

(ii) a period of 2 years beginning on the date on which the previous action terminates,

whichever is greater.

19 U.S.C. § 2253(e)(7)(A).[10]  The SAA explains that Section 203(e)(7) is intended to "limit[] the provision of new relief in respect of a product for which import relief was provided previously." SAA at 293, *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4266; *see also* H. Comm. on Ways & Means, H.R. Rep. No. 103-826, at 131 (1994) (reflecting same understanding of Section 203(e)(7)).  Section 203(e)(7)(A) thus prevents the reapplication of safeguard duties to an imported product for at least two years after safeguard duties were lifted on that product.

Bifacial panels constitute "an article [that] was the subject of an action under subparagraph (A) . . . of subsection (a)(3)" of Section 203.  Bifacial panels were subject to safeguard duties for 491 days, starting on February 7, 2018, when the solar safeguard measure went into effect, until June 13, 2019, when USTR issued the Exclusion.  84 Fed. Reg. at 27,685.

Under Section 203(e)(7)(A), no new safeguard duties could be placed on bifacial panels for a period of two years from the date of the Exclusion.  Thus, the earliest date that bifacial panels can lawfully be subject to safeguard duties again is June 13, 2021, and only after a full investigation by the ITC pursuant to Section 202.  Proclamation 10101, however, subjected bifacial panels to safeguard duties, without a new investigation, starting October 25, 2020.  By re-imposing safeguard duties on bifacial panels nearly eight months before the expiration of the two-year period set forth in Section 203(e)(7)(A), Proclamation 10101 violated the Trade Act.

---

[10] Section 203(e)(7)(B) contains an exception to this rule if a safeguard measure was in place with respect to an article for a period of 180 days or less.  19 U.S.C. § 2253(e)(7)(B).  Bifacial panels were subject to safeguard duties from February 7, 2018 through June 12, 2019, or 491 days, so this exception does not apply.

Defendants' principal argument to the contrary is that bifacial panels are not "an article" that was subject to a safeguard action for purposes of Section 203(e)(7). Mot. to Dismiss at 19-22.  According to Defendants, Section 203(e)(7) would only apply to CSPV cells and modules, writ large.  *See id.*  Defendants' interpretation of the statute is implausible and incorrect.

There is no basis in the statutory language for concluding that bifacial solar modules are not "an article [that] was the subject of an action."  19 U.S.C. § 2253(e)(7).  A bifacial solar panel is an identifiable object that is traded internationally and was subject to a safeguard action. The fact that CSPV cells and modules writ large might be considered "an article" for purposes of the safeguard statute does not preclude bifacial modules from also being "an article." Interpreting Section 203(e)(7) as applying only when the "article" addressed in the prior action and the new action are defined exactly the same would allow safeguard duties to be immediately re-imposed on products following the termination of a safeguard measure as long as the domestic industry slightly modifies the definition of the article for which relief is sought.  For example, under Defendants' interpretation, safeguard duties could be kept on all CSPV products for the statutory maximum period of time, and then safeguard duties could be immediately applied to just CSPV panels (those being only a subset of the original "article"), and then upon the expiration of the second measure, safeguard duties could be immediately applied to just bifacial panels (those being a further subset of the "articles" subject to the first and second measures).  As noted above, the SAA explains that Section 203(e)(7) was meant to "limit[] the provision of new relief in respect of a product for which import relief was provided previously."  SAA at 293. Given this stated purpose, it is implausible that Congress could have intended for Section 203(e)(7) to be interpreted in a manner that would allow imported products to be repeatedly and continuously subject to safeguard duties by the slightest tweaks to the definition of the imported "article."  The Court should not assume that Congress intended an interpretation that would

render this specific statutory requirement effectively nugatory and run counter to the overall

scheme that views safeguard measures as limited tools to solve temporary problems. *See Young*

*v. UPS,* 135 S. Ct. 1338, 1352 (2015) (holding that "a statute ought, upon the whole, to be so

construed that, if it can be prevented, no clause is rendered superfluous, void, or insignificant."

(internal quotation marks and citation omitted)); *United Steelworkers of Am. v. Weber*, 443 U.S.

193, 202 (1979) (refusing to adopt a statutory interpretation that "would bring about an end

completely at variance with the purpose of the statute" (internal quotation marks and citation

omitted)); *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 389 (1951) (rejecting

statutory interpretation under which "the exception swallows the proviso and destroys its

practical effectiveness").

Fundamentally, Defendants are mistaken with respect to the starting point of the analysis

for Section 203(e)(7).  Defendants treat the definition of the "article" subject to the earlier

safeguard action as the starting point.  But the proper starting point is the article subject to the

new safeguard action.  If the article subject to the new action was previously subject to safeguard

duties, then the limitation in Section 203(e)(7) applies.  As demonstrated above, using the article

subject to the new action as the starting point is the only reasonable means to carry out the intent

of Congress to "limit[] the provision of new relief in respect of a product for which import relief

was provided previously."  SAA at 293.

Using the article subject to the new action as the starting point is also supported by

Section 202(h)(2), which is the statutory provision that addresses when the ITC can initiate a

new investigation for products previously subject to a safeguard measure.  Section 202(h)(2)

provides as follows:

> No new investigation shall be conducted with respect to an article that is or has
> been the subject of an action under section 2253(a)(3)(A), (B), (C), or (E) of this
> title if the last day on which the President could take action under section 2253 of

this title in the new investigation is a date earlier than that permitted under section 2253(e)(7) of this title.

19 U.S.C. § 2252(h)(2). The SAA explains that the limitations in Section 203(e)(7) paralleled Section 202(h), but that the timeline for new relief was moved up, and thus the Uruguay Round Agreements Act "also ma[de] a conforming change for this purpose to section 202(h), which governs ITC investigations." SAA at 293.[11] Given that these provisions were intended to operate in tandem, they should be read as complementary.

The focus of Section 202(h)(2) is on the article that would be subject to the new investigation, and whether that article in turn was previously subject to a safeguard action. As recognized in the SAA, Section 202(h)(2) and Section 203(e)(7) are intended to work together, with Section 202(h)(2) placing limits on new investigations that the ITC can undertake if the article is or was subject to a safeguard action, while Section 203(e)(7) places limits on the President's authority to ultimately grant relief with respect to that article. Given that the initial reference point in Section 202(h)(2) is to the article that would be subject to the new investigation, it logically follows that the starting point of the analysis in Section 203(e)(7) is the article that would be subject to the new action that normally occurs at the completion of a Commission investigation.

Here, bifacial panels are the article that would be subject to a new safeguard action (in the form of the safeguard duties imposed by Proclamation 10101), and the relevant question is whether bifacial panels were previously subject to one of the types of safeguard action listed in Section 203(e)(7)(A). Bifacial panels were subject to an increase in duty under subparagraph

---

[11] Although the SAA refers to Section 202(h) generally, the specific provision that parallels Section 203(e)(7) is Section 202(h)(2), and the "conforming change . . . to section 202(h)" was made only to Section 202(h)(2). Section 202(h)(1) was not amended by the Uruguay Round Agreements Act.

(A) of Section 203(a)(3), and thus the two-year waiting period in Section 203(e)(7)(A) applies. Because Proclamation 10101 violated that waiting period, it is unlawful.

Defendants' only other defense regarding Section 203(e)(7) is that the President delegated to USTR the authority to only "exclude" a product, not to "terminate" the action. Mot. to Dismiss at 21-22. Defendants' semantical argument improperly places form over substance. Plaintiffs recognize that the President retained for himself the authority to terminate the safeguard measure with respect to all covered CSPV products. But that is irrelevant to the question of whether bifacial panels were "the subject of action under subparagraph (A), (B), (C), or (E) of subsection (a)(3)" of Section 203. They certainly were. It also ignores the practical and legal reality that on June 12, 2019, bifacial panels were subject to safeguard duties, but as of June 13, 2019 (the date of the Exclusion), they were no longer subject to such duties. Nothing in the text of Proclamation 9693 indicated that exclusions would be anything other than permanent,[12] and neither the procedures that USTR published to govern the safeguard exclusion nor the actual Exclusion decision gave any indication that the Exclusion was only temporary.[13]

---

[12] To the extent Defendants argue the President delegated to USTR the authority to withdraw exclusions via Annex I to Proclamation 9693, Mot. to Dismiss at 18, Defendants quote only a fragment of a sentence, the remainder of which states that USTR is authorized "to specify, subsequent to the effective date specified in this note, that such CSPV cells and modules will be considered 'goods excluded from the application of relief' upon publication by the USTR of a notice in the Federal Register." 83 Fed. Reg. at 3547. The full language suggests an intent to give USTR the power to modify the HTSUS to reflect the *grant*, not the withdrawal, of an exclusion. Such an intention is consistent with the Proclamation's actual text, which specifically authorizes USTR to grant product exclusions and modify the HTSUS accordingly without even hinting that USTR is authorized to withdraw an exclusion. When interpreting statutes, courts presume that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). The Court should presume the same of the President's Proclamation and not find authority to withdraw an exclusion based solely on an ambiguous sentence fragment in the Annex.

[13] The failure to indicate that granted exclusions would be subject to continued monitoring and potential withdrawal is contrasted with the Section 301 exclusion process, which is also

Regardless of what Defendants may want to call it, the action in "subparagraph (A). . . of subsection (a)(3)," i.e., the increase in duty, was terminated with respect to bifacial panels—and thus could not lawfully be re-imposed within two years under Section 203(e)(7)(A).

## IV.    PROCLAMATION 10101 VIOLATES SECTION 201 OF THE TRADE ACT

Regardless of whether Proclamation 10101 is consistent with Section 204(b)(1)(b) and Section 203(e)(7) of the Trade Act, the President erred in issuing Proclamation 10101 without first weighing whether the benefits of imposing the CSPV safeguard measure on bifacial solar panels exceed the measure's social and economic costs, or conducting such a cost-benefit analysis with respect to increasing the safeguard duty rate during the fourth year of the safeguard measure.

Under Section 201(a) of the Trade Act, the President may impose safeguard measures only upon a finding that such measures will *both* assist the domestic industry in making a positive adjustment to import competition *and* that the measures' benefits exceed their social and economic costs.  *See* 19 U.S.C. § 2251(a).  Section 203(a)(2) likewise requires the President to consider "the short-and long-term economic and social costs of the actions authorized . . .

---

administered by USTR.  The Section 301 exclusion process specifically indicated that product exclusions would be valid only for a limited period.  *See, e.g.*, *Procedures To Consider Requests for Exclusion of Particular Products From the Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 32,181, 32,182 (July 11, 2018) ("Any exclusion will be effective starting from the July 6, 2018 effective date of the additional duties, and extend for one year after the publication of the exclusion determination in the Federal Register."); *Procedures To Consider Requests for Exclusion of Particular Products From the Additional Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,236 (Sept. 18, 2018) (providing for exclusions lasting one year from date exclusion is published); *see also Request for Comments Concerning the Extension of Particular Exclusions Granted Under the December 2018 Product Exclusion Notice From the $34 Billion Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 58,427 (Oct. 31, 2019) (setting up procedure for parties to request extension of product exclusions).

relative to their short- and long-term economic and social benefits" before imposing safeguard measures. 19 U.S.C. § 2253(a)(2). Proclamation 10101 failed to include such a finding or analysis and therefore should be set aside. *See Maple Leaf Fish,* 762 F.2d at 89 (court may set aside presidential action where it exceeds the scope of the President's statutory authority).

Defendants insist that the President did not need to consider social and economic costs *at all* when deciding whether to withdraw the Exclusion, and thereby re-impose the safeguard measure on bifacial solar panels, or to increase the duty rate on all covered CSPV products during the fourth year of the safeguard measure. *See* Mot. to Dismiss at 23. They argue that the President determined in Proclamation 9693—which he issued in 2018, over two and a half years prior to Proclamation 10101—that the benefit of imposing a safeguard measure on CSPV products exceeded the social and economic cost of doing so, and that nothing in Section 204 of the Trade Act obligates the President to perform such an analysis anew when considering whether to modify a safeguard measure. *See id.* Defendants' argument has several defects.

First, Proclamation 9693 weighed the costs and benefits of imposing safeguard measures on the basis that the safeguard duty rate during the fourth year of the measure would be 15 percent. *See* Proclamation 9693 at Annexes, page 4 (83 Fed. Reg. at 3548). The President never considered whether the economic and social benefits of a safeguard measure with a duty rate of 18 percent during its fourth year would outweigh the measure's costs.

Second, even assuming the President did consider the economic and social costs of imposing safeguard measures on bifacial solar panels when issuing Proclamation 9693, Defendants are wrong to assert that the President can increase or expand a safeguard measure under Section 204 without considering the social and economic costs versus benefits of doing so. The President acknowledged this limitation on his own authority in Proclamation 9693 when he conceded, back in 2018, that he could only thereafter reduce, modify, or terminate the safeguard

40

measure if he determined that it was necessary "to facilitate efforts by the domestic industry to make a positive adjustment to import competition *and* to provide greater economic and social benefits than costs."  Proclamation 9693 ¶ 12.  In other words, the President himself already admitted that modifying the measure would require him to assess the cost/benefit effects of such action.

Third, Defendants' argument that the President did not need to consider the costs of withdrawing the Exclusion, imposing the safeguard measure on bifacial panels, or increasing the safeguard duty rate in the fourth year of the measure is inconsistent with the Trade Act's objectives.  Those objectives include ensuring that any safeguard measure will assist the domestic industry in making a positive adjustment to import competition, and that the measure's benefits exceed its social and economic costs.  *See* 19 U.S.C. § 2251(a); 19 U.S.C. § 2253(a)(2). Allowing the President to re-impose or increase a safeguard measure on a product under Section 204 of the Trade Act, without first considering whether the benefits of doing so exceeds the social and economic costs, would create an exception to Section 201(a) and 203(a)(2) that would swallow the statutory rule.  Such an exception would give the President unfettered authority to impose new or heightened safeguard measures using Section 204 without considering one of the factors Congress clearly instructed the President to consider under Sections 201 and 203.  Taken to its logical extreme, Defendants' position is that the President could impose a safeguard duty of one percent on certain CSPV products under Section 201 (after concluding that the costs of doing so did not outweigh the benefits), but then use Section 204 to increase the safeguard duty to 50 percent, or expand its scope to additional CSPV products, without ever considering whether the benefits of doing so exceed the costs.  In effect, Defendants' position that the President may act

under Section 204 with no regard to economic and social costs and benefits renders Sections

201(a) and 203(a)(2) literally meaningless.[14]

Finally, Defendants argue that, even if the President was required to weigh the social and

economic costs of imposing safeguard measures on bifacial solar panels, the President made such

a determination when he noted that the Exclusion "impaired" the effectiveness of Proclamation

9693.  *See* Mot. to Dismiss at 23.  Defendants are trying to squeeze water from a stone.  At most,

the President's statement with regard to the effectiveness of the safeguard measure refers to

whether that measure is helping the industry to make "a positive adjustment to import

competition."  Such a benefit could be occurring, but could be outweighed nonetheless by the

costs, in which case the relief would not be meeting the objectives of the statute.  Therefore, the

President's bald, unexplained statement that the effectiveness of the safeguard measure is being

impaired by the Exclusion has nothing to do with whether the benefits of imposing the safeguard

measure on bifacial solar panels exceed the economic and social costs of doing so—much less

whether the benefits of increasing the safeguard duty rate on all covered CSPV products exceed

the economic and social costs.

## CONCLUSION

For the reasons set forth above, Proclamation 10101 violated the Trade Act.  We

therefore respectfully request that the Court deny Defendants' Motion to Dismiss, grant

Plaintiffs' Cross-Motion for Summary Judgment, declare Proclamation 10101 unlawful and

---

[14] The only way to give effect to Defendants' position without granting the President
unencumbered authority to impose new or heightened tariffs without considering the measures'
social and economic costs is to read Section 204 as Plaintiffs do—to only authorize trade
liberalizing modifications to a safeguard measure.  *See supra* at Section II.C.

therefore null and void, and order the refund, with interest, of all additional duties imposed by

reason of Proclamation 10101 to all Plaintiffs who are legally entitled to such refunds.

Respectfully Submitted,

/s/ Amanda Shafer Berman
John Brew
Larry Eisenstat
Amanda Shafer Berman
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500
aberman@crowell.com

Frances Hadfield
**CROWELL & MORING LLP**
590 Madison Ave, 20th Floor
New York, NY 10022
(212) 803-4040

*Counsel to Invenergy Renewables, LLC*

/s/ Matthew R. Nicely
Matthew R. Nicely
James E. Tysse
Daniel M. Witkowski
Devin S. Sikes
Julia K. Eppard
**AKIN GUMP STRAUSS HAUER &
FELD LLP**
2001 K Street, N.W.
Washington, D.C. 20006
(202) 887-4000
mnicely@akingump.com

*Counsel to SEIA and NextEra Energy, Inc.*

/s/ Kevin M. O'Brien
Kevin M. O'Brien
Christine M. Streatfeild
**BAKER & MCKENZIE LLP**
815 Connecticut Ave, NW
Washington, DC 20006
(202) 452-7000
kevin.obrien@bakermckenzie.com

May 7, 2021

*Counsel to EDF Renewables, Inc*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Matthew R. Nicely, at Akin Gump Strauss Hauer & Feld LLP, who is responsible for the foregoing brief, hereby certify that the foregoing brief complies with the word-count limitation set forth in ¶ 2(B) of the Standard Chambers Procedures of this Court, as amended on October 3, 2016. Relying upon the word count feature of the word processing program used to prepare the brief, I certify that it contains 13,765 words.

<u>/s/ Matthew R. Nicely</u>
May 7, 2021