IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, and EDF RENEWABLES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, *ET AL*., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

**PUBLIC VERSION**

Court No. 20-03941

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS
AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

TARA K. HOGAN
Assistant Director

STEPHEN C. TOSINI
Senior Trial Counsel

JOSHUA E. KURLAND
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 616-5196
Email: stephen.tosini@usdoj.gov

Attorneys for Defendants

June 11, 2021

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:      THE HONORABLE GARY S. KATZMANN, JUDGE

_____

|  |  |  |
|---|---|---|
| SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, and EDF RENEWABLES, INC., | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Court No. 20-03941 |
| UNITED STATES, *ET AL.*, | ) ) | |
| Defendants. | ) ) ) | |

_____

## **ORDER**

On consideration of defendants' motion to dismiss, plaintiffs' motion for summary judgment, and all other pertinent papers, it is hereby

ORDERED that defendants' motion to dismiss is granted and, it is further

ORDERED that this action is dismissed pursuant to Rule 12(b)(6) of the Rules of this Court and, it is further

ORDERED that plaintiffs' motion for summary judgment is denied as moot.


Dated: _____

      New York, NY                                                 _____

                                                              JUDGE

# <u>TABLE OF CONTENTS</u>

BACKGROUND ................................................................................................................2

SUMMARY OF THE ARGUMENT ............................................................................... 8

ARGUMENT ...................................................................................................................9

     I.     Standard Of Review ............................................................................ 9

     II.    The President Lawfully Accepted The Domestic Industry's Petition ..................10

          A.     The President's Fact-Finding Is Not Subject To Review .........................10

          B.     The Statute Does Not Require That A Petition Take Any Particular Format ....................................................................................................12

          C.     Section 204 Does Not Require The Domestic Industry To Wait Until After The ITC Issued Its Midterm Report To File The Petition ...............14

          D.     A Majority Of The Representatives Of The Domestic Industry Filed The Petition ........................................................................................14

               1.     In Gauging Whether A Petition Is Filed By A Majority Of The Representatives Of The Domestic Industry Under 19 U.S.C. § 2254(b)(1)(B), It Is Appropriate To Analyze Production Volumes ......................................................................................15

               2.     A Majority Of The Domestic Industry Petitioned For The Modifications Made In *Proclamation 10101* ................................19

          E.     The Statute Does Not Require Petitioners To Assert That The Industry Has Made A Positive Adjustment To Import Competition ......................21

     III.   The President Lawfully Acted Based Upon His Finding That The Domestic Industry Has Begun To Make A Positive Adjustment To Import Competition ....22

     IV.   The President's Restoration Of Safeguard Duties On Bifacial Panels Was A Permissible Modification Under Section 204(b)(1)(B) ........................................24

          A.     Plaintiffs Fail To Establish A Clear Misconstruction Of Section 204...... 25

          B.     The President Had Inherent Authority To Oversee The Exclusion Process ....................................................................................................29

V.      The President Did Not Violate Section 203..............................................................30

VI.     Plaintiffs Misconstrue Sections 201, 202, And 204................................................33

CONCLUSION..............................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................................ 9

*Bostock v. Clayton Cty., Georgia*,
  140 S. Ct. 1731 (2020) ........................................................................................ 27, 28, 29 32

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................................................... 10

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .......................................................................................................... 24

*Corus Group PLC v. Int'l Trade Comm'n*,
  352 F.3d 1351 (Fed. Cir. 2003) .................................................................................. 11, 23

*Florsheim Shoe Co., Div. of Interco, Inc. v. United States*,
  744 F.2d 787 (Fed. Cir. 1985) .................................................................................... 11, 30

*Invenergy Renewables LLC v. United States*,
  422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) .............................................................. 3, 4

*Maple Leaf Fish Co. v. United States*,
  762 F.2d 86 (Fed. Cir. 1985) ............................................................................................ 24

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .......................................................................................................... 10

*Michael Simon Design, Inc. v. United States*,
  609 F.3d 1335 (Fed. Cir. 2010) ........................................................................................ 11

*Milner v. Department of Navy*,
  562 U.S. 562 (2011) .......................................................................................................... 27

*Mingus Constructors, Inc. v. United States*,
  812 F.2d 1387 (Fed. Cir. 1987) .......................................................................................... 9

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999) .......................................................................................................... 29

*Platt v. Union Pacific R.R. Co.*,
  99 U.S. 48 (1879) .............................................................................................................. 28

*PrimeSource Bldg. Prod., Inc. v. United States*,
   No. 20-00032, 2021 WL 1248956 (Ct. Int'l Trade Apr. 5, 2021) ........................... 11

*Rothe Dev. Corp. v. United States Dep't of Defense*,
   262 F.3d 1306 (Fed. Cir. 2001).................................................................... 10

*Russello v. United States*,
   464 U.S. 16 (1983)....................................................................... 29, 32, 33

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) ...................................................................... 29

*Silfab Solar, Inc. v. United States*,
   892 F.3d 1340 (Fed. Cir. 2018).............................................................. 19, 24

*Sneaker Circus, Inc. v. Carter*,
   457 F. Supp. 771 (E.D.N.Y. 1978), *aff'd*, 614 F.2d 1290 (2d Cir. 1979)................... 10

*Transpacific Steel LLC v. United States*,
   466 F. Supp. 3d 1246 (Ct. Int'l Trade 2020) .................................................... 11

*United States Cane Sugar Refiners' Ass'n v. Block*,
   683 F.2d 399 (C.C.P.A. 1982) ................................................................... 11

United States v. *George S. Bush & Co.*,
   310 U.S. 371 (1940)............................................................................. 24, 25

*W. Bend Co., Div. of Dart Indus. v. United States*,
   576 F. Supp. 630 (Ct. Int'l Trade 1983) ........................................................ 30

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)................................................................................ 29

**Statutes**

1 U.S.C. § 1 ......................................................................................... 13

19 U.S.C. § 2171 ................................................................................... 29

19 U.S.C. § 2251 .................................................................................... 2

19 U.S.C. § 2251(a) ........................................................................... 18, 31

19 U.S.C. § 2251(b) ................................................................................ 23

19 U.S.C. § 2252 ................................................................................... 17

19 U.S.C. § 2252(a) ................................................................................................ 17

19 U.S.C. § 2252(b) ............................................................................................ 3, 31

19 U.S.C. § 2252(c) ........................................................................................... 15, 32

19 U.S.C. § 2252(d)(1)(A) ...................................................................................... 32

19 U.S.C. § 2253(a) ................................................................................................ 18

19 U.S.C. § 2253(c)(7)(A) ...................................................................................... 31

19 U.S.C. § 2253(e)(2) ............................................................................................ 18

19 U.S.C. § 2254(a) ................................................................................. 5, 14, 22, 23

19 U.S.C. § 2254(b) ......................................................................................... *passim*

**Regulations**

*Procedures to Consider Additional Requests for Exclusion of Particular Products From the
    Solar Products Safeguard Measure,*
    83 Fed. Reg. 6,670 (USTR Feb. 14, 2018) (Exclusion Procedures) .......................................... 3

*Proclamation 9693 of January 23, 2018, To Facilitate Positive Adjustment to Competition From
    Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully
    Assembled Into Other Products) and for Other Purposes,*
    83 Fed. Reg. 3,541 (Jan. 23, 2018) ................................................................................ *passim*

*Proclamation 10101: To Further Facilitate Positive Adjustment to Competition From Imports of
    Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled
    Into Other Products),*
    85 Fed. Reg. 65,639 (Oct. 16, 2020) .............................................................................. *passim*

*Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure,*
    84 Fed. Reg. 54,244-45 (USTR Oct. 9, 2019) ....................................................................... 5

**Other Authorities**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products*
     Investigation No. TA-201-75, USITC Pub. 4739 (Nov. 2017) ...................................... passim

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry,*
     Investigation No. TA-201-075, USITC Pub. 5021 (Feb. 2020) ..................................... passim

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Advice on the Probable Economic Effect of Certain Modifications to the Safeguard Measure,*
     Investigation No. TA-201-075, USITC Pub. 5032 (Mar. 2020)..........................................5, 26

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:      THE HONORABLE GARY S. KATZMANN, JUDGE

_____

SOLAR ENERGY INDUSTRIES                 )
ASSOCIATION, NEXTERA ENERGY, INC.,      )
INVENERGY RENEWABLES LLC, and EDF       )
RENEWABLES, INC.,                       )         **PUBLIC VERSION**
                                        )
          Plaintiffs,                   )
                                        )
     v.                                 )         Court No. 20-03941
                                        )
UNITED STATES, *ET AL.*,                )
                                        )
          Defendants.                   )
_____  )

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

In our motion to dismiss, we demonstrated that plaintiffs failed to show that the President clearly misconstrued the governing statute, committed a significant procedural violation, or acted outside delegated authority in issuing Presidential Proclamation No. 10101.  Rather, the President acted lawfully and fully within his authority under the safeguard statute by closing a loophole that the President determined had been undermining the effectiveness of the safeguard measure on solar products.  Plaintiffs' combined motion for summary judgment and response to our motion fails to upset this showing or offer more than the same unpersuasive arguments previously raised.

The remainder of plaintiffs' brief contests the validity of the petitions submitted by a majority of domestic industry.  However, as we demonstrate below, the domestic industry consisted of the universe of domestic manufacturers who make products that are like or directly competitive with the article at issue in the United States International Trade Commission (ITC)

investigation that underlies Proclamation No. 10101.  The petitioners represented more than half of total domestic production from January through June 2019, the most recent period covered by the ITC's midterm report.  Therefore, a majority of the representatives of the domestic industry supported the petition, which satisfied the relevant statutory provision authorizing the President to modify the safeguard measure.

## <u>BACKGROUND</u>

To address the serious injury to the domestic solar industry caused by increased imports, the President implemented a "safeguard measure" under Section 201 of the Trade Act of 1974 (19 U.S.C. § 2251, *et seq.*), to protect the domestic industry from serious injury suffered due to increased imports of solar products for which the antidumping and countervailing duty laws were ill suited to provide relief.  *See Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products)*, Inv. No. TA-201-75, USITC Pub. 4739 (Nov. 2017), available at < https://www.usitc.gov/publications/safeguards/pub4739-vol_i.pdf > (USITC Pub. 4739); *see also Proclamation 9693 of January 23, 2018*, *To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes*, 83 Fed. Reg. 3,541 (Jan. 23, 2018) (*Proclamation 9693*).

During the initial Section 201 proceeding, the ITC investigated crystalline silicon photovoltaic (CSPV) cells, whether or not partially or fully assembled into other products, such as solar modules (solar products).  USITC Pub. 4739 at 13.  Solar products have been the subject of multiple antidumping and countervailing duty proceedings, in which the ITC has identified material injury to the domestic industry stemming from unfair pricing and subsidization in China and Taiwan.  *Id*. at 24.  As the ITC explained, the antidumping and countervailing orders has

caused foreign producers and exporters to move production to other countries and to continue to export their products in increasing amounts at low prices.  *Id.* at 40-41, 44-45.  This trend resulted in lower prices for CSPV products in the U.S. market, revenue losses for domestic producers, and numerous plant closures.  The ITC made an affirmative determination of serious injury pursuant to 19 U.S.C. § 2252(b), USITC Pub. 4739 at 1, unanimously concluding that increased imports were a substantial cause of serious injury, or threat thereof, to the domestic CSPV industry.

To allow the industry to adjust to increased import competition, the President issued *Proclamation 9693*, in which he established additional duties on imports of solar products.  The President also delegated to the Office of the United States Trade Representative (USTR) authority to grant the "exclusion of a particular product from the safeguard measure" if "the USTR determines, after consultation with the Secretaries of Commerce and Energy, that a particular product should be excluded," as well as to "modify or terminate any such [exclusion] determination."  *Proclamation 9693*, 83 Fed. Reg. 3,543-44, 3,547, Annex I ¶ 18.d. Subsequently, USTR published procedures for seeking exclusions from the safeguard measure. *Procedures to Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6,670-72 (USTR Feb. 14, 2018) (*Exclusion Procedures*).

Certain interested persons requested exclusion of "bifacial" solar panels, which consist of cells that convert sunlight into electricity on both the front and back of the cells.  *See Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1268 (Ct. Int'l Trade 2019) (*Invenergy I*).  After the Trade Representative granted the exclusion, certain domestic producers of solar products objected, arguing the exclusion would cause harm by allowing increased imports, and

requested that the Trade Representative withdraw the exclusion.  USTR did not publish a notice

that it was considering withdrawal of the exclusion.  *Id*.  The Trade Representative ultimately

withdrew the exclusion.  *Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products*

*Safeguard Measur*e, 84 Fed. Reg. 54,244-45 (USTR Oct. 9, 2019) (*October Withdrawal*)).  This

withdrawal, as well as a subsequent withdrawal of the bifacial exclusion are the subject to the

above cited *Invenergy* matter.

On a separate track, Section 204 authorizes the President to take certain actions with

respect to safeguard measures implemented under Section 203 of the Trade Act.  19 U.S.C.

§ 2254(b)(1) & (a)(2).  Under Section 204, the ITC monitors the effectiveness of any safeguard

measure applied by the President, and, if the initial period during which the action taken under

Section 203 exceeds three years, the ITC submits a report on the results of such monitoring to the

President no later than the mid-point of the safeguard period.  *Id.*  During its midterm review

proceeding, the ITC received comments and heard testimony regarding the domestic solar

industry's ability to adjust to import competition in light of increasing imports of bifacial solar

products.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully*

*Assembled Into Other Products: Monitoring Developments in the Domestic Industry*,

Investigation No. TA-201-075, USITC Pub. 5021 (Feb. 2020), available at

<https://www.usitc.gov/publications/other/pub5021.pdf>.

In its monitoring report, the ITC highlighted domestic solar product producers'

statements that certain factors had impaired the domestic industry's adjustment to import

competition, including "the exclusion in June 2019 of bifacial CSPV modules from the safeguard

measure."  *Id*. at 7; *see also id.* at VI-4–5 ("Several firms also pointed to the exclusion of bifacial

panels as a major factor influencing CSPV module prices.").  The ITC acknowledged record

evidence or reached conclusions relating to the effect of imports of bifacial products on the United States market, as well as the domestic solar industry's ability to adjust to the increased import competition from such imports.  *Id*. at I-74-76, III-4, VI-4-5.

Section 204(b)(1) of the statute provides that, after receiving the ITC's report, the President may modify, reduce or terminate a safeguard measure, if certain conditions are met.  19 U.S.C. § 2254(b)(1).

In response to a request from the Trade Representative under 19 U.S.C. § 2254(a)(4), the ITC issued an additional report on the "probable economic effect on the industry concerned of any reduction, modification, or termination of" *Proclamation 9693* under 19 U.S.C. § 2254(b)(4).  *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Advice on the Probable Economic Effect of Certain Modifications to the Safeguard Measure*, Investigation No. TA-201-075, USITC Pub. 5032 (Mar. 2020), available at <https://www.usitc.gov/publications/other/pub5032.pdf>.

In its second report, the ITC concluded that the "exclusion for imports of bifacial modules . . . is likely to have significant effects on prices and trade in both modules and cells." *Id*. at ES-3.  The ITC further explained that "bifacial modules are likely to account for a growing share of the market over the next few years and can substitute for monofacial products in all market segments.  Imports of bifacial modules that are exempt from safeguard tariffs put significant price pressure on U.S. module producers, as these modules can be produced at virtually the same cost as monofacial modules." *Id*. at III-4.  Important to the viability of a United States solar manufacturing industry, "lower-priced bifacial modules will likely drive down U.S. market prices for modules." *Id*. at III-5; *see also id.* at ES-4–5, I-4–5, II-9–10, II-15–18, III-1, III-4–7, D-7–10 (also discussing issues caused by bifacial exclusion).

Following receipt of the ITC's reports, the President received petitions from domestic producers of like or directly competitive articles at issue in the ITC investigation that accounted for a majority of domestic production of that subject merchandise.  Specifically, a majority of domestic producers of subject merchandise requested that the President withdraw the bifacial exclusion and increase the rate of duty for the final year of the safeguard measure.  *See* Defs. Response to Pls. Mot. for Discovery, at Att. A (May 7, 2021), ECF No. 23 (Petition).

Specifically, based on the confidential version of the USITC Pub. 5021, domestic production of CSPV products from January through June 2019, the most recent period covered by the ITC's midterm report, totaled approximately **[   ]** Megawatts (MW), so a majority of the domestic industry would consist of entities that produced more than **[   ]** MW.  *See* USITC Pub. 5021 at III-14-III-15 (Table III-4).  Accordingly, based on the figures below, taken from Table III-4 of the ITC's midterm report, **[     ]** percent of the domestic industry by production volume requested the increase in the rate of duty, and **[     ]** percent of the domestic industry requested withdrawal of the bifacial exclusion:

**Domestic Producers Requesting Increase in Rate of Duty**

| Company | Production (MW) |
|---------|-----------------|
|         |                 |
| Auxin   | **[ ]**         |
| Hanwha  | **[ ]**         |
| LG      | **[ ]**         |
|         |                 |
| **Total** | **[ ]**       |

**Domestic Producers Requesting Withdrawal of Bifacial Exclusion**

| Company | Production (MW) |
|---|---|
|  |  |
| Auxin | [  ] |
| Hanwha | [  ] |
| Heliene | [  ] |
| Mission | [  ] |
| SolarTech | [  ] |
|  |  |
| **Total** | [  ] |

Source:  USITC Pub. 5021, at III-14 – III-15 (Table III-4).

The President issued Proclamation 10101 on October 16, 2020, in which he noted the

ITC's findings and conclusions that "bifacial modules are likely to account for a greater share of

the market in the future and can substitute for monofacial products in the various market

segments, such that exempting imports of bifacial modules from the safeguard tariff would apply

significant downward pressure on prices of domestically produced CSPV modules."

*Proclamation 10101: To Further Facilitate Positive Adjustment to Competition From Imports of*

*Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into*

*Other Products)*, 85 Fed. Reg. 65,639, 65,640 (Oct. 16, 2020).

After taking into account the ITC's reports, "receiving a petition from a majority of the

representatives of the domestic industry," and finding "that the domestic industry has begun to

make positive adjustment to import competition," the President decided to revoke the bifacial

exclusion.  *Id*.  The President reasoned that "the exclusion of bifacial panels from application of

the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action

proclaimed in *Proclamation 9693*."  *Id*.  The President thus concluded "that it is necessary to

revoke that exclusion and to apply the safeguard tariff to bifacial panels."  *Id*.  The President

7

further decided to slow the reduction of the tariff rate for the fourth year of the solar safeguard, reducing the rate from 20 percent to 18 percent, as opposed to 15 percent. *Id*.

## SUMMARY OF THE ARGUMENT

The President fully complied with all of the statutory requirements under Section 204. He obtained the necessary reports from the ITC. After considering the ITC's reports, receiving petitions from a majority of the domestic industry, and concluding that the domestic industry has begun to make positive adjustment to import competition, the President decided to modify the safeguard measure on solar products by revoking the bifacial exclusion and slowing the reduction in the rate of duty for the final year of the measure. Because the plaintiffs cannot show that the President's determination involves a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority, the Court should dismiss the complaint.

First, a majority of the domestic industry by production volume petitioned for the President to revoke the bifacial exclusion and to slow the reduction in the rate of duty for the fourth year of the safeguard measure. The statute does not define the word "petition." Thus, the President lawfully accepted the domestic industry's communications as "a petition" under the statute.

Second, Section 204(b)(1)(B) allows the President to modify an existing safeguard measure. A modification in this context necessarily means some change to the measure beyond a "reduction" or "termination." Revocation of the bifacial exclusion and slowing of the tariff rate reduction in the fourth year of the safeguard measure fall squarely within of the President's authority to modify an existing safeguard measure. Plaintiffs' proffered interpretation would limit the term "modification" to certain "trade liberalizing" actions. Such an interpretation is

unreasonable, and indeed, wrongly uses legislative history to create an ambiguity where none in the statute exists.  Plaintiffs' constricted view of the President's authority further ignores the overriding principle in Section 201 that remedies allow seriously injured domestic manufacturing industries to make positive adjustments to import competition.

Third, plaintiffs' allegation that the President violated the Section 203 waiting period for reimposition of safeguard measures by withdrawing the exclusion fares no better.  Importantly, the existing safeguard measure was never "terminate[d]" with respect to bifacial panels.  Instead, bifacial panels were excluded from application of the additional duties under the ongoing safeguard measure, subject to withdrawal of that exclusion.

Lastly, plaintiffs misconstrue the plain language of Sections 201, 202, and 204 of the Trade Act, attempting to engraft a requirement onto midterm reviews that exists only for initial determinations.

## **ARGUMENT**

### I.    **Standard Of Review**

Summary judgment is appropriate where there are no genuine disputes as to any material fact.  USCIT R. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).  "The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT R. 56(a).  In analyzing Fed. R. Civ. P. 56, the Supreme Court explained that the party "seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(quoting Fed. R. Civ. P. 56(c)). "In evaluating the grant of a motion for summary judgment, [the

Court's] task is to discern whether 'the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party.'" *Rothe Dev. Corp. v. United States Dep't of Defense*, 262

F.3d 1306, 1316 (Fed. Cir. 2001) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

Corp.*, 475 U.S. 574 (1986)). Likewise, evidence proffered to the Court in conjunction with a

motion for summary judgment must be admissible. USCIT R. 56(c)(2).

## II.     The President Lawfully Accepted The Domestic Industry's Petition

The Court should reject plaintiffs' challenges to the sufficiency of the petition requesting

the two modifications to the solar safeguard measure. Pls. Br. 13-21. Because the President

stated that he made the requisite findings, there is no further basis for judicial inquiry.

Moreover, even if the Court were to look behind the President's statement, 19 U.S.C. §

2254(b)(1)(B) does not require the President to treat each request from a domestic producer as a

separate "petition" and consider it in isolation from other requests. Further, the statute contains

none of the requirements that plaintiffs seek to impose. It does not require representatives of the

domestic industry to wait to submit the petition until after the ITC issued its midterm report or

initiated the midterm review. Additionally, a majority of the representatives of the domestic

industry filed the petition. Lastly, the statute does not require the representatives to assert that

the domestic industry had made a positive adjustment to import competition in the petition.

### A.     The President's Fact-Finding Is Not Subject To Review

The Court "must assume that if the President said he [made the requisite findings and

considerations under the trade statute] . . . then he in fact considered them." *Sneaker Circus, Inc.

v. Carter*, 457 F. Supp. 771, 793 (E.D.N.Y. 1978), *aff'd*, 614 F.2d 1290 (2d Cir. 1979). On this

basis, the Federal Circuit has consistently rejected requests to "go behind" the text of the President's Proclamation or Executive Order. *Florsheim Shoe Co., Div. of Interco, Inc. v. United States*, 744 F.2d 787, 797 (Fed. Cir. 1985); *see also United States Cane Sugar Refiners' Ass'n v. Block*, 683 F.2d 399, 404 (C.C.P.A. 1982).

Here, the President stated that he had received a petition from the majority of the representatives of the domestic industry. *Proclamation 10101*, 85 Fed. Reg. at 65,640. At this point, the inquiry over this issue should be at an end. The cases that plaintiffs cite do not suggest that further inquiry into the President's factual determinations is permitted. Rather, those decisions focused entirely on ensuring that preconditional action taken by certain actions by other officials that were preconditions to presidential action did, in fact, occur. *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1343 (Fed. Cir. 2010), involved the contention that the ITC's recommendations to the President for modifications to the Harmonized Tariff Schedule of the United States (HTSUS) were required to exhibit rate neutrality. Similarly, *Corus* involved the question whether the ITC had included a particular product within the scope of its serious injury determination that underpinned a presidential section 201 proclamation. *Corus Group PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1356 (Fed. Cir. 2003)*; see also Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246, 1254-55 (Ct. Int'l Trade 2020) (Secretary of Commerce action preceding presidential determination); *PrimeSource Bldg. Prod., Inc. v. United States*, No. 20-00032, 2021 WL 1248956, at *4 (Ct. Int'l Trade Apr. 5, 2021) (no question of presidential fact-finding); *Cane Sugar Refiners*, 683 F.2d at 404 (involved the question whether there was a clear misconstruction of the statute, not fact-finding).

In sum, the President made the determination that he received the requisite petition, and this determination is not subject to review. Even if the Court were to review whether the petition

was, in fact, received from a majority of the representatives of the domestic industry, the

President acted lawfully on accepting the petition from a majority, by production volume, of the

industry.

### B.   The Statute Does Not Require That A Petition Take Any Particular Format

Section 204 authorizes reduction, modification, or termination of a safeguard measure if

the President "determines, after a majority of the representatives of the domestic industry

submits to the President a petition requesting such reduction, modification, or termination on

such basis, that the domestic industry has made a positive adjustment to import competition."  19

U.S.C. § 2254(b)(1)(B).  It imposes no further substantive or formal requirements and, in

particular, does not specify a particular format for a petition.  The definition of "petition" is "a

formal written request made to an authority or organized body (such as a court)." *See* Definition

of "Majority," *Merriam-Webster Dictionary*, https://www.merriam-

webster.com/dictionary/petition.  Thus, the President has substantial discretion in deciding what

constitutes a "petition" for purposes of this provision.

The President lawfully treated the compilation of three letters received as "a petition"

under section 2254(b)(1)(B).  Each of the three letters comprising the petition met the criteria of

making a formal request to an authority, namely the President.  Each of the three letters

comprising the petition described in detail the modifications sought pursuant to section 2254(b),

and which companies supported each modification:

- **Letter submitted by LG Electronics USA, Inc.:**  This letter "identif[ied] desired changes to the solar safeguard measures," which included, in relevant part, a "{s}low down of reduction in duties for remainder of solar safeguard term.  This letter also specified LGEUS's understanding that "Hanwha Q Cells, USA, Auxin Solar" supported this change. *See* Resp. to Pls. Mot. for Disc., at Att. A (May 7, 2021), ECF No. 23 (Petition).

- **Letter filed by Q CELLS and Auxin Solar:** This letter "request[ed] . . . modifications" including, in relevant part, that "the President should use his broad authority to withdraw the bifacial exclusion via proclamation as part of the mid-term review," and to "{m}aintain the tariff rate in year 4 at the highest possible rate (e.g. 19% instead of 15%)." This letter also specified these companies' understanding that "a number of other U.S. solar manufacturers have positions on the mid-term review that are very similar to Q CELLS and Auxin Solar." *Id.* at Att. B.

- **Letter filed collectively by Mission Solar, Heliene, Auxin Solar, and SolarTech Universal:** This letter "urge{d} the USTR to immediately rescind this {bifacial} exclusion order before further damage is done to the U.S. solar manufacturing industry." The letter was signed by these four companies. *Id.* at Att. C.

The fact that 19 U.S.C. § 2254(b)(1)(B) refers to "a petition" in the singular, and the petition here was comprised of three letters, changes nothing. Pls. Br. 14. The first words of the first title of the first section of the United States Code direct that, "{i}n determining the meaning of any Act of Congress, unless the context indicates otherwise--words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1. Nothing in Section 204 itself or elsewhere suggests that the President is precluded from treating multiple documents together as a "petition" filed by a majority of the representatives of the domestic industry. Again, Section 204(b)(1)(B) contains certain petition requirements, but does not specify any particular format. Although the letters each requested varying modifications to the safeguard measure, the President did not misconstrue the statute by treating them collectively as one petition, given the overlap in their subject matter and the explicit reference in the QCELLS/Auxin letter to the positions of other domestic producers.

Lastly, the petition, read as a whole, requested the same types of modifications that the President ultimately adopted. Pls. Br. 13. Two letters specifically requested withdrawal of the

bifacial exclusion, and two requested slowing of the reduction of the tariff rate for the fourth year

of the solar safeguard measure.  These are the modifications that the President ultimately

adopted.  *Proclamation 10101*, 85 Fed. Reg. at 65,640, ¶ 9.

### C.   Section 204 Does Not Require The Domestic Industry To Wait Until After The ITC Issued Its Midterm Report To File The Petition

Representatives of the domestic industry are not required to wait until after the ITC has

issued its midterm report, or until after it has initiated the midterm review, before they submit a

petition requesting modifications to the solar safeguard measure.  The statute specifies no time

by which representatives of the domestic industry may or must submit a petition.  The statute's

only timing constraint is on the President, who may reduce, modify, or terminate the safeguard

action only after receiving the report required under 19 U.S.C. § 2254(a)(2)(A).  The President

complied, signing Proclamation No. 10101 on October 10, 2020, well after the ITC's February

2020 report.  The statute imposes no comparable requirement on the domestic industry seeking a

reduction, modification, or termination of a safeguard measure.  Pls. Br. 15.

### D.   A Majority Of The Representatives Of The Domestic Industry Filed The Petition

The President lawfully determined that a majority of the representatives of the domestic

industry filed the petition.  *See Proclamation 10101*, 85 Fed. Reg. at 65,640 ("after receiving a

petition from a majority of the representatives of the domestic industry with respect to each of

the following modifications . . .").  Plaintiffs wrongly insist that a majority must be determined

by a head count of the companies that reported producing CSPV products.  In light of the

statute's objective of facilitating the domestic industry's adjustment to import competition, the

President reasonably gauged the requesters' share of the domestic production that the safeguard

measure is supposed to protect.

14

1.      **In Gauging Whether A Petition Is Filed By A Majority Of The Representatives Of The Domestic Industry Under 19 U.S.C. § 2254(b)(1)(B), It Is Appropriate To Analyze Production Volumes**

Section 2254(b)(1)(B) authorizes the President to reduce, modify, or terminate a safeguard measure if requested by "a majority of the representatives of the domestic industry," but does not specify what constitutes a "majority."  Plaintiffs simply assume, absent any authority, that a "majority" exists only if the number of companies supporting a request is greater than half of the total number of companies within the domestic industry.  This assumption misconstrues the statute and frustrates congressional intent.  To determine whether a "majority" of a "domestic industry" supports a petition, the President lawfully considered the petitioning representatives' production volume against total domestic industry production.

While Section 2254 does not define the phrase "a majority of the representatives of the domestic industry," the "domestic industry" is defined in 19 U.S.C. § 2252(c)(6)(A)(i)), to

> Mean[], with respect to an article, the producers as a whole of the like or directly competitive article or those producers whose collective production of the like or directly competitive article constitutes a major proportion of the total domestic production of such article.

The "article" in question is the imported article subject to the ITC's investigation. Thus, the domestic industry consists of producers who make the article like or directly competitive with the imported article.

Applying this understanding to section 204(b)(1)(B), which takes effect after imposition of a safeguard measure, the domestic industry consists of the producers of articles like or directly competitive with the imports subject to the safeguard measure. With regard to the operation of this provision, the ITC will have already determined that the imports are a substantial cause of serious injury to that industry, and the President will

have already determined that the measure is necessary to facilitate those producers'

adjustment to import competition.  Thus, the section means that the President may

"modify" a safeguard measure following receipt of a petition from "representatives" of

the producers of the article subject to the ITC's serious injury determination that led to

the measure.  In the underlying solar safeguard investigation, the ITC found the domestic

industry was comprised of U.S. manufacturers who produce CSPV cells or modules or

both.  *See* USITC Pub. 4739, at 18 (Nov. 2017) ("Consequently, for our analysis in this

investigation, we define the domestic industry as all U.S. producers of CSPV cells

(whether or not partially or fully assembled into other products), including integrated

producers of CSPV cells and modules and independent module producers").

Section 2254(b)(1)(B) further requires that a "majority" of the representatives of the

domestic industry submit the petition for modification.  The dictionary defines a "majority" as "a

number or percentage equaling more than half of a total."  *See* Definition of "Majority,"

*Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/majority.

Accordingly, a petition requesting modification of a safeguard measure must have support from

representatives of more than 50 percent of the domestic industry.

The statute does not specify how to measure the totality of the domestic industry or

weight the representatives requesting a modification to determine whether more than half support

the petition.  Plaintiffs simply assume that the statute demands a head count of the number of

producers making the like or directly competitive article and a weighing of the number of

companies requesting reduction, modification, or termination against the number who oppose or

express no view.  Pls. Br. 15-17.  This assumption does not withstand scrutiny.

First, it is significant that Section 202 defines the domestic industry as "the producers as a whole of the like or directly competitive article or those producers *whose collective production* of the like or directly competitive article *constitutes a major proportion of the total domestic production* of such article."  19 U.S.C. § 2252 (emphasis added).  As it is production that defines inclusion in the domestic industry, and producers of less than the "whole" of domestic production may be "the domestic industry" if they constitute a "major proportion of total domestic production," it makes sense to measure whether a group of producers is "representative" of the industry based on the volume of production.

Second, Section 202 provides that a petition to commence a Section 201 proceeding "may be filed with the Commission by an entity . . . which is representative of an industry."  19 U.S.C. § 2252(a)(1).  The ITC's regulations provide that, to establish representativeness, petitioners must report the "*percentage of domestic production* of the like or directly competitive domestic article that such represented firms and/or workers account for and *the basis for claiming that such firms and/or workers are representative of an industry*."  19 C.F.R. § 206.14(b)(2) (emphasis added).  The regulations also require reporting of "the percentage of domestic production" to determine whether a petition for extension of a safeguard measure is filed "on behalf of the industry concerned" for purposes of section 2254(c).  *See* 19 C.F.R. § 206.54(d)(2)(ii).  Neither the statute nor the ITC's regulations specify a percentage threshold to establish "representativeness" for this inquiry.  Although the ITC's regulations do not bind the President, they provide a useful guidepost for assessing the reasonableness of the interpretation of 19 U.S.C. § 2554(b)(1)(B).

Third, measuring representativeness on production volume serves the purpose of the statute, which is to "facilitate efforts by the domestic industry to make a positive adjustment to

import competition." 19 U.S.C. §§ 2251(a), 2253(a).  This objective focuses on the industry as a whole.  Under plaintiffs' interpretation, a group of small producers who collectively produced a minimal quantity of the like or directly competitive product could effectively hold veto power over whether the President could consider reduction, modification, or termination of a safeguard measure.  Such an outcome is directly contrary to the objective of facilitating a positive adjustment for the industry as a whole.

Plaintiffs appear to acknowledge that this is not an idle or theoretical possibility. Plaintiffs define the domestic industry as consisting of "20 firms with domestic operations that the ITC identified in its February 2020 monitoring report."  Pls. Br. 10.  The ITC's data show that many of these producers [

].  USITC Pub. 5021 at III-13.  Thus, adopting plaintiffs' interpretation would preclude the President from reducing, modifying, or terminating the solar safeguard measure even if the producers of a large majority of the CSPV products made in the United States requested a change.

Weighting producers in accordance with their production volume avoids incongruity, and ensures that the supporters of any request for modification truly reflect the majority of the domestic industry, and not an idiosyncratic subset of production.  It also comports with the language of the statute.  As noted above, the purpose of the statute is to facilitate a positive adjustment to import competition for an industry.  Thus, the focus is on the level of production and the ability to compete with imports – not the simple number of companies.

It is also significant that the statute allows the President to apply a tariff, tariff-rate quota, or quantitative restriction "only to the extent the cumulative impact of such action does not exceed the amount necessary to prevent or remedy the serious injury."  19 U.S.C. § 2253(e)(2).

18

The statute specifies three factors for the ITC to consider in an evaluation of serious injury: "(i) the significant idling of productive facilities in the domestic industry, (ii) the inability of a significant number of firms to carry out domestic production operations at a reasonable level of profit, and (iii) significant unemployment or underemployment within the domestic industry." 19 U.S.C. § 2252(c)(1)(A). Again, the focus is on production. Even where the statute mentions the number of firms, it does so in terms of whether that number of unprofitable firms is "significant" in terms of "production operations." *Id.*

Therefore, these facts show that the President did not clearly misconstrue the governing statute, commit a significant procedural violation, or take action outside delegated authority. *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018).

## 2.    A Majority Of The Domestic Industry Petitioned For The Modifications Made In *Proclamation 10101*

The data from producers who provided usable data in response to the ITC's requests show that domestic producers that requested withdrawal of the bifacial exclusion and a change in the level of the safeguard tariff for the fourth year of the safeguard measure represented a majority of the CSPV products produced in the United States.

Even were the Court to wrongly address this factual finding, *see Silfab*, 892 F.3d at 1346, there is no question that 16 producers responded to the ITC's questionnaires and provided comprehensive data on all aspects of their production of modules, including confidential business information. *See* ITC Pub. 5021 at III-13. This evidence not only establishes the existence of their operations, but is also probative of their relative size within the domestic industry. For example, Table III-4 reports domestic module production based on 16 companies that provided usable capacity and production data in response to the ITC's questionnaire. *See*

*id.*[1]  The ITC used these producers' data to evaluate developments following application of the safeguard measure.  Table III-4 provides the production, capacity, and average capacity utilization for each of these 16 companies.  *Id.* at III-14-III-15.  The companies that petitioned for the two modifications that led to *Proclamation 10101* were represented in this data.  *Compare id.* with Petition at Atts. A, B, C.

Based on the actual domestic production of producers who participated in the ITC's midterm review for the most recent period for which the ITC was able to obtain information (January 2019 to June 2019), a majority of the representatives of the relevant domestic industry supported the petition with respect to the two modifications.  The total production of CSPV modules during January 2019 to June 2019 was approximately [            ].  ITC Pub. 5021 at III-13-III-14 (Table III-4).  Accordingly, to satisfy 19 U.S.C. § 2254(b)(1)(B), a petition would need the support of domestic manufacturers whose collective production was greater than [

    ].[2]

The request to modify the tariff rate during the fourth year of the solar safeguard measure was proposed by U.S. module producers Auxin, Hanwha Q CELLS, and LG.  Compared to the 16 companies whose production data were depicted in Table III-4, those representatives constituted a majority of production during this time period.  *See* ITC Pub. 5021 at III-14-III-15.

---

[1] The business proprietary version of an excerpt of the ITC's midterm report containing Table III-4 is appended to this brief as Exhibit A.

[2] The ITC was able to obtain data on the productive capacity of companies that did not respond to its information requests.  ITC Pub. 5021 at I-46.  However, capacity data does not indicate how much these companies actually produced or, indeed, whether they produced anything at all. In fact, many of the producers who responded to the ITC's information requests produced at volumes far below total capacity.  *See id.* at III-15 (Table III-4).

Auxin, Hanwha Q CELLS, Heliene, Mission and Solar Tech requested withdrawal of the bifacial exclusion.  Again, compared to the 16 producers' production volume depicted in Table III-4 of the ITC's midterm report, these representatives constituted a majority of production during this time period.  *Id.*

Thus, the facts support the President's finding that the petition was filed by "a majority of the representatives of the domestic industry" under 19 U.S.C. § 2254(b)(1)(B).

**E.     The Statute Does Not Require Petitioners To Assert That The Industry Has Made A Positive Adjustment To Import Competition**

Lastly, plaintiffs contend that the petition must assert that "the domestic industry has made a positive adjustment to import competition," to comply with 19 U.S.C. § 2254(b)(1)(B).  Pls. Br. 13-14, 16.  This reading is incorrect.  Section 204(b)(1)(B) allows the President to reduce, modify, or terminate a safeguard action "*if the President determines*, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, *that the domestic industry has made a positive adjustment to import competition*."  19 U.S.C. § 2254(b)(1)(B) (emphasis added).  The President alone determines if "the domestic industry has made a positive adjustment to import competition" after receiving the petition.  Nothing in this provision suggests that the petition must even mention "a positive adjustment to import competition."

Plaintiffs contend that the words "on such basis" in Section 204(b)(1)(B) mean that the petition must be made on the "'basis' . . .  that the domestic industry has made a positive adjustment to import competition,'" and that a petition itself must include an allegation to that effect.  Pls. Br. 15-16.  This is a tortured interpretation.  The adjective "such" refers *back* to something indicated *earlier* in the text.  As the phrase "positive adjustment to import competition" comes at the *end* of Section 204(b)(1)(B), "on such basis" cannot be read to refer to

it.  Moreover, the plain language of Section 204(b)(1)(B) shows that the President alone decides whether "the domestic industry has made a positive adjustment to import competition."  The fact that the petition does not discuss the domestic industry's positive adjustment to import competition, does not expand or limit the requirement of the President to make this determination.  Indeed, allegation regarding the domestic industry's adjustment would be superfluous, as the statute authorizes the President to act only after receiving the ITC's midterm report explicitly addressing "the progress and specific efforts made by workers and firms in the domestic industry to make a positive adjustment to import competition."  19 U.S.C. § 2254(a)(1) and (2).  At that point, the relevant determination is not whether representatives allege that they have made a positive adjustment, but rather whether the ITC report shows that they have.

Lastly, plaintiffs' reading makes no sense because it would require individual producers to make determinations regarding the entire industry.  But the most that one could reasonably expect from a domestic petitioner would be its (1) stance on a particular issue; and (2) a description of *its own* experiences.

### III.   The President Lawfully Acted Based Upon His Finding That The Domestic Industry Has Begun To Make A Positive Adjustment To Import Competition

Plaintiffs contend that the President exceeded his statutory authority because he found in *Proclamation 10101* that the domestic solar manufacturing industry "has begun to make positive adjustments to import competition," 85 Fed. Reg. at 65,640 whereas Section 204(b)(1), 19 U.S.C. § 2254(b)(1), contains the words "has made a positive adjustment to import competition." Pls. Br. 21-23.  This semantic argument is inconsistent with the plain language of the statute and congressional intent.

First, the phrase "has made a positive adjustment" is broad enough to include "has begun to make a positive adjustment" contained in the proclamation because both indicate that the

action of "adjust{ing}" has moved in a positive direction.  Plaintiffs assume that the

"adjustment" envisaged in the statute is binary: athe industry is either unadjusted or fully

adjusted.  That is not the case.  Section 204 calls for the ITC to "monitor developments with

respect to the domestic industry, including the progress and specific efforts made by workers and

firms in the domestic industry to make a positive adjustment to import competition."  19 U.S.C.

§ 2254(a)(1).  The results of this monitoring inform the ITC's midterm report, which in turn

triggers the President's authority to "reduce, modify, or terminate" a safeguard measure.  Thus,

the statute foresees a process of "developments," including "progress" and "efforts" toward the

goal of complete adjustment.    Indeed, the plain meaning of "has begun to make a positive

adjustment" requires that there has been some forward, or "positive" progress towards the

ultimate goal of the safeguard measure and, thus, falls within the statutory phrase, "has made a

positive adjustment to import competition."  19 U.S.C. § 2254(b)(1)(B).  Plaintiffs' cake-baking

analogy, therefore, fails to account for either the statutory text or common sense.  *See* Pls. Br. 21-

22.

Section 201(b)'s definition of "positive adjustment to import competition" does not

detract from this plain language.  *See* 19 U.S.C. § 2251(b).  Indeed, the definition acknowledges

that "domestic industry may be considered to have made a positive adjustment to import

competition even though the industry is not of the same size and composition as the industry at

the time the investigation was initiated."  19 U.S.C. § 2251(b)(2).  Accordingly, the statute

recognizes that there can be room for improvement or that certain segments of an industry can

improve at different speeds than others.

And even if the statute could be read to specifically address only two extreme polar

opposite situations: (1) complete recovery of the entire domestic industry; or (2) demise of the

entire domestic industry, the President possesses discretion to address situations falling between those two poles.  The governing standard is far more deferential than that afforded to *agencies* under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).  To succeed here, plaintiffs must demonstrate a "'clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority.'"  *Silfab Solar*, 892 F.3d at 1346 (quoting *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985)).  Even then, "there are limited circumstances when a presidential action may be set aside if the President acts beyond his statutory authority, but such relief is only rarely available."  *Id.* (citing *Corus*, 352 F.3d at 1356).  Here, Congress entrusted the President to administer Section 201 and, thus, plaintiffs must show a "clear misconstruction" in the President's gap filling – something that they cannot do.  Ultimately, "{t}he President's method of solving the problem was open to scrutiny neither by the {appellate court} nor by us."  United States v. *George S. Bush & Co.*, 310 U.S. 371, 378-79 (1940).

IV.     **The President's Restoration Of Safeguard Duties On Bifacial Panels Was A Permissible Modification Under Section 204(b)(1)(B)**

Plaintiffs contend that Section 204(b)(1)(B) allows only "liberalizing" of safeguard measures, which precludes restoration of the duties on bifacial panels.  Compl. ¶ 57 (citing 19 U.S.C. §§ 2254(b)(1)(B), 2481(6)); Pls. Br. 23.  This argument fails because Section 204(b)(1)(B) explicitly allows "modification" *in addition to* "reduction" or "termination."  To limit "modification" only to actions that *reduce* safeguard protections such as rates of duty would make "modification" coterminous with another action authorized by Section 204, "reduction", and therefore render "modification" superfluous.

This argument also fails because the President did not "increase" the safeguard measure by reinstating the safeguard duty on bifacial products or by slowing the tariff reduction rate in

24

the fourth year of the safeguard measure.  Pls. Br. 23-24.  First, by reinstating the application of

Section 201 duties to bifacial panels, the President restored the safeguard measure as originally

contemplated.  Second, by slowing the tariff reduction rate in the fourth year of the safeguard

measure, the President was not increasing the duty beyond the 20 percent rate that was in place

during year three.  The change from 15 percent to 18 percent in year four remains a net reduction

in the tariff rate between years three and four, not an increase.

### A.    Plaintiffs Fail To Establish A Clear Misconstruction Of Section 204

Plaintiffs wrongly contend that the text, structure, and legislative history of Section 204

allow for only liberalization of safeguard measures.  Pls. Br. 24-32.  This contention fails

because plaintiffs apply the wrong standard of construing Section 204 and, in any event, the

overarching purpose of Section 204 is to protect domestic industries from serious harm inflicted

by import competition.

First, plaintiffs apply the wrong standard.  Their brief's primary theme is that the

President acted unreasonably in interpreting Section 204 even though his actions fall within the

ordinary meaning of the word "modify."  *See*, *e.g.*, Pls. Br. 28-32.  But this Court does not

review the President's actions for reasonableness.  *George S. Bush & Co.*, 310 U.S. at 378-79.

Rather, the Court may look only to whether the challenged presidential action was authorized.

Here, nothing limits the President's authority in making modifications to a safeguard under

Section 204(b) to only liberalize trade.  "To imply {this limitation} would be to add what

Congress has omitted."  *Id*.  In sum, "the judgment of the President that on the facts, adduced in

pursuance of the procedure prescribed by Congress, a change of rate is necessary is no more

subject to judicial review under this statutory scheme than if Congress itself had exercised that

judgment."  *Id*. at 379–80.

Even if the Court were to apply a "reasonableness" standard, the President's determination would stand. There is no question that the exclusion of bifacial products has undermined the effectiveness of the safeguard measure. *See* USITC Pub. 5032 at III-4 ("bifacial modules are likely to account for a growing share of the market over the next few years and can substitute for monofacial products in all market segments. Imports of bifacial modules that are exempt from safeguard tariffs put significant price pressure on U.S. module producers, as these modules can be produced at virtually the same cost as monofacial modules."); *see also id.* at ES-3–5, I-4–5, II-9–10, II-15–18, III-1, III-4–7, D-7–10 (discussing issues caused by bifacial exclusion). Accordingly, in such situations in which the improvement in the domestic industry's fortunes is incomplete, it is eminently reasonable for the President to "modify" the safeguard measure under Section 204(b), in a manner that would reduce the serious injury caused by import competition. This is also the case with the President's determination to slow the reduction in the tariff rate during the fourth year of the safeguard measure. The President determined that:

> the exclusion of bifacial panels from application of the safeguard tariffs has impaired the effectiveness of the 4-year action I proclaimed in Proclamation 9693, and that to achieve the full remedial effect envisaged for that action, it is necessary to adjust the duty rate of the safeguard tariff for the fourth year of the safeguard measure to 18 percent.

*Proclamation 10101*, 85 Fed. Reg. at 65,640.

Furthermore, plaintiffs' reliance on legislative history is unpersuasive. Pls. Br. at 27-28 (citing Statement of Administrative Action to Accompany the Uruguay Round Agreement, H.R. Rep. No. 103-316, at 286 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4262 (SAA)). The cited portion of the SAA does not address the President's authority under Section 204(b)(1)(B). Moreover, the meaning of "modify" is not limited to a subset of modifications, and Congress elected not to include any language limiting the President's authority to modify. Accordingly,

plaintiffs are left with contending that the SAA acts as an implied limit on the President's discretion to "modify" a safeguard measure and that their reading of the SAA creates an ambiguity in the statute because the safeguard statute's definition of the word "modify" should not extend to its plain and ordinary meaning.  This contention fails because "'[l]egislative history, for those who take it into account, is meant to clear up ambiguity, not create it.'" *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1749 (2020) (quoting *Milner v. Department of Navy*, 562 U.S. 562, 574 (2011)).  And this holds true even if the law, as applied, generates results that were not expected or intended by the drafters.  The "fact that [a statute] has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Id*. (internal quotations and citations omitted).

In a similar vein, plaintiffs argue that the President's action was "unreasonable" because there might be potential "modifications" to safeguard measures that would be trade liberalizing but not involve a "reduction" or "termination" of the safeguard.  Pl. Br. 29-32.  First and foremost, this attacks the wrong problem.  As explained above, the purported congressional intent of trade liberalization stems solely from selected legislative history.  And legislative history, standing alone, cannot inject ambiguity into statutory language, even if the history appears to contradict the statute's ordinary meaning. *Bostock*, 140 S. Ct. at 1749.

Furthermore, the mere fact that one could semantically construct a trade liberalizing "modification" that is not called a "reduction" or "termination" does not save plaintiffs' attempt to redefine "modification."  Plaintiffs proffer as a counterexample a quota "modification" that *increases* the volume of imports.  Of course, that same *increase* in volume *reduces* the protection afforded by the safeguard measure and, thus, has the true nature of a reduction.  In fact, under

plaintiffs' logic, one could say that, by increasing a quota to an infinite volume, the President would merely be modifying the safeguard – not terminating it.  In sum, plaintiffs' attempt to twist out of the plain language through artifice is unsuccessful.

In any event, the fact that plaintiffs would even attempt to create a scenario where a modification does not involve a reduction or termination shows the error of their argument.  In essence, they search for a sliver of meaning within the word "modify" that would not be rendered wholly redundant under their argument that the word "modify" must be limited to actions that are trade liberalizing.  Indeed, "a legislature is presumed to have used no superfluous words.  Courts are to accord a meaning, if possible, to every world in a statute." *Platt v. Union Pacific R.R. Co*., 99 U.S. 48, 58 (1879).  When the Court accords meaning, it must "normally do so "in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock*, 140 S. Ct. at 1738.  "After all, *only the words on the page* constitute the law adopted by Congress and approved by the President."  *Id*. (emphasis added).

Lastly, plaintiffs' attempt to escape the plain meaning of the conference report issued with Section 204 provides them no support  Pls. Br. 31 (citing H.R. Rep. No. 100-576, at 687 (1988) (Conf. Rep.), *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1720).  The report explains that an earlier Senate amendment had stated that, upon receipt of the "ITC monitoring report, the President may reduce, modify (*but not increase*), or terminate any action."  H.R. Conf. Rep. 100-576, 687, 1988 U.S.C.C.A.N. 1547, 1720 (emphasis added).  This limitation was absent from Section 204, as enacted.  19 U.S.C. § 2254(b)(1).  Indeed, the crux of plaintiffs' argument is that, by excising plaintiffs' favored language from the statute, Congress somehow intended that this deleted language govern.  Of course, it is "the words on the page {that} constitute the law adopted by Congress and approved by the President," not the words cut from the page before

enactment. *Bostock*, 140 S. Ct. at 1738. "Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23-24 (1983).

### B.  The President Had Inherent Authority To Oversee The Exclusion Process

Plaintiffs contend that the President lacked authority to withdraw the bifacial exclusion. Pls. Br. 32-33.  The President delegated the authority to grant and terminate exclusions to the Trade Representative. *See Proclamation 9693*, 83 Fed. Reg. 3,541 at Annex I.  Contrary to plaintiffs' view that presidential action is presumptively *invalid* unless the President identifies a specific statute that allows that action, the Court must sustain presidential action if there is an "'act of Congress to which [the Court's] attention has been directed from which such a power can *fairly be implied*.'" *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)) (emphasis added); Def. Mot. to Dismiss 18-19.

Plaintiffs contend that the proclamation must cite the basis for the President's authority. Proclamation 10101 explicitly cites Section 204 of the Trade Act, which gives the President that authority.  But even had the Proclamation contained no formal citation, all that is required is that the Government identify a statute to which the Court's "'attention has been directed from which such a power can fairly be implied.'" *Id*. (citing *Youngstown*, 343 U.S. at 585).  In addition to Section 201, we also identified 19 U.S.C. § 2171, which grants the President supervisory powers over the United States Trade Representative.  Courts routinely look for alternative sources of authority to support presidential action, undermining any suggestion that the failure to explicitly invoke a particular statutory provision warrants setting aside otherwise authorized action. *E.g.,* *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 189 (1999) ("look[ing]

elsewhere for a constitutional or statutory authorization" for the President's removal order after determining that a particular statute did not authorize it); *see also W. Bend Co., Div. of Dart Indus. v. United States*, 576 F. Supp. 630, 634 (Ct. Int'l Trade 1983).

Lastly, *Florsheim* does not assist the plaintiffs.  Pls. Br. 33.  Indeed, in that case, the Court explained that "the presidential decision is a multifaceted judgmental decision, for which there is no law to apply.  After it is decided that the President has congressional authority for his action, his motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny."  *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787, 796 (Fed. Cir. 1984) (internal quotations and citations omitted).

## V.    **The President Did Not Violate Section 203**

Section 203 bars the reimposition of safeguard measures on articles previously subject to a safeguard measure during a waiting period after termination.  Plaintiffs contend that Section 203 bars rescission of the bifacial exclusion, which restored the safeguard measure to its original parameters.  Pls. Br. 33-38.  This misapprehends both Proclamation 10101 and Section 203.

First, the President authorized the Trade Representative to "*modify* the HTS provisions created by Annex 1 to this Proclamation to *exclude* such particular product from the safeguard measure." *Proclamation 9693*, 83 Fed. Reg. at 3,544 (emphasis added).  The President also delegated authority to USTR to "modify or terminate any such [exclusion] determination."). *Id*. at Annex I.  The President did not delegate any authority to "terminate" the safeguard measure.  As a result, had USTR "terminated" the measure as to any particular product, then that action would be void *ab initio* in light of the President's direction.

Despite this clear chain of delegation, plaintiffs nevertheless contend that an "exclusion" must act as a "termination" under Section 203.  Pls. Br. 38.  But their claim that *Proclamation*

*9693* intended that exclusions be "permanent," *id.*, fails to give effect to the very words used by the President, which allowed USTR only to "exclude" a product or to "modify or terminate any such [exclusion] determination."  83 Fed. Reg. 3,544; *id.* Annex I.  Accordingly, a full reading of the President's proclamation puts this argument to rest.

Second, the remainder of plaintiffs' Section 203 argument misidentifies the "article" for Section 201 purposes and wrongly attempts to equate the statutory term "article" with the word "product" contained in *Proclamation 9693*, 85 Fed. Reg. at 3,544.  Pls. Br. 33-37.  To be sure, had the President *terminated* the safeguard measure for a subset of products within the subject article in a Section 204 action, then that group of products would be subject to a two-year prohibition on reimposition of safeguard remedies under Section 203(c)(7)(A), 19 U.S.C. § 2253(c)(7)(A).  That is not what happened here.

In any event, plaintiffs misconstrue the statutory term "article" to mean a particular product.  Section 201 describes the "article" as the totality of all products under investigation.  *See* Def. Mot. to Dismiss 19-22.  Indeed, the term "article," as used in Section 203, refers to the foundational authority of Section 201, which conditions safeguard relief on an ITC determination that "*an article* is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article . . . "  19 U.S.C. § 2251(a) (emphasis added).  Section 202(b)(1)(a) directs the ITC "to *determine whether an article* is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing *an article like or directly competitive with the imported article*."  19 U.S.C. § 2252(b)(1)(A) (emphasis added).  Indeed, under the statute, the ITC investigates and the President provides relief to the domestic industry facing

31

injurious import competition from an article.  To this end, the ITC immediately defines the scope

of the "article" under investigation and the members of "the domestic industry."  *See generally*

USITC Pub. 4739 (Nov. 2017).

Moreover, Congress intended that "article" and "product" be separate terms.  The statute

contains special rules regarding "a domestic industry that produces a perishable agricultural

*product* or citrus *product* that is like or directly competitive with an imported perishable

agricultural *product* or citrus *product*."  19 U.S.C. § 2252(d)(1)(A) (emphasis added).  In

contrast, the preceding paragraph defines "domestic industry" to mean, "with respect to *an*

*article*, the producers *as a whole* of the like or directly competitive *article* or those producers

whose collective production of the like or directly competitive article constitutes a major

proportion of the total domestic production of such *article*."  19 U.S.C. § 2252(c)(6).

Nevertheless, plaintiffs ask the Court to conclude "that the differing language in the two

subsections has the same meaning in each."  *Russello*, 464 U.S. at 23.  Given that Congress

treated these terms as having different meanings, one cannot contest the President's following

Congress's lead and allowing exclusion of a "product" but not the "article."   Nothing in the

legislative history overcomes the clear statutory language used by Congress. Pls. Br. 34; see

*Bostock*, 140 S. Ct. at 1739.

Lastly, distinguishing "article" and "product" does not create absurd results.  Pls. Br. 38.

Plaintiffs contend that a consequence of defining the article at issue as consisting of "crystalline

silicon photovoltaic cells (whether or not partially or fully assembled into other products)

[(CPSV products)]," USITC Pub. 4739 at 5, would be that a follow-on safeguard measure that

made slight alterations to the scope of the "article" would exempt certain products from the

Section 203(c)(7)(A) waiting period.  However, if that were congressional intent, then so long as

that intent was constitutional, then the statute must stand.  In any event, the Section 203(c)(7)(A)

waiting period prevents "action."  As a result, by taking "action" on a newly defined "article"

whose scope includes products within the scope of an "article" subjected to a terminated

safeguard measure, the President would be taking action against a product falling within the

definition of article from the terminated measure.  For example, a new safeguard measure

covering bifacial products would necessarily involve action against CSPV products.

Accordingly, plaintiffs' attempt at *reductio ad absurdum* fails.

## VI.    Plaintiffs Misconstrue Sections 201, 202, And 204

Finally, relying on provisions found elsewhere in the statute, plaintiffs seek to engraft

words onto Section 204 requiring the President to make an express statement that he weighed

social costs and benefits of any reduction, modification, or termination.  Pls. Br. 39-42.

Specifically, they cite Sections 201(a) and 203(a)(2), which direct the President to consider the

economic and social costs and benefits in making the initial decision to impose a safeguard

measure.  *Id*. at 39-40.  But Section 204 does not require that the President re-do this analysis.

The words "social costs and benefits" are mentioned nowhere in Section 204.  That statute

provides the template for the President to follow, and there is no statutory basis for appending

additional requirements onto Section 204 determinations.  "[W]here Congress includes particular

language in one section of a statute but omits it in another section of the same Act, it is generally

presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion."

*Russello*, 464 U.S. at 23.

Moreover, the President already determined in *Proclamation 9693* that the economic and

social benefits of the solar safeguard measure outweighed the economic and social costs.  83

Fed. Reg. at 3,542.  In *Proclamation 10101*, the President determined in "that the exclusion of

bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action I proclaimed in *Proclamation 9693*," and that "the exclusion of bifacial panels from application of the safeguard tariffs has impaired the effectiveness of the 4-year action I proclaimed in Proclamation 9693, and that to achieve the full remedial effect envisaged for that action, it is necessary to adjust the duty rate of the safeguard tariff for the fourth year of the safeguard measure to 18 percent."  85 Fed. Reg. at 65,640.   This is not extracting "water from a stone."  Pls. Br. 42.  Rather, the President concluded that the bifacial exclusion had "impaired" action previously taken, which was explicitly identified as necessary to "facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs."  The President corrected this impairment by withdrawing the bifacial exclusion and modifying the slowdown in the tariff rate reduction in the fourth year of the safeguard measure.  *Proclamation 9693*, 83 Fed. Reg. at 3,542.  He therefore reaffirmed his earlier decision to impose a safeguard remedy and everything that led up to it.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court dismiss the complaint for failure to state a claim upon which relief can be granted and deny plaintiffs' motion for summary judgment as moot.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/  TARA K. HOGAN
Assistant Director

/s/  STEPHEN C. TOSINI
Senior Trial Counsel
/s/  JOSHUA E. KURLAND
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 616-5196
Email: stephen.tosini@usdoj.gov

June 11, 2021                              Attorneys for Defendants

CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(2) of the United States Court of International Trade, I certify that this motion contains 10,016 words, excluding those portions that do not count toward the word limitation and, thus, complies with the Court's Chambers Procedures.

/s/ Stephen C. Tosini