UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |  |
|---|---|---|
| SOLAR ENERGY INDUSTRIES ASSOCIATION, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Court No. 20-3941 |
| UNITED STATES, et al., | ) ) | |
| Defendants. | ) ) ) | |

PLAINTIFFS' REPLY IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT

John Brew
Larry Eisenstat
Amanda Shafer Berman
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500
aberman@crowell.com

Frances Hadfield
**CROWELL & MORING LLP**
590 Madison Ave, 20th Floor
New York, NY 10022
(212) 803-4040

*Counsel to Invenergy Renewables, LLC*

Matthew R. Nicely
James E. Tysse
Daniel M. Witkowski
Devin S. Sikes
Julia K. Eppard
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K Street, N.W.
Washington, D.C. 20006
(202) 887-4000
mnicely@akingump.com

*Counsel to SEIA and NextEra Energy, Inc.*

Kevin M. O'Brien
Christine M. Streatfeild
**BAKER & MCKENZIE LLP**
815 Connecticut Ave, NW
Washington, DC 20006
(202) 452-7000
kevin.obrien@bakermckenzie.com

*Counsel to EDF Renewables, Inc.*

June 25, 2021

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES............................................................................................... ii

INTRODUCTION ...............................................................................................................1

ARGUMENT .......................................................................................................................1

    I.     PROCLAMATION 10101 VIOLATES SECTION 204 OF THE TRADE
          ACT.....................................................................................................................1

          A.     The President Did Not Receive the Petition Required by Section
               204(b)(1)(B)..............................................................................................2

               1.     The Court Has the Authority to Determine Whether the
                     Petitions Meet the Statutory Requirements....................................2

               2.     The Petitions Did Not Request a Modification on the Basis
                     That the Domestic Industry Has Made a Positive
                     Adjustment to Import Competition ...................................................3

               3.     No Petition from a Majority of the Representatives of the
                     Domestic Industry Was Submitted to the President........................5

               B.     The President Did Not Make the Finding Required by Section
                204(b)(1)(B)..............................................................................................8

               C.     The President Took Action Not Authorized by Section
                204(b)(1)(B)............................................................................................12

               D.     The President Did Not Have Inherent Authority to Issue
                Proclamation 10101 ................................................................................16

    II.     PROCLAMATION 10101 VIOLATES SECTION 203 OF THE TRADE
          ACT...................................................................................................................18

    III.    PROCLAMATION 10101 VIOLATES SECTION 201 OF THE TRADE
          ACT...................................................................................................................21

CONCLUSION...................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barrett v. United States*,
423 U.S. 212 (1976)................................................................9

*BFP v. Resolution Trust Corp.*,
511 U.S. 531 (1994)................................................................13

*Carr v. United States*,
560 U.S. 438 (2010)................................................................9

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)................................................................11

*Corus Group PLC v. International Trade Commission*,
352 F.3d 1351 (Fed. Cir. 2003)................................................2, 3

*D. Ginsberg & Sons, Inc. v. Popkin*,
285 U.S. 204 (1932)................................................................17

*Est. of Cowart v. Nickols Dilling Co.*,
505 U.S. 469 (1992)................................................................9

*Florsheim Shoe Co., Div. of Interco, Inc. v. United States*,
744 F.2d 787 (Fed. Cir. 1984)................................................18

*Gilda Indus., Inc. v. United States*,
622 F.3d 1358 (Fed. Cir. 2010)................................................13

*Keene Corp. v. United States*,
508 U.S. 200 (1993)................................................................10

*King v. Burwell*,
576 U.S. 473 (2015) ................................................14, 15, 21

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999)................................................................17

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014)................................................................11

*Platt v. Union Pacific R.R. Co.*,
99 U.S. 48 (1879)................................................................4

*Schwegmann Bros. v. Calvert Distillers Corp.*,
 341 U.S. 384 (1951) ........................................................................................21

*Transpacific Steel LLC v. United States*,
 415 F. Supp. 3d 1267 (Ct. Int'l Trade 2019) ................................................11, 12

*United States v. Wilson*,
 503 U.S. 329 (1992) ......................................................................................9, 10

*W. Bend Co., Div. of Dart Indus. v. United States*,
 576 F. Supp. 630 (Ct. Int'l Trade 1983) ......................................................17, 18

*Yates v. United States*,
 574 U.S. 528 (2015) ........................................................................................11

**Statutes**

19 U.S.C. § 1671a(c)(4) ...........................................................................................8

19 U.S.C. § 1673a(c)(4) ...........................................................................................8

19 U.S.C. § 2171 ...............................................................................................16, 17

19 U.S.C. § 2251(a) ...............................................................................................21

19 U.S.C. § 2251(b)(1) ........................................................................................9, 11

19 U.S.C. § 2251(b)(2) ..........................................................................................10

19 U.S.C. § 2252(d)(1)(A) .....................................................................................19

19 U.S.C. § 2252(d)(5)(B) .....................................................................................19

19 U.S.C. § 2253(a)(1)(A) .......................................................................................2

19 U.S.C. § 2253(e)(1)(B)(i)(II) ...........................................................................10

19 U.S.C. § 2254(b)(1) ...............................................................................3, 5, 8, 9

19 U.S.C. § 2254(c)(1) ...........................................................................................10

19 U.S.C. § 2481(6) ...............................................................................................14

Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100-418, § 1401(a)....................16, 17

Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100-418, § 1601(a)....................16, 17

**Other Authorities**

134 Cong. Rec. 7197 (1988) ..................................................................................5

H.R. Rep. 100-576 (1988) ....................................................................................4

Modify, *Merriam-Webster Dictionary*, https://www.merriam-
    webster.com/dictionary/modify ...................................................................14

Proclamation No. 7529, 67 Fed Reg. 10,553 (Mar. 5, 2002) ...........................2

Proclamation No. 9693, 83 Fed. Reg. 3,541 (Jan. 25, 2018) ...................12, 20

Proclamation No. 10101, 85 Fed. Reg. 65,639 (Oct. 16, 2020) ..................8, 12, 13, 16

Representative, *Merriam-Webster Dictionary*, https://www.merriam-
    webster.com/dictionary/representative ..........................................................7

Such, *Merriam-Webster Dictionary*, https://www.merriam-
    webster.com/dictionary/such ..........................................................................4

U.S. Const. art. I, § 8, cl. 1 .................................................................................11

USITC Pub. 5021 (Feb. 2020) .............................................................................7

## INTRODUCTION

Plaintiffs Solar Energy Industries Association, NextEra Energy, Inc., Invenergy Renewables LLC, and EDF Renewables, Inc. ("Plaintiffs") respectfully submit this Reply in support of their Cross-Motion for Summary Judgment, ECF No. 28.  As Plaintiffs explained in our initial brief ("Pls.' Brief"), President Trump violated the Trade Act of 1974 when he modified the solar safeguard measure via Proclamation 10101.  President Trump violated Section 204(b)(1)(B) by acting without statutory prerequisites having been met, without making the findings required by Section 204(b)(1)(B), and by increasing trade restrictions, which is not authorized by Section 204(b)(1)(B).  President Trump also violated Section 203(e)(7) by re-imposing safeguard duties on bifacial panels less than two years after safeguard duties were lifted from imports of those panels.  And President Trump violated Section 201(a) of the Trade Act by failing to consider the social and economic costs of the modifications to the safeguard measure.  Because Defendants fail to show that Proclamation 10101 is consistent with the Trade Act in their Reply in Support of their Motion to Dismiss and Response to Plaintiffs' Motion, ECF No. 29 ("Gov. Reply"), the Court should grant Plaintiffs' Cross-Motion for Summary Judgment.

## ARGUMENT

### I.     PROCLAMATION 10101 VIOLATES SECTION 204 OF THE TRADE ACT

Plaintiffs previously demonstrated that Proclamation 10101 violated Section 204(b)(1)(B), because President Trump did not receive the petition required to take action under that provision, he did not make the finding required under that provision, and he took action that was not authorized by that provision.  Pls.' Br. 12-32.  None of Defendants' rebuttals is supported by the law or the facts.

A.      **The President Did Not Receive the Petition Required by Section 204(b)(1)(B)**

No petition meeting the requirements set forth in Section 204(b)(1)(B) was submitted to the President. *Id.* at 12-21. Defendants fail to demonstrate otherwise.

1.      **The Court Has the Authority to Determine Whether the Petitions Meet the Statutory Requirements**

Defendants argued in their Motion to Dismiss that the Court could not review the President's statement that he had received a petition meeting the requirements of Section 204(b)(1)(B). Mot. to Dismiss 16-18, ECF No. 17. Defendants largely repeat the same argument in their Reply. Gov. Reply 10-11. Plaintiffs have already explained why the Court should reject Defendants' untenable position. Pls.' Br. 17-21.

The only new argument Defendants assert is that the cases Plaintiffs cited to support the Court's authority to review the President's compliance with statutory prerequisites "focused entirely on ensuring that preconditional action taken by . . . other officials that were preconditions to presidential action did, in fact, occur." Gov. Reply 11. But that is Plaintiffs' point: the Court in those cases ensured that the preconditions to Presidential action did, in fact, occur, rather than simply taking the President's word for it. For example, in *Corus Group PLC v. International Trade Commission*, 352 F.3d 1351 (Fed. Cir. 2003), President Bush applied safeguard duties on tin mill products via Proclamation 7529, which stated that "[t]he ITC commissioners were equally divided with respect to the determination required under section 202(b)" regarding tin mill products. Proclamation No. 7529, 67 Fed. Reg. 10,553, 10,553 ¶ 2 (Mar. 5, 2002). President Bush thus claimed in Proclamation 7529 that he received the report from the ITC that contained the findings required by the statute to allow Presidential action. *Id.* ¶¶ 1-2; *see also* 19 U.S.C. § 2253(a)(1)(A) ("After receiving a report under section 2252(f) of this title containing an affirmative finding regarding serious injury, or the threat thereof, to a domestic industry, the President shall take all

appropriate and feasible action . . . .").  But the Federal Circuit did not take the President's word for it, or treat this assertion as unreviewable; instead, the court reviewed the ITC's report for itself to determine whether the ITC had in fact reached a tie vote with respect to tin mill products, explaining that "the President's action was lawful only if the Commission was evenly divided." *Corus,* 352 F.3d at 1360-61.

Plaintiffs are asking the Court to apply the same analysis here.  President Trump's action was lawful only if he, in fact, received a conforming petition.  As *Corus* (along with Plaintiffs' other authority) demonstrates, President Trump's assertion that he received a petition from a majority of the representatives of the domestic industry does not prevent this Court from independently ensuring that he in fact complied with that statutory requirement.

### 2. The Petitions Did Not Request a Modification on the Basis That the Domestic Industry Has Made a Positive Adjustment to Import Competition

The letters supposedly constituting the required "petition" do not identify the domestic industry's positive adjustment to import competition as the basis for the request to modify the safeguard measure.  Pls.' Br. 13-16.  Defendants do not contend otherwise.  *See* Gov. Reply 21-22. Instead, Defendants argue that "[n]othing in this provision [(i.e., Section 204(b)(1)(B))] suggests that the petition must even mention "a positive adjustment to import competition."  Gov. Reply 21.  The statutory text belies Defendants' argument.

Section 204(b)(1)(B) allows the President to reduce, modify, or terminate a safeguard action only "if the President determines, *after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination* **on such basis**, *that the domestic industry has made a positive adjustment to import competition*." 19 U.S.C. § 2254(b)(1)(B) (emphasis added).  The phrase "on such basis" means that the request

for modification must be explicitly made on the basis that the domestic industry has made a positive adjustment to import competition.   Pls.' Br. 15-16.   Defendants characterize this interpretation as "tortured" and claim that "[t]he adjective 'such' refers *back* to something indicated *earlier* in the text."  Gov. Reply 21.  The definition of "such" encompasses "something stated, implied, or exemplified."   "Such," *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/such.  In context, that must refer to a "positive adjustment," which is the only "basis" offered in the text.  Plaintiffs' reading thus gives the phrase "such basis" meaning.

Tellingly, Defendants do not identify the "basis" that the language "refers back to" from "earlier" in the text.  Nor do Defendants identify any alternative reading of the text that makes sense.  Rather, they simply ask the Court to read the words "on such basis" out of the statute.  As Defendants themselves observe, "a legislature is presumed to have used no superfluous words.  Courts are to accord a meaning, if possible, to every world in a statute."  Gov. Reply 28 (citing *Platt v. Union Pacific R.R. Co.*, 99 U.S. 48, 58 (1879)).

To the extent that there is any remaining ambiguity in Section 204(b)(1)(B), the legislative history confirms that Plaintiffs' interpretation is correct.  The Conference Report describes the intent of this provision as follows:

> [S]ubsequent to receiving the first ITC monitoring report (or ITC advice thereafter), the President may reduce, modify or terminate any action taken if either:
>
> > (1) [the President finds changed circumstances] or
> >
> > (2) a majority of representatives of the domestic industry requests such reduction, modification or termination *on the basis that the domestic industry has made a positive adjustment to import competition*.

H.R. Rep. 100-576 at 688 (1988) (emphasis added).  The summary of the bill in the Congressional Record also explains that this provision "[a]uthorizes the President, after 2 years have lapsed, to reduce, modify, or terminate action if either (1) *the domestic industry requests it on the basis that*

4

*it has made a positive adjustment*, or (2) . . . ."  134 Cong. Rec. 7197 (1988) (emphasis added).  Both passages make clear that the domestic industry's request must be on the basis that the industry has made a positive adjustment to import competition.

Defendants also argue that requiring the domestic industry to state that they have made a positive adjustment would be superfluous to the ITC's mid-term report.  Gov. Reply 22.  But Defendants ignore the fact that the President is not required to take the ITC's report into account under Section 204(b)(1)(B).  Only Section 204(b)(1)(A) imposes such a requirement.[1]  The modification of a safeguard measure pursuant to Section 204(b)(1)(B) is driven by the wishes of the domestic industry, not the findings of the ITC.

Finally, Defendants assert that Plaintiffs' reading of the statute "makes no sense because it would require individual producers to make determinations regarding the entire industry."  Gov. Reply 22.  But it is perfectly reasonable for Congress to believe that "a majority of the representatives of the domestic industry" would be knowledgeable about the overall industry, and could speak authoritatively on the industry's behalf.  Defendants provide no basis to ignore the clear intent of Congress.

### 3. No Petition from a Majority of the Representatives of the Domestic Industry Was Submitted to the President

Proclamation 10101 is separately unlawful because no petition from a majority of the representatives of the domestic industry was submitted to the President.  *See* Pls.' Br. 14-17.  The President can act under Section 204(b)(1)(B) only "after a majority of the representatives of the

---

[1] Although the President must wait to take action under Section 204(b)(1)(B) until he receives the ITC's report, 19 U.S.C. § 2254(b)(1) (prohibiting action "before the President receives the [ITC's] report"), this serves only as a timing requirement for purposes of Section 204(b)(1)(B).  *Compare* 19 U.S.C. § 2254(b)(1)(A) (separately requiring President to take into account the ITC's report); 134 Cong. Rec. 7197 (1988) (describing provision as "[a]uthoriz[ing] the President, after 2 years have lapsed, to reduce, modify, or terminate action").

domestic industry submits to the President a petition."  No single letter was joined by a majority of the representatives of the domestic industry, even if Defendants' erroneous interpretation of "majority of the representatives of the domestic industry" (discussed below) is adopted.

Defendants argue that the Court should read Section 204(b)(1)(B) as allowing the submission of multiple "petitions."  Gov. Reply 13.  Defendants' position would undermine the assumption that the petition submitted reflects the views and knowledge of the domestic industry. Sporadic letters from various companies can hardly be said to reflect the views of the industry as a whole, particularly when each letter said something different, and none of them addressed what the statute actually requires.  Defendants also ignore Plaintiffs' argument that the statute requires that the domestic industry "*submits to the President* a petition."  Pls.' Br. 14.  Defendants cite a dictionary that defines "petition" as "a formal written request made to an authority or organized body (such as a court)," and then claim that "[e]ach of the three letters comprising the petition met the criteria of making a formal request to an authority, namely the President."  Gov. Reply 12.  But all of the letters produced by Defendants were submitted to USTR, not the President.

The July 2019 Letter, ECF No. 23, Attachment C, should not be considered a "petition" for additional reasons.  That letter "urge[s] USTR to immediately rescind th[e] exclusion order" on bifacial panels.  Notably, the July 2019 Letter was submitted before the ITC even initiated the mid-term review process.  The request for *USTR* to "*immediately*" take action cannot reasonably be construed as a "formal request" that the *President* modify the safeguard measure, because the President is not authorized to modify the safeguard measure under Section 204(b)(1) until after the ITC issues its mid-term report, which would not happen until *seven months later*.  Once this letter is disregarded, there is no basis to conclude that a majority of the representatives of the domestic

industry petitioned for withdrawal of the Exclusion, regardless of how "majority of the representatives of the domestic industry" is defined.

Finally, even if the three letters can be treated as a single "petition" submitted to the President, there still would be no petition requesting each modification from "a majority of the representatives of the domestic industry." Pls.' Br. 15-17. Defendants argue that a majority of the domestic industry, defined in terms of the percentage of overall CSPV module production in the first half of 2019, requested the modifications. Gov. Reply 6-7, 14-19. Defendants read the statute as if it said "representatives of the majority" of the domestic industry, but that is not what it says. Instead, it refers to "a majority of the representatives." The same dictionary that Defendants cite in their Reply defines "representative" as "one that represents another or others: such as . . . one that represents a business organization." "Representative," *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/representative. Thus, "majority of the representatives" reflects a majority of particular individuals, consistent with Plaintiffs' reading of the statute. According to the ITC's monitoring report, there are 20 domestic CSPV producers, USITC Pub. 5021 (Feb. 2020), at I-40, Table I-10, and the representatives of only six of them signed the letters to USTR that President Trump treated as the petition. Because there was no petition from "a majority of the representatives of the domestic industry," President Trump lacked authority under Section 204(b)(1)(B) to modify the safeguard measure.

Defendants unpersuasively argue that it was proper for President Trump to have relied on a petition that was joined by companies reflecting a majority of domestic production. Defendants observe that "production" is emphasized throughout the safeguard statute, *see* Gov. Reply 17-19, but they ignore the actual text of the provision in question. Congress *omitted* any reference to production in Section 204(b)(1)(B). Given Congress's focus on production elsewhere in the

statute, had Congress intended for the petition to be filed on behalf of firms representing a "majority of production," it would have said so.  Notably, other trade remedy statutes are explicit when production is intended to be used to determine a majority.  The antidumping and countervailing statute has provisions for purposes of determining whether a domestic industry supports a petition, and those provisions are explicit that percentage of production should be used. *See* 19 U.S.C. §§ 1671a(c)(4), 1673a(c)(4).  Section 204(b)(1)(B) contains no similar language.

Defendants assert that Plaintiffs' textual reading of the statute would effectively give smaller producers a disproportionate influence over whether the President could modify the safeguard measure.  Gov. Reply 18-19.  Defendants' policy arguments do not compel the Court to adopt Defendants' reimagining of unambiguous text.  In requiring a petition from "a majority of the representatives" of the industry, the statutory text reflects a Congressional desire for the petition to express the views of a majority of industry participants irrespective of the size of their production, including those with smaller production volumes who may be the companies that were most harmed by increased imports.

**B.      The President Did Not Make the Finding Required by Section 204(b)(1)(B)**

Section 204(b)(1)(B) authorizes the President to reduce, modify, or terminate a safeguard action only "if the President . . . determines . . . that the domestic industry has made a positive adjustment to import competition."  19 U.S.C. § 2254(b)(1)(B).  Instead of making such a finding, the President determined in Proclamation 10101 that "the domestic industry *has begun to make* positive adjustment to import competition."   85 Fed. Reg. 65,639, 65,640 (Oct. 16, 2020) (emphasis added).  In failing to make the requisite finding, the President acted outside of his statutory authority and in a manner inconsistent with the statutory scheme.  Pls.' Br. 21-23.

Defendants equate Plaintiffs' argument to a quibble over "semantic[s]" and contend that "the phrase 'has made a positive adjustment' is broad enough to include 'has begun to make a positive adjustment.'"  Gov. Reply 22.  In Defendants' view, the President may act so long as the domestic industry "has moved in a positive direction," or so long as "some forward, or 'positive' progress [is made] towards the ultimate goal of the safeguard measure."  *Id.* at 22-23.

The plain text of the statute belies Defendants' arguments.  Section 201(b)(1) provides that "a positive adjustment to import competition occurs when . . . the domestic industry . . . is able to compete successfully with imports" after a safeguard terminates or "the domestic industry experiences an orderly transfer of resources to other productive pursuits" *and* "dislocated workers in the industry experience an orderly transition to productive pursuits."  19 U.S.C. § 2251(b)(1)(A)-(B).  "Positive adjustment" also appears in Section 204(b)(1)(B), and must be construed to have the same meaning as the definition provided in Section 201(b)(1).  *See Est. of Cowart v. Nickols Dilling Co.*, 505 U.S. 469, 479 (1992) ("[I]dentical terms within an Act bear the same meaning." (citations omitted)).

Section 204(b)(1)(B), however, does not merely repeat "positive adjustment" in the same manner as it appears in Section 201(b)(1).  Instead, Section 204(b)(1)(B) authorizes the President to act only when the domestic industry "*has made* a positive adjustment to import competition." 19 U.S.C. § 2254(b)(1)(B).  "Congress' use of a verb tense" – here, the present perfect "has made" – "is significant in construing statutes."  *United States v. Wilson*, 503 U.S. 329, 333 (1992) (citations omitted).  Congress uses "the present perfect tense" of a verb to "denot[e] an act that has been completed."  *Barrett v. United States*, 423 U.S. 212, 216 (1976); *accord Carr v. United States*, 560 U.S. 438, 448 (2010).  In other words, Congress authorized the President to act pursuant to Section 204(b)(1)(B) only if the domestic industry has already made its positive adjustment to

import competition; merely "beginning" to make such an adjustment conflicts with the statutory standard.

Defendants' argument also fails to address Plaintiffs' argument that Congress's deliberate use of "has made" was intended to convey a different meaning than "is making," which is used elsewhere in the statute. Pls.' Br. 22-23. In Section 204(c)(1), Congress instructed the ITC to consider "whether there is evidence that the [domestic] industry *is making* a positive adjustment to import competition" in deciding whether to extend the duration of the safeguard. 19 U.S.C. § 2254(c)(1) (emphasis added). Separately, in Section 203, Congress authorized the President to extend a safeguard if he determines, *inter alia*, that "there is evidence that the domestic industry *is making* a positive adjustment to import competition." 19 U.S.C. § 2253(e)(1)(B)(i)(II) (emphasis added). This shows that, had Congress intended for the President to act under Section 204(b)(1)(B) based on a finding that an adjustment is in process, it would have said so, using the appropriate verb tense. *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)); *see also Wilson*, 503 U.S. at 333 (describing Congress's use of a particular verb tense as "significant").

Defendants' remaining arguments fare no better. Defendants posit that the Court should treat "is making" and "has made" in Section 204 as synonymous because the definition of "positive adjustment" in Section 201 contemplates a recovery by the domestic industry in which it "is not of the same size and composition as the industry at the time the investigation was initiated." Gov. Reply 23 (quoting 19 U.S.C. § 2251(b)(2)). Defendants' construction, however, strips "positive adjustment" from its context in Section 204(b)(1)(B) and ignores Congress's explicit instruction

that the President may act only once the domestic industry "has made" the positive adjustment. Defendants' proffered construction would therefore improperly render "has made" in Section 204(b)(1)(B) mere surplusage.  *See Yates v. United States*, 574 U.S. 528, 546 (2015) (rejecting a proposed statutory interpretation that would render certain words "surplusage").

Defendants contend that even if the Court disagrees with their interpretation of Section 204(b)(1)(B), "the President possesses discretion to address situations falling between" either "complete recovery of the entire domestic industry" or "demise of the entire domestic industry." Gov. Reply 23-24.  That is a false dichotomy:  Congress defined a "positive adjustment" as the ability of the industry merely to "compete successfully," not as a "complete recovery of the entire domestic industry."  19 U.S.C. § 2251(b)(1)(A)-(B).  Defendants also ignore the fact that action under Section 204(b)(1)(A) is *not* predicated on the domestic industry having made a positive adjustment.

Regardless, this is Congress's choice to make; no amount of alleged presidential discretion may overcome a clear statutory command.  *See, e.g.*, *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014) ("Our analysis begins and ends with the text" when the "text is patently clear.").  Defendants cite no authority for the proposition that the President has inherent authority to "gap fill[]" in this context.  Gov. Reply 24.[2]  Nor can it:  the authority to impose duties rests with Congress, U.S. Const. art. I, § 8, cl. 1, and the express conditions that

---

[2] Defendants likewise contend that the standard governing the President's construction of a statute "is far more deferential than that afforded to *agencies* under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)."  Gov. Reply 24.  Defendants cite no authority for this proposition, and, in any event, the President has no authority to ignore the clearly expressed intentions of Congress, regardless of the standard that applies to the President's construction of a statute.  *See, e.g.*, *Transpacific Steel LLC v. United States*, 415 F. Supp. 3d 1267, 1273 (Ct. Int'l Trade 2019) (holding that the President unlawfully failed to follow "the statute's clear and unambiguous steps").

Congress attached to its delegation of authority to the President "would become mere formalities" if the President "could act beyond" those conditions. *Transpacific*, 415 F. Supp. 3d at 1276. Defendants' view of the President's inherent authority to modify safeguard measures would render meaningless all of the conditions that Congress imposed in delegating authority to the President under the safeguard statute.

### C.    The President Took Action Not Authorized by Section 204(b)(1)(B)

The modifications announced in Proclamation 10101 also violated Section 204(b)(1)(B) because they increased trade restrictions. Pls.' Br. 23-32. Defendants' contrary arguments should be rejected.

Defendants argue that Proclamation 10101 did not increase trade restrictions. Defendants claim that the withdrawal of the Exclusion merely restored the safeguard measure to its prior scope. Gov. Reply 25. That position conflicts with Proclamation 10101 itself, which describes the withdrawal of the Exclusion as a "modification" of the safeguard measure and modifies the HTSUS to apply safeguard duties to solar panels that were not subject to those duties when Proclamation 10101 was issued. 85 Fed. Reg. at 65,640, 65,642. Contrary to Defendants' arguments, President Trump thus plainly *increased* trade restrictions via the withdrawal of the Exclusion.

Defendants also argue that the change in the duty rate for the fourth year of the safeguard measure did not result in an increase from the third year of the safeguard measure. Gov. Reply 25. That is irrelevant. In the original safeguard Proclamation, President Trump set the duty rate for the fourth year of the measure to 15 percent, and the HTSUS was amended accordingly. Proclamation No. 9693, 83 Fed. Reg. 3,541, 3,548 (Jan. 25, 2018). President Trump then ordered the HTSUS to be amended to reflect an 18 percent duty rate. Proclamation No. 10101, 85 Fed.

Reg. at 65,640.  Had Proclamation 10101 not issued, importers would be paying a 15 percent duty right now, instead of 18 percent.  In this way, too, Proclamation 10101 resulted in an increase in trade restrictions.

Defendants next argue that it was "reasonable" for the President to increase trade restrictions in light of the facts before him.  *See* Gov. Reply 25-26.  Plaintiffs are not attacking the reasonableness of the President's judgment, but whether the law authorized him to take the action he took.  An analysis of the statute's text and structure and the application of traditional tools of statutory interpretation demonstrate that Congress did not intend for the modification authority in Section 204(b)(1)(B) to be used to increase trade restrictions.  *See* Pls.' Br. 23-32; *see also Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1363 (Fed. Cir. 2010) (acknowledging that deference is accorded to the Executive Branch in decisions "implicating the discretionary authority of the President in matters of foreign relations," but explaining that "the judiciary is the final authority on issues of statutory construction" (internal quotation marks and alteration omitted)).  The President's view of what he considers good policy does not allow him to take action that is beyond the powers delegated to him by Congress.

As to the actual interpretation of the statute, Defendants again argue that Plaintiffs' interpretation would render "modification" superfluous.  Gov. Reply 24, 27-28.  Plaintiffs have already explained why an interpretation of Section 204(b)(1)(B) that allows only trade-liberalizing modifications does not render "modification" superfluous, providing specific examples of modifications of an action that would not involve a "reduction" of that particular action.  Pls.' Br. 28-29; *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994) (interpretation would not render statutory provision superfluous because it would "continue to have independent meaning" in certain contexts).  Defendants take issue with Plaintiffs' example that a modification in the

nature of an "increased" quota would be trade-liberalizing, by arguing that "the same *increase* in volume *reduces* the protection afforded by the safeguard measure and, thus, has the true nature of a *reduction*." Gov. Reply 27. But the statute does not refer to a modification, termination or reduction of "protection." It refers to the "reduction, modification, or termination of the action." Under Section 203(a)(3), a quota is a type of "action." In Plaintiffs' example, a "reduction" of the "action"—the quota—would actually increase trade restrictions, while the authority to "modify" the quota would allow an increase of that "action" that liberalizes trade. In a similar vein, the form of the "action" imposed can be changed from a quota to a tariff rate quota. That is a modification of the action that liberalizes trade, but it is not a reduction of the original action (the quota).[3]

Defendants next argue that Plaintiffs' interpretation would violate the plain and ordinary meaning of "modify." Gov. Reply 27-28. Defendants' argument is flawed.

First, it is not factually accurate. According to the dictionary that Defendants cite elsewhere in their Reply, the very first definition of "modify" is "to make less extreme: MODERATE." "Modify," *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/modify. This ordinary meaning supports Plaintiffs' interpretation that the use of the word "modify" in Section 204(b)(1)(B) was intended to authorize only trade liberalizing measures.

Second, the word "modify" in Section 204(b)(1)(B) cannot be considered in isolation. As the Supreme Court explained in *King v. Burwell*,

> If the statutory language is plain, we must enforce it according to its terms. But oftentimes the meaning—or ambiguity—of certain words or phrases may only

---

[3] The fact that a modification could be used to effectively achieve a reduction or termination of an action in certain instances does not mean that those terms are superfluous, and those situations were specifically contemplated by Congress. *See* 19 U.S.C. § 2481(6) ("modification . . . includes the elimination of any duty or other import restriction").

> become evident when placed in context.  So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme.  Our duty, after all, is to construe statutes, not isolated provisions.

576 U.S. 473, 486 (2015) (internal quotation marks and citations omitted); *see also id.* at 496-97

(rejecting seemingly plain meaning of statutory term when consideration of context and broader

statute rendered that interpretation untenable).  Regardless of whether Defendants' interpretation

of "modify" is consistent with its ordinary meaning, that word cannot be given the meaning that

Defendants ascribe to it when that word is considered in context and with a view to the broader

safeguard statute.

Here, the finding that justifies the "modification" is the domestic industry having made a

"positive adjustment" to import competition, i.e., a finding that the domestic industry is now able

to compete with imports.  That finding logically supports only one possible modification:  a

*reduction* in trade restrictions.  As Plaintiffs explained, the safeguard statute also contains

provisions that require trade restrictions to be phased down and that prohibit the extension of trade

restrictions when those restrictions are no longer necessary or serving their original purpose.  Pls.'

Br. 4-5.  These provisions reflect an overall intent that safeguard measures be progressively trade

liberalizing, which was confirmed in the Uruguay Round Agreements Act Statement of

Administrative Action.  Pls.' Br. 27-28.  Plaintiffs' interpretation is consistent with that broader

intent, while Defendants' is not.

The safeguard statute also has a carefully constructed system of procedural and substantive

checks to make sure that the concerns of interested parties other than the domestic industry are

considered and that the benefits of safeguard actions outweigh their costs.  *See* Pls.' Br. 3-5.

Interpreting "modification" as meaning trade-liberalizing changes to the safeguard measure fits

neatly within that system, given that the only procedural prerequisite (other than the timing

requirement that applies to all of Section 204(b)(1)) is that the domestic industry file a petition asking for a reduction, modification, or termination of the measure.  Defendants' interpretation, on the other hand, would allow the President to grant additional trade relief to the domestic industry merely because the industry asked for it, without having to consider anything other than the domestic industry's petition.  That would completely upset the careful balance that Congress struck everywhere else in the statute.  This Court should not adopt an interpretation of the statute that does violence to the overall statutory scheme.  *See* Pls.' Br. 35-36.

### D.    The President Did Not Have Inherent Authority to Issue Proclamation 10101

Finally, Defendants argue President Trump had inherent authority to oversee the exclusion process.  Gov. Reply 29-30.  He did not.

Defendants assert that the President delegated to USTR the authority to terminate exclusions, citing Annex I to Proclamation 9693.  Gov. Reply 29.  As explained in Section II, below, Defendants' reading of Annex I is unreasonable.  Proclamation 10101 does not indicate that the President had previously delegated any such authority to USTR, and it describes the withdrawal of the Exclusion as a "modification" of the safeguard measure.  85 Fed. Reg. at 65,640.  That characterization indicates that even the President recognized that withdrawal of the Exclusion was not authorized under the original safeguard measure.

Defendants then argue that 19 U.S.C. § 2171 serves as an alternative basis of authority for the President to withdraw the Exclusion.  Gov. Reply 29.  That section of the Trade Act imposes obligations on USTR and provides that USTR shall be responsible for such functions as the President may direct.  19 U.S.C. § 2171(c)(1)(J).  It does not grant additional authority over tariffs to the President, which is a power that the Constitution vests in the first instance with Congress. Moreover, 19 U.S.C. § 2171(c)(1)(J) was added to the Trade Act at the same time as Section 204(b)(1).  *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100-418, §§ 1401(a),

1601(a), 102 Stat. 1107, 1238, 1261.  Congress specifically provided for, and set limitations on, the modification of safeguard measures when it added Section 204(b)(1) to the Trade Act. Congress could not have intended to grant the President authority to modify safeguards, which is what Proclamation 10101 states it is doing,[4] only if the President follows specific statutory procedures in Section 204, and at the same time provide the President broad authority to modify safeguard measures without following any procedural requirements—especially not through the vague and inapplicable language in 19 U.S.C. § 2171(c)(1)(J).  *See D. Ginsberg & Sons, Inc. v. Popkin,* 285 U.S. 204, 208 (1932) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment.").

In any event, even if 19 U.S.C. § 2171(c)(1)(J) *could* provide President Trump with the authority to withdraw the Exclusion,[5] President Trump cited Section 204(b)(1)(B), not 19 U.S.C. § 2171(c)(1)(J), as the legal basis for his action.  *See* 85 Fed. Reg. at 65,640.  Defendants assert that "[c]ourts routinely look for alternative sources of authority to support presidential action." Gov. Reply 29.  Yet, neither of the cases Defendants cite for that proposition involved a court upholding Presidential action on the basis of a statutory provision different from one that was cited by the President.  In *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999), the executive order did not cite any specific authority—unlike here, where President Trump specifically relied on Section 204(b)(1)(B).  (Even then, the *Mille Lacs* Court held that the President had no authority to issue that executive order.)  And in *W. Bend Co., Div. of Dart Indus.*

---

[4] Defendants' argument in their Motion to Dismiss also refers to President Trump's "independent and undelegated authority to modify a safeguard measure."  Mot. to Dismiss 19.  Defendants thus also recognize that President Trump modified the safeguard measure.

[5] Defendants do not argue that 19 U.S.C. § 2171(c)(1)(J) serves as a separate basis of authority to increase the safeguard duty rate during the fourth year of the measure.

*v. United States*, 576 F. Supp. 630, 634 (Ct. Int'l Trade 1983), the court in fact refused to consider an alternative statutory basis for the President's authority. These cases are consistent with the Federal Circuit's admonishment that "the courts may not go behind the Executive Orders to search for the 'actual' basis for the President's action." *Florsheim Shoe Co., Div. of Interco, Inc. v. United States*, 744 F.2d 787, 797 (Fed. Cir. 1984).

## II.      PROCLAMATION 10101 VIOLATES SECTION 203 OF THE TRADE ACT

Plaintiffs explained in their initial brief that Proclamation 10101 violated Section 203(e)(7) of the Trade Act by re-imposing safeguard duties on bifacial panels less than two years after such duties were lifted with respect to those panels. Pls.' Br. 33-39. Defendants' arguments to the contrary are unpersuasive.

First, in an apparent about-face, Defendants concede that bifacial panels may be an "article" for purposes of Section 203(e)(7). Defendants acknowledge that "had the President terminated the safeguard measure for a subset of products within the subject article in a Section 204 action, then that group of products would be subject to a two-year prohibition on reimposition of safeguard remedies." Gov. Reply 31 (emphasis omitted). Defendants further state that "a new safeguard measure covering bifacial products would necessarily involve action against CSPV products" and violate Section 203(e)(7). Gov. Reply 33. Defendants therefore agree with Plaintiffs' understanding of the statute. *See* Pls.' Br. 35-38.

Defendants nevertheless argue that the safeguard action was not terminated with respect to bifacial panels. Defendants still contend that Plaintiffs have misidentified the relevant "article" for purposes of Section 203(e)(7) and claim that the President authorized only the exclusion of a "product," which has a different meaning than "article" under the statute. Gov. Reply 31-32. Thus,

in Defendants' view, the safeguard action could not be terminated with respect to bifacial panels, because they are not an "article." *See id.*

Defendants' argument runs headlong into their own recognition that Section 203(e)(7) also applies to a "subset of products within the subject article" that are later subject to additional safeguard remedies. But if that were not enough to defeat Defendants' argument, the statute does not draw the distinction between "article" and "product" that Defendants claim. Defendants cite 19 U.S.C. § 2252(d)(1)(A), which refers to "perishable agricultural product" and "citrus product," as supporting that distinction. Gov. Reply 32. Congress defined "perishable agricultural *product*" as "any agricultural *article*" that meet certain criteria, and those criteria similarly refer to characteristics of "the *article*." 19 U.S.C. § 2252(d)(5)(B) (emphases added). Thus, for purposes of the very provisions that Defendants cite, Congress indicated that "product" and "article" share the same meaning, contrary to Defendants' assertion. The legislative history regarding Section 203(e)(7) also refers to "new relief in respect of a product." *See* Pls.' Br. 34. Congress thus understood "article" and "product" to be synonymous. The fact that exclusions applied only to a "product" thus does not support Defendants' case.

Defendants otherwise claim that the action was not "terminated" with respect to bifacial panels. Gov. Reply 30-31. Defendants' arguments on this point largely reiterate what they said previously. *See* Mot. to Dismiss 21-22. As Plaintiffs already explained, the fact that the President retained authority to terminate the entire CSPV safeguard measure under Section 204 does not mean that Section 203(e)(7) is inapplicable to the subset of products that were excluded by USTR. Pls.' Br. 38. Defendants' arguments also place form over substance through the arbitrary use of labels and ignore the practical and legal effects of the Exclusion. *See id.*

19

The only new claim that Defendants have raised to support their contention that the action was not "terminated" in regard to bifacial panels is their assertion that the President, via Annex I to Proclamation 9693, delegated the authority to USTR to modify or terminate exclusion determinations.  Gov. Reply 30.  But as Plaintiffs have explained, the text of Proclamation 9693 refers only to the authority to *grant* exclusions, and the remainder of the sentence in the Annex that Defendants have selectively quoted reflects an intent to give USTR the power to grant exclusions, not withdraw them.  Pls.' Br. 38 n.12.  Moreover, neither USTR's exclusion procedures nor its notices announcing exclusions reflected any intention by USTR that exclusions would be subject to monitoring and potential withdrawal.  *See id.* at 38-39 & n.13.  This stands in contrast to USTR's clear statements in the Section 301 context that exclusions were only temporary, *see id.*, and strongly suggests that USTR did not understand that it had the authority to withdraw exclusions when it granted them.

In their Reply, Defendants also alter the text of Annex I.  Gov. Reply 30.  Nowhere does the Annex actually say "exclusion determination."  Furthermore, Proclamation 9693 explicitly gives USTR the authority to revise the list of excluded developing countries, or to suspend the exclusion for developing countries entirely.  83 Fed. Reg. at 3,543 (providing that if certain criteria are met, "the USTR is authorized . . . to remove the relevant country from the list [of excluded developing countries] or suspend operation of that subdivision [excluding developing countries], as appropriate").  Thus, President Trump knew how to delegate to USTR the authority to withdraw or modify an exclusion—but chose not to give USTR that same authority over product-specific exclusions granted pursuant to Proclamation 9693.  This further supports Plaintiffs' argument that Annex I is not reasonably interpreted as delegating to USTR the power to withdraw exclusions.  And with the broader statutory scheme providing for safeguard measures to be progressively trade-

liberalizing, *see* Pls.' Br. 4, 24-28, the claimed delegation of authority to USTR to withdraw exclusions would run counter to that scheme; this further supports rejecting Defendants' attempts to find a delegation of authority to withdraw exclusions in an ambiguous sentence fragment in the Annex to Proclamation 9693. *Cf. King*, 576 U.S. at 492-98 (declining to adopt interpretation of provision in statute that would undermine broader statutory scheme).

## III.   PROCLAMATION 10101 VIOLATES SECTION 201 OF THE TRADE ACT

Proclamation 10101 also violated the Trade Act because the President failed to weigh the social and economic costs and benefits of withdrawing the Exclusion. Pls.' Br. 39-42.

In response to Plaintiffs' arguments, Defendants first assert that Section 204 itself does not impose a cost-benefit requirement. Gov. Reply 33. Defendants' argument ignores the overarching rule for safeguard actions established in Section 201, which provides that "the President, *in accordance with this part*, shall take *all* appropriate and feasible *action within his power which* the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and *provide greater economic and social benefits than costs*." 19 U.S.C. § 2251(a) (emphases added). This sets the parameters for all actions taken pursuant to the entire safeguard statute (i.e., "this part" of Title 19), including the modification of safeguard measures. The fact that Section 204 does not specifically reiterate the requirement to consider costs and benefits reflected in Section 201 (and Section 203(a)), does not mean that action taken pursuant to Section 204 is exempt from that overarching requirement. Moreover, Defendants' interpretation of Section 204 would create an exception to Section 201(a) and Section 203(a) that would swallow the rule, and thus must be rejected. *See* Pls.' Br. 41-42; *Schwegmann Bros. v. Calvert Distillers*

21

*Corp.*, 341 U.S. 384, 389 (1951) (rejecting statutory interpretation under which "the exception swallows the proviso and destroys its practical effectiveness").[6]

Defendants further argue that the President already considered social and economic costs and benefits when he issued his original safeguard Proclamation.  Gov. Reply 33.  Plaintiffs already identified the faults in that argument, namely that President Trump did his cost-benefit analysis on the basis of a substantively different action from the modified action resulting from Proclamation 10101.  Pls.' Br. 40.  His stale findings in Proclamation 9693 therefore cannot substitute for the analysis of costs and benefits of the action reflected in and resulting from Proclamation 10101.

Defendants also recite the President's findings in Proclamation 10101 that the bifacial Exclusion impaired the remedial effect of his original action, and assert that he corrected that impairment.  Gov. Reply 33-34.  According to Defendants, in doing so, President Trump "reaffirmed his earlier decision to impose a safeguard remedy and everything that led up to it."  Gov. Reply 34.  Again, that original remedy substantively differed from the modified safeguard measure brought about by Proclamation 10101.  To achieve the remedial effect that he supposedly intended in the first instance, President Trump increased the negative collateral effects on (i) parties that had detrimentally relied on the Exclusion in entering contracts and otherwise planning their business and (ii) parties that must pay, whether directly or indirectly, the higher safeguard duty on all covered CSPV products during the fourth year of the safeguard measure.  President Trump's original cost-benefit analysis in Proclamation 9693 did not, and could not, take any of those

---

[6] The only way to give effect to Defendants' position without granting the President effectively limitless authority to impose new or heightened tariffs without considering the measures' social and economic costs is to read Section 204 as only authorizing trade liberalizing modifications to a safeguard measure after the domestic industry has asked for such modification.

additional harms into account, and Defendants do not provide any basis to conclude that President Trump took those harms into account in Proclamation 10101.

## CONCLUSION

For all these reasons and those set forth in Plaintiffs' initial brief, the Court should enter judgment for Plaintiffs, declare Proclamation 10101 unlawful, and grant Plaintiffs the other relief requested in their Cross-Motion for Summary Judgment.

Respectfully Submitted,

/s/ Amanda Shafer Berman
John Brew
Larry Eisenstat
Amanda Shafer Berman
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500
aberman@crowell.com

Frances Hadfield
**CROWELL & MORING LLP**
590 Madison Ave, 20th Floor
New York, NY 10022
(212) 803-4040

*Counsel to Invenergy Renewables, LLC*

/s/ Matthew R. Nicely
Matthew R. Nicely
James E. Tysse
Daniel M. Witkowski
Devin S. Sikes
Julia K. Eppard
**AKIN GUMP STRAUSS HAUER &
FELD LLP**
2001 K Street, N.W.
Washington, D.C. 20006
(202) 887-4000
mnicely@akingump.com

*Counsel to SEIA and NextEra Energy, Inc.*

/s/ Kevin M. O'Brien
Kevin M. O'Brien
Christine M. Streatfeild
**BAKER & MCKENZIE LLP**
815 Connecticut Ave, NW
Washington, DC 20006
(202) 452-7000
kevin.obrien@bakermckenzie.com

*Counsel to EDF Renewables, Inc.*

June 25, 2021

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Akin Gump Strauss Hauer & Feld LLP hereby certifies that

Plaintiffs' Reply in Support of Cross-Motion for Summary Judgment, dated June 25, 2021,

complies with the word-count limitation set forth in ¶ 2(B) of the Standard Chambers Procedures

of this Court, as amended on October 3, 2016.  The motion contains 6,991 words according to

the word-count function of the word-processing software used to prepare the motion.

/s/ Matthew R. Nicely
Matthew R. Nicely
**AKIN GUMP STRAUSS HAUER &
FELD LLP**
2001 K Street, N.W.
Washington, D.C. 20006
(202) 887-4046
mnicely@akingump.com

*Counsel to SEIA and NextEra Energy, Inc.*

Dated: June 25, 2021