Slip Op. 21-154

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SOLAR ENERGY INDUSTRIES ASSOCIATION, NEXTERA ENERGY, INC., INVENERGY RENEWABLES LLC, and EDF RENEWABLES, INC.,** | |
| **Plaintiffs,** | |
| **v.** | **Before: Gary S. Katzmann, Judge** |
| **UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, AND TROY A. MILLER, IN HIS OFFICIAL CAPACITY AS ACTING COMMISSIONER OF UNITED STATES CUSTOMS AND BORDER PROTECTION,** | **Court No. 20-03941** |
| **Defendants.** | |

### <u>OPINION</u>

[The court denies Defendants' motion to dismiss and grants Plaintiffs' motion for summary judgment.]

Date: <u>November 16, 2021</u>

<u>Matthew R. Nicely</u> and <u>Daniel M. Witkowski</u>, Akin, Gump, Strauss, Hauer & Feld LLP, of Washington, D.C., argued for Plaintiffs Solar Energy Industries Association and NextEra Energy, Inc. With them on the briefs were <u>James E. Tysse, Devin S. Sikes</u> and <u>Julia K. Eppard</u>.

<u>Amanda Shafer Berman</u>, and <u>John Brew</u>, Crowell & Moring LLP, of Washington, D.C. and New York, N.Y., argued for Plaintiff Invenergy Renewables LLC. With them on the briefs were <u>Larry F. Eisenstat</u> and <u>Frances Hadfield</u>.

<u>Christine M. Streatfeild</u> and <u>Kevin M. O'Brien</u>, Baker & McKenzie LLP, of Washington, D.C., argued for Plaintiff EDF Renewables, Inc.

<u>Stephen C. Tosini</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S.

Department of Justice, of Washington, D.C., argued for Defendants United States, United States Customs and Border Protection, and Troy A. Miller, in his Official Capacity as Acting Commissioner of United States Customs and Border Protection. With him on the briefs were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director, and Joshua E. Kurland, Trial Attorney.

Katzmann, Judge:  Solar modules consist of cells that convert sunlight into electricity on both the front and the back of the cells.[1]  The court has on five occasions addressed ongoing litigation involving efforts by the President to withdraw an exclusion from safeguard duties on imported solar modules, duties which the President had imposed by proclamation to protect the domestic industry from serious injury suffered due to increased imports.[2]  Flowing from a new complaint, the case now before the court principally involves the most recent effort by the President in 2020, invoking Section 204 of the Trade Act of 1974 ("Trade Act") -- a separate track not adjudicated in the previous litigation -- to withdraw an exclusion from safeguard duties on imported solar modules.  That section provides that if certain conditions are met, the President is authorized to "reduce, modify, or terminate" previously instituted safeguard measures.  Plaintiffs Solar Energy Industries Association ("SEIA"), NextEra Energy, Inc. ("NextEra"), Invenergy Renewables LLC ("Invenergy"), and EDF Renewables, Inc. ("EDF-R")[3] have initiated this suit to

---

[1]  For purposes of this opinion, the terms "solar modules" and "solar panels" are used interchangeably.

[2]  Prelim. Inj. Order and Op., Invenergy Renewables LLC v. United States, 43 CIT __, 422 F. Supp. 3d 1255 (2019) ("Invenergy I"); Order and Op. Den. Mot. to Show Cause, id., 44 CIT __, 427 F. Supp. 3d 1402 (2020) ("Invenergy II"); Order and Op. Den. Mot. to Dissolve Prelim Inj., Mots. to Dismiss and Granting Mot. to Suppl. Compl., id., 44 CIT __, 450 F. Supp. 3d 1347 (2020) ("Invenergy III"); Order and Op. Den. Mot. to Dissolve Prelim Inj., Mot. to Stay, Granting Mot. to Modify Prelim. Inj., Mot. to Complete Administrative R., and Vacating USTR Decision, id., 44 CIT __, 476 F. Supp. 3d 1323 (2020) ("Invenergy IV"); Order and Op. Den. Mot. to Modify Prelim. Inj., id., 44 CIT __, 482 F. Supp. 3d 1344 (2020) ("Invenergy V").

[3]  Per the complaint, SEIA "is the national trade association for the U.S. solar industry, with hundreds of member companies . . . throughout the solar value chain, including importers, manufacturers, distributors, installers, and project developers[;]" "NextEra is one of the largest

challenge Presidential Proclamation 10101, which withdrew the exclusion of bifacial solar panels

from Section 201 safeguards on imported crystalline silicon photovoltaic ("CSPV") solar panels.

<u>Proclamation 10101: To Further Facilitate Positive Adjustment to Competition from Imports of</u>

<u>Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into</u>

<u>Other Products)</u>, 85 Fed. Reg. 65,639 (Oct. 16, 2020) ("<u>Proclamation 10101</u>"); Complaint at 1,

Dec. 29, 2020, ECF No. 2 ("Compl."). Named as Defendants are the United States, United States

Customs and Border Protection ("CPB"), and Troy A. Miller, in his Official Capacity as Acting

CBP Commissioner (collectively "the Government.")

This case raises a number of questions regarding the interface of <u>Proclamation 10101</u> with

Sections 201–204 of the Trade Act.  For example: (1) Do three letters (reflecting a majority of the

domestic industry production) which seek the modification of safeguards constitute a petition as

required by statute?  (2) Is the requirement that a petition be submitted to the President satisfied

by submission to the United States Trade Representative ("USTR")?  (3) Does the Proclamation's

withdrawal of the exclusion for bifacial modules violate the statutory temporal restrictions which

must be met before new presidential action may be taken?  (4) Was <u>Proclamation 10101</u> issued in

violation of the requirement that the President determine that an action will "provide greater

economic and social benefits than costs"?  (5) Can the word "modify" in Section 204(b)(1)(B) be

read to permit increased restrictions on trade?  The court concludes that with respect to the first

four questions, the answer is "Yes."  With respect to the fifth question, the answer is "No."

---

electric power and energy infrastructure companies in North America and a leader in the renewable
energy industry[;]" Invenergy Renewables, LLC, "is the world's leading independent and
privately-held renewable energy company" [and] "develops, owns and operates large-scale
renewable and other clean energy generation facilities around the world[;]" and EDF Renewables,
Inc. "has more than 30 years of expertise in the renewable energy industry," with a focus on "wind,
solar, energy storage and offshore wind."  Compl., ¶¶ 7-9.

Plaintiffs allege that Proclamation 10101 violates Sections 201, 203 and 204 of the Trade Act and seek both a declaratory judgment that the proclamation is unlawful and the injunction of its enforcement.  Compl. at 16–21.  The Government has moved to dismiss Plaintiffs' complaint; Plaintiffs oppose this motion and have moved separately for summary judgment.  The Government in turn opposes Plaintiffs' motion.  The court concludes that the various procedural challenges posed by Plaintiffs to Proclamation 10101 are unpersuasive.  However, the court also concludes that because Section 204(b)(1)(B) permits only trade-liberalizing modifications to existing safeguard measures, Proclamation 10101's withdrawal of the exclusion of bifacial solar panels and increase of the safeguard duties on CSPV modules constituted both a clear misconstruction of the statute and action outside the President's delegated authority.  The court now grants Plaintiffs' motion for summary judgment and denies the Government's motion to dismiss.

## BACKGROUND

### I.        Legal & Regulatory Framework

Section 201 of the Trade Act of 1974 authorizes the executive branch to implement discretionary protective measures ("safeguards") to protect a domestic industry from the harm associated with an increase in imports from foreign competitors, and Sections 202 through 204 lay out the procedures for issuing such safeguards.  19 U.S.C. §§ 2251–54.  Relevant here, Section 202 provides that upon petition from domestic entities or industries, the International Trade Commission ("ITC") may make an affirmative determination that imports have seriously injured, or threaten serious injury to, domestic industry.  19 U.S.C. § 2252.  Once such a determination has been made, Section 203 permits the President to authorize safeguard measures to temporarily

protect domestic industry from the identified harm.  19 U.S.C. § 2253.

For the duration of any safeguard measure, Section 204 provides that the ITC shall monitor "developments with respect to the domestic industry, including the progress and specific efforts made by workers and firms in the domestic industry to make a positive adjustment to import competition." 19 U.S.C § 2254(a)(1).  If a safeguard duty is imposed for longer than three years, the ITC "shall submit a report on the results of the monitoring . . . to the President and to the Congress not later than the date that is the mid-point of the initial period, and of each such extension, during which the action is in effect." 19 U.S.C § 2254(a)(2).

Upon receipt of this report, the President is authorized to reduce, modify, or terminate the safeguard measures according to either 19 U.S.C. § 2254(b)(1)(A) or 19 U.S.C. § 2254(b)(1)(B). The statute specifically provides that:

(1)   Action taken under [Section 203] may be reduced, modified, or terminated by the President (but not before the President receives the report required under subsection (a)(2)(A)) if the President—

(A)   after taking into account any report or advice submitted by the Commission under subsection (a) and after seeking the advice of the Secretary of Commerce and the Secretary of Labor, determines, on the basis that either—

(i)  the domestic industry has not made adequate efforts to make a positive adjustment to import competition, or

(ii) the effectiveness of the action taken under [Section 203] of this title has been impaired by changed economic circumstances, that changed circumstances warrant such reduction, or termination;

(B)   determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition.

19 U.S.C. § 2254(b)(1).

Safeguard measures have a maximum duration of four years, unless extended for another maximum of four years based upon a new determination by the ITC.  19 U.S.C. § 2253(e)(1).  In addition, measures resulting in the increase or imposition of duties on an article, the institution of a tariff-rate quota with respect to an article, the imposition or modification of qualitative import restrictions on an article, or limitations on the import of an article subject to international agreements face a two-year "cooling-off period," during which further action is restricted.  19 U.S.C. § 2253(e)(7)(A).  Once terminated, such safeguard measures may not be re-imposed, nor may additional such measures be enacted on the same article, for at least two years following the date of termination.  Id.

## II.    *Factual Background & Procedural History*

On January 23, 2018, President Trump issued Presidential Proclamation 9693, which imposed a safeguard measure under Section 203(a)(3) of the Trade Act on certain CSPV products.  Proclamation 9693: To Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products) and for Other Purposes, 83 Fed. Reg. 3,541 (Jan. 23, 2018) ("Proclamation 9693").  Proclamation 9693 imposed a duty on CSPV modules for a four-year period beginning on February 7, 2018.  Id.

On February 14, 2018, USTR published a notice detailing the procedures to request a product exclusion.  Procedures to Consider Additional Requests for Exclusion of Particular Products from the Solar Products Safeguard Measure, 83 Fed. Reg. 6,670 (USTR Feb. 14, 2018).  Pursuant to these procedures, on June 13, 2019, USTR granted a number of requested exclusions from the safeguard measures declared by Proclamation 9693, including an exclusion for bifacial

solar panels.  Exclusion of Particular Products from the Solar Products Safeguard Measure, 84

Fed. Reg. 27,684 (USTR Jun. 13, 2019).

USTR attempted to withdraw the exclusion of bifacial solar panels on October 9, 2019 and

again on April 17, 2020.  Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products

Safeguard Measure, 84 Fed. Reg. 54,244 (USTR Oct. 9, 2019) ("First Withdrawal");

Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar

Products, 85 Fed. Reg. 21,497 (USTR Apr. 17, 2020) ("Second Withdrawal").  Each withdrawal

was issued on the basis that "[s]ince publication of [the exclusion] notice, the U.S. Trade

Representative has evaluated this exclusion further and . . . determined it will undermine the

objectives of the safeguard measure," First Withdrawal, 84 Fed. Reg. at 54,244; with the Second

Withdrawal noting that bifacial solar panel imports are directly substitutable for domestically-

produced monofacial solar panels, and concluding that because "[c]ompetition from low-priced

imports prevented domestic producers from selling significant quantities of solar panels in the

utility segment during the ITC's original investigation period . . . low-priced imports of bifacial

solar panels due to the exclusion are likely to have a similar effect under current market

conditions," 85 Fed. Reg. at 21,498.

Both attempted withdrawals were challenged before the court in Invenergy Renewables

LLC v. United States, with consumers, purchasers, and importers of utility-grade bifacial solar

panels "argu[ing] that the importation of bifacial solar panels does not harm domestic producers

because domestic producers do not produce utility-scale bifacial solar panels; [and] thus

oppos[ing] safeguard duties that they contend increase the cost of these bifacial solar panels."

Invenergy I, 422 F. Supp. 3d at 1264.  Both withdrawals were ultimately enjoined.  See id. at 1294;

Invenergy IV, 476 F. Supp. 3d at 1356–57.  Following the court's expansion of its preliminary

injunction to include the <u>Second Withdrawal</u> in <u>Invenergy IV</u>, President Trump issued

<u>Proclamation 10101</u> on October 16, 2020.  <u>Proclamation 10101</u> again withdrew the exclusion,

thereby re-imposing safeguard duties on bifacial modules, and further increased the safeguard

duties on CSPV modules declared under <u>Proclamation 9693</u> from 15% to 18%.[4]  85 Fed. Reg. at

65,640–42.

Plaintiffs sought to incorporate <u>Proclamation 10101</u> into the ongoing <u>Invenergy</u> litigation,

and into the court's previously issued PI enjoining USTR from withdrawing the exclusion.  <u>See</u>

<u>Invenergy V</u>, 482 F. Supp. 3d at 1351.  The court denied both leave to amend and expansion of

the PI, finding that Plaintiffs' <u>Proclamation 10101</u> claims "involve actions undertaken by the

President, a party not implicated in Plaintiffs' complaints or supplemental complaints [in the

<u>Invenergy</u> litigation] and seek relief against the President not contemplated by Plaintiffs' prior

pleadings" -- in other words, that "the core issues are different."  <u>Id.</u> at 1353.  In the wake of the

court's denial, this action was filed in a separate complaint on December 29, 2020.  Compl.

The Government filed a motion to dismiss the action on March 1, 2021.  Defs.' Mot. to

Dismiss, March 1, 2021, ECF No. 17 ("Defs.' Br.").  Plaintiffs filed a cross-motion for summary

judgment and a response to the Government's motion to dismiss on May 7, 2021.  Pls.' Resp. to

Defs.' Mot. to Dismiss and Cross-Mot. for Summ. J., ECF No. 28 ("Pls.' Resp.").  The Government

filed its reply to Plaintiffs' motion for summary judgment on June 11, 2021.  Defs.' Reply in Supp.

of Mot. to Dismiss and Resp. to Pls.' Mot. for Summ. J., ECF No. 30 ("Defs.' Reply"). On June

25, 2021, Plaintiffs filed their own reply in support of their cross-motion for summary judgment.

Pls.' Reply in Support of Cross-Mot. for Summ. J., ECF No. 32 ("Pls.' Reply").  In response to a

---

[4]  The parties agree that this is the first instance of the President employing 19 U.S.C. § 2254(b)(1)(B) to withdraw an exclusion. <u>See</u> Oral Argument, July 13, 2021, ECF No. 38; Pls.' Resp. to Oral Arg. Questions at 7, Jul. 9, 2021, ECF No. 36.

request by the court, the parties filed written responses prior to argument.  Defs.' Resp. to the Ct.'s

Questions, Jul. 9, 2021, ECF No. 35; Pls.' Resp. to Oral Arg. Questions.  Oral argument was held

July 13, 2021 and the parties filed supplemental briefs on the issues discussed at oral argument

thereafter.  Oral Arg., ECF No. 38; Defs.' Suppl. Br., Jul. 20, 2021, ECF No. 39; Defs.'

Transpacific Br., Jul. 20, 2021, ECF No. 40; Pls.' Transpacific Br., Jul. 20, 2021, ECF No. 41;

Pls.' Suppl. Br., Jul. 20, 2021, ECF No. 42.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(i), which provides

that the court "shall have exclusive jurisdiction of any civil action commenced against the United

States, its agencies, or its officers, that arises out of the law of the United States providing for . . .

[the] administration and enforcement" of tariffs and duties.  The court may review Presidential

action pursuant to Section 201, insofar as it gives rise to a controversy involving international trade

and foreign affairs, for a "clear misconstruction of the governing statute, a significant procedural

violation, or action outside delegated authority."  See Maple Leaf Fish Co. v. United States, 762

F.2d 86, 89 (Fed. Cir. 1985).

## DISCUSSION

Plaintiffs raise four overarching claims.  First, Plaintiffs argue that Proclamation 10101

violates the procedural requirements of Section 204(b)(1)(B) of the Trade Act with respect to the

nature and contents of the petition the President must receive prior to taking action.  Second,

Plaintiffs claim that Proclamation 10101 violates the requirements of Section 203(e)(7) of the

Trade Act by imposing a new safeguard measure on bifacial modules less than two years after the

previous measure -- namely, the duties imposed by Proclamation 9693 -- expired.  Third, Plaintiffs

argue that Proclamation 10101 violates the requirements of Section 201 of the Trade Act because

the President failed to weigh the social and economic costs and benefits of the modifications prior to issuing the proclamation.  Finally, Plaintiffs argue that <u>Proclamation 10101</u> violates the substantive requirements of Section 204(b)(1)(B) of the Trade Act by increasing safeguard measures under the aegis of that provision.

The court addresses each of these arguments in turn and concludes that while the Government prevails on the questions of procedural compliance -- the form, contents, and timing of the petition, as well as the President's assessment of costs and benefits -- <u>Proclamation 10101 ultimately</u> fails to comply with the substantive requirements of Section 204(b)(1)(B) of the Trade Act.  Accordingly, the court grants Plaintiffs' motion for summary judgment and denies the Government's motion to dismiss.

I.      ***<u>Proclamation 10101</u> Does Not Violate the Procedural Requirements of § 204(b)(1)(B) of the Trade Act***

Plaintiffs identify five procedural requirements within Section 204(b)(1)(B).  Four of these requirements pertain to features of the petition submitted by the domestic industry: first, "the petition must be submitted by 'a majority of the representatives of the domestic industry'"; second, it must be submitted to the President; third, "by the use of the language '*such* reduction, modification, or termination,' the petition must request the reduction, modification, or termination that the President ultimately adopts" and fourth, "by the use of the language 'on *such* basis,' the petition must request the reduction, modification or termination on the basis that 'the domestic industry has made a positive adjustment to import competition.'"  Pls.' Resp. at 13–14 (quoting 19 U.S.C. § 2254(b)(1)(B)).  The final requirement Plaintiffs identify is that the President must find that the industry "has made a positive adjustment to import competition."  <u>Id.</u>; 19 U.S.C. § 2254(b)(1)(B).

Plaintiffs' arguments that Proclamation 10101 significantly violated the procedural requirements of Section 204 are unpersuasive. The court concludes that: (1) the letters submitted to the Trade Representative are, taken collectively, sufficient to constitute a petition to the President; (2) submission to USTR was sufficient to satisfy the requirements of the statute; (3) the petition adequately complied with the statute's requirement that "such reduction, modification, or termination" be requested by the "majority of the representatives of the domestic industry"; (4) the petition in this case did not significantly violate 204(b)(1)(B)'s "on such basis" requirement; and (5) the President's finding that the domestic industry "has begun to make" a positive adjustment to import competition again does not significantly violate the statutory requirement that the President find the domestic industry "has made," a positive adjustment to import competition. 19 U.S.C. § 204(b)(1)(B).

As a preliminary matter, the parties dispute the jurisdiction of the court over the above questions. Plaintiffs contend that they are requesting judicial inquiry into whether the President satisfied the statutory predicates for action under the safeguard statute, and that the challenge to Proclamation 10101 is therefore within the authority of the court. Pls.' Resp. at 17–21; see Silfab Solar, Inc. v. United States, 892 F.3d 1340, 1346 (Fed. Cir. 2018) (holding that courts may set aside Presidential action if the President "acts beyond his statutory authority"). The Government, meanwhile, frames the inquiry as a requested review of Presidential fact-finding, which would be outside the scope of judicial review. Defs.' Reply at 10–12; see Florsheim Shoe Co., Div. of Interco, Inc. v. United States, 744 F.2d 787, 796 (Fed. Cir. 1985) ("After it is decided that the President has congressional authority for his action, 'his motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny.'" (quoting United States Cane Sugar Refiners' Ass'n v. Block, 683 F.2d 399, 404 (C.C.P.A. 1982))).

Plaintiffs' view prevails.  It has been established by the Federal Circuit that courts may consider whether "the President has violated an explicit statutory mandate."  Motion Sys. Corp. v. Bush, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc).  Such analysis has been undertaken where the disputed Presidential action constitutes an exercise of delegated authority without complete discretion, including where the President has acted to institute safeguard measures under the Trade Act.  See, e.g., Maple Leaf Fish Co., 762 F.2d at 89; see also, e.g. Corus Group PLC v. Int'l Trade Com'n, 352 F.3d 1351, 1358–59 (Fed. Cir. 2003).  Here as well, the court may consider whether the President's action constituted a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority."  Silfab, 892 F.3d at 1346 (citing Maple Leaf Fish Co., 762 F.2d at 89).

Even so, the law is clear that claims alleging violation of the President's statutory mandate face an extraordinarily high bar for success.  The court in Silfab Solar, Inc. v. United States, for example, determined that even where procedural violations are alleged with respect to the agency recommendations underlying Presidential action, the President may nevertheless act to approve those recommendations without judicial intrusion.  Silfab, 892 F.3d at 1347 (rejecting challenge to Presidential action under Section 201 following alleged procedural violations by the ITC under Section 202).  Silfab also made clear that the failure of the President to comply with statutory requirements generally, so long as those requirements are not conditions precedent to the action challenged before the court, provides no basis for overturning the challenged action.  Id.  Similarly, in Maple Leaf Fish Co. v. United States, the court determined that reliance on an allegedly flawed ITC report nevertheless did not invalidate the resultant Presidential action.  These cases illustrate that more is required for a successful challenge to Presidential safeguards than simple noncompliance, and Plaintiffs' challenges must be weighed against that benchmark here.

### A.      The Petition

With respect to the petition, Plaintiffs allege that the three letters which constitute the purported petition do not satisfy the requirements of Section 204(b)(1)(B) because (1) they were not a petition to the President within the meaning of the statute; (2) they only contained requests from three companies for a change in the duty rate and from five companies for the withdrawal of the exclusion, and thus were not a petition by a majority of the representatives of the domestic industry for the same modification instituted by the President; and (3) they failed to allege that the domestic industry has made a positive adjustment to import competition, "much less [to] identify such positive adjustment as the basis for their request to modify the safeguard measure."  Pls.' Resp. at 16.  The Government responds that (1) the statute does not define "petition," and the President therefore "lawfully accepted the domestic industry's communications as 'a petition' under the statute;" (2) the petition constituted a request from the majority of the industry by production volume and collectively requested the relief granted by the President; and (3) the statute does not require petitioners to assert that the industry has made a positive adjustment to import competition.  Defs.' Reply at 8, 14–21.  The court addresses each of these arguments in turn.

### 1.      The Letters Submitted to USTR Constituted a Petition

With respect to the requirement that a petition be submitted to the President, Plaintiffs' overarching argument is that "an amalgamation of three letters submitted to USTR" by Auxin Solar, SolarTech Universal, Mission Solar Energy, LG Electronics USA, Inc., and Hanwha Q CELLS cannot constitute a petition.  Pls.' Resp. at 14.  Plaintiffs object to both the form and timing of the alleged petition.

First, Plaintiffs argue that that the earliest of the three letters, submitted to USTR in July 2019, cannot serve as the basis for Presidential action in any case because it was submitted prior

to the issuance of the ITC's midterm report.  Pls.' Resp. at 15.  This argument is without merit, as

19 U.S.C. § 2254(b)(1) requires only that the President must receive the ITC report before taking

action and does not require any particular timing with respect to industry petitions.  The court

therefore rejects Plaintiffs' timing argument.

Next, Plaintiffs argue that "multiple documents" do not constitute "'a petition' in the

singular," and therefore the three letters comprising the alleged petition fail to satisfy the text of

the statute.  Pls.' Resp. at 14.  However, as the Government notes, the statute provides no

requirement for the form a petition must take.  Defs.' Reply at 12.  Furthermore, the United States

Code provides that "[i]n determining the meaning of any Act of Congress, unless the context

indicates otherwise -- words importing the singular include and apply to several persons, parties,

or things."  1 U.S.C. § 1; Defs.' Reply at 13.  There is no indication in the statute that a petition

must constitute a single document.  The court therefore determines that the letters submitted in this

case were reasonably construed as a petition under the meaning of Section 204(b)(1)(B).

### 2.      *Submission of the Letters to USTR was Not a Procedural Violation*

In addition to disputing that the letters in this case constitute a petition, Plaintiffs argue that

any petition in fact submitted fails to satisfy Section 204(b)(1)(B) because it was submitted to

USTR and not to the President.  Pls.' Resp. at 14.  The court rejects this argument for two reasons.

First, the statute does not require, or even suggest, that the President may not exercise discretion

in determining the appropriate method of submission.  By contrast, where Congress has intended

strict requirements with respect to petitions under the safeguard statute, those requirements have

generally been explicit.  For example, Section 202 of the Trade Act requires that a petition under

that section be "filed with the Commission" and additional documents "submit[ted] to the

Commission and the [USTR]" within a set period, and further prescribes specific language that

must be included in the petition.  19 U.S.C. § 2252(a)(1), (3)–(4).  No such detailed requirements are found under Section 204(b)(1)(B).  Accordingly, the court declines to read such inflexibility into the statute.  See Jama v. Immigration and Customs Enf't, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

Furthermore, the petitions were submitted to USTR, and USTR  is the agency which "act[s] as the principal spokesperson of the President on international trade."[5]  19 U.S.C. § 2171(c)(1)(E). With respect to safeguard duties specifically, the statute contemplates the close relationship between the President and USTR; requiring that "the interagency trade organization established under 1872(a)," of which USTR is chair, "make a recommendation to the President as to what action the President should take" prior to the institution of any safeguards.   19 U.S.C. § 2253(a)(1)(C); 19 U.S.C.  § 1872(a)(3)(A).   Given the close relationship of USTR and the President in the context of trade regulation and of safeguards specifically, the court finds that filing the petitions with USTR reasonably satisfied Section 204(b)(1)(B)'s requirement that the petitions be submitted to the President.

###   3.   *The Petition Constituted a Request from the Majority of the Representatives of the Domestic Industry for the Relief Granted by the President*

Plaintiffs next argue that even if the three letters submitted to USTR constitute a valid petition, the withdrawal was requested by at most six out of twenty of the "representatives of the domestic industry," which is less than a majority and therefore in violation of the statute.  Pls.'

---

[5] See About Us, Office of the U.S. Trade Representative, https://ustr.gov/about-us (last visited Nov. 9, 2021).

Resp. at 16–17.  The Government counters that it is appropriate to look to production volume to determine if a majority of domestic industry representatives have submitted a petition, and that by this measure a majority of the domestic industry has requested both the withdrawal of the exclusion and the increased duty rate imposed by Proclamation 10101.  Defs.' Reply at 15–18.  Plaintiffs, in turn, respond that this conflates "a majority of the representatives" -- the language of the statute -- with "representatives of the majority."  Pls.' Reply at 7.  The latter language, according to Plaintiffs, might permit measuring the majority by production volume, but "'majority of the representatives' reflects a majority of particular individuals."  Id.

The language of the statute belies Plaintiffs' interpretation.  Section 202(c)(6)(A)(i) defines "domestic industry" with respect to a specific article as "the producers as a whole of the like or directly competitive article or those producers whose collective production of the like or directly competitive article constitutes a major proportion of the total domestic production of such article." 19 U.S.C. § 2252(c)(6)(A)(i).  Clearly, the statute permits definition of domestic industry on the basis of production volume.  Id.  Section 204(b)(1)(B) may accordingly be read to require (prior to any safeguard adjustments) a petition by "a majority of the representatives of" the producers who are responsible for a "major proportion" of domestic production, and a finding by the President that the same producers have positively adjusted to import competition.  19 U.S.C. § 2254(b)(1)(B).  In short, Section 204(b)(1)(B) implicitly contemplates the submission of a petition by those producers responsible for the majority of production volume.  Id.

Nor does context support a reading of 204(b)(1)(B) that focuses on a numerical majority of representatives, rather than a proportional majority of manufacturers.  First, the statute requires that a "majority . . . submits" a petition, not that a majority of the representatives submit a petition. Id.  Second, it is clear from the statute's follow-on requirement that the President determine that

the domestic industry as a whole has positively adjusted to competition that 204(b)(1)(B) is intended to permit changes to a safeguard measure where a specific domestic industry has <u>overall</u> adapted to competition -- not when a certain number of producers have requested modification. <u>Id.</u>   Requiring that a <u>numerical</u> majority of industry representatives petition for modification, regardless of the associated production volume, would therefore not support the ultimate aim of 204(b)(1)(B) as there is no indication that such a numerical majority would reflect industry-wide adaptation.  Accordingly, the court concludes that the statute should not be read to exclusively require petition by a majority of representatives.

Having thus determined that production volume is an appropriate metric for the assessment of a petition, the court concludes that a majority of the domestic industry requested the modifications.  Auxin, Hanwha Q CELLS, and LG requested the modification of the tariff rate in the fourth year of the solar safeguard measure, and according to the confidential filings submitted to the court, these representatives constitute a majority of the domestic industry by production volume.  <u>See</u> ITC Pub. 5021 at III-14 III-15 (Table III-4).  Similarly, Auxin, Hanwha Q CELLS, Heliene, Mission, and Solar Tech requested withdrawal of the bifacial exclusion, and these domestic producers, too, constitute a majority of production during the relevant period.  <u>Id.</u>  Thus, the court finds no basis to conclude that a majority of the domestic industry representatives failed to request the relief granted by the President.

### 4.   <u>*Proclamation 10101* Did Not Clearly Misconstrue the Language of Section 204(b)(1)(B)</u>

Finally, the parties dispute whether the petition submitted by the domestic industry must request relief on the basis that the domestic industry has made a positive adjustment to import competition.  Plaintiffs' argument hinges on the statute's inclusion of "on such basis," which they contend should be read to require that petitioners must request reduction, modification, or

termination of the safeguard measure on the basis that the domestic industry has made a positive adjustment to competition.  Pls.' Resp. at 14–15.  The Government argues that the statute must instead be interpreted to require the President to determine the domestic industry has made a positive adjustment to competition on the basis of either the petition or the ITC midterm review report referenced earlier in Section 204.  Defs.' Suppl. Br. at 7.  As the President in fact relied on the ITC report, the Government contends that the court must defer to his reasonable interpretation of the statute and accept that "on such basis" refers to the ITC report.  Id.

The question before the court is not merely one of statutory interpretation.  Rather, as noted above, the court may only set aside Presidential action where such action constitutes a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority."  Maple Leaf Fish Co., 762 F.2d at 89.  Accordingly, the appropriate inquiry is not how the court would interpret the statute, but whether the President's interpretation of the statute was a "clear misconstruction" warranting judicial intervention.

The court concludes that it was not.  As the Government notes, the President's determination of positive adjustment on the basis of the ITC report is at least plausibly supported by the statutes as a whole.  First, "such" is typically read to "refer[] back to something indicated earlier in the text," which disfavors Plaintiffs' view that the basis referred to is the industry's positive adjustment.  Defs.' Reply at 21–22.  Second, a determination made on the basis of the ITC report would reflect "the views of an independent body based on information and argument provided by all market participants," and would therefore align with the Section 204(b)(1)(B)'s overall aim of permitting the adjustment of safeguard measures when the industry as a whole begins to adapt to competition.  Defs.' Suppl. Br. at 7.  The President's reading of the statute is not

the only possible interpretation of "on such basis."  Nevertheless, neither is it so implausible as to amount to a clear misconstruction.

Even in the event that the correct referent of "such basis" under Section 204(b)(1)(B) is, as Plaintiffs contend, "that the domestic industry has made a positive adjustment to import competition," there is likely no basis to set aside Proclamation 10101.  Plaintiffs argue that the correct interpretation of "such basis" requires that the petition submitted to the president include a request for modification on the basis of positive adjustment.  Pls.' Resp. at 16.  Failure to satisfy such a requirement would therefore be an interpretive error by the representatives of domestic industry, rather than the President -- and would result in a flawed petition.  As discussed above, the Federal Circuit has previously recognized that, where there is nothing in the statute that "prohibit[s] the President from approving recommendations that are procedurally flawed," procedural inadequacies in recommendations provided to the President do not provide a basis for rejecting the resultant Presidential action.  See Silfab, 892 F.3d at 1347 (quoting Dalton v. Specter, 511 U.S. 462, 476).  Indeed, "a recommendation does not cease to be made 'under' [the relevant] section . . . simply because the recommendation is assertedly contrary to the substantive requirements of that provision."  Id. (quoting Michael Simon Design, Inc. v. United States, 609 F.3d 1335, 1341 (Fed. Cir. 2010)).  Even under Plaintiffs' interpretation of the statute, as in Silfab, there is no requirement in Section 204 precluding the President's acceptance of a flawed petition.  Accordingly, even if the appropriate referent of "on such basis" under Section 204(b)(1)(B) were "the domestic industry has made a positive adjustment to import competition," the failure of petitioners to comply with this requirement would not render Proclamation 10101 unlawful.

### B.    The President's Determination.

Finally, Plaintiffs allege that the President failed to comply with the procedural requirements of Section 204(b)(1)(B) by determining in Proclamation 10101 that the domestic industry "has begun to make" a positive adjustment to import competition, rather than "has made" such a positive adjustment.  Pls.' Resp. at 21–23.  The Government rejects Plaintiffs' argument that there is a meaningful distinction between "has made" and "has begun to make" which would invalidate the President's action under Section 204.  Defs.' Reply at 22–24.

The court agrees with the Government.  The phrase "has made a positive adjustment" in the statute is broad enough to include the finding that the domestic industry "has begun to make a positive adjustment" contained in the proclamation.  For their argument to succeed, Plaintiffs must demonstrate a "clear misconstruction of the governing statute," Silfab, 892 F.3d at 1346, and the distinction between "has made" and "has begun to make" is too narrow to rise to the level of a clear misconstruction.  Accordingly, the court rejects Plaintiffs' arguments with respect to the President's procedural compliance with the statute.

### II.    Proclamation 10101 Does Not Violate Section 203(e)(7) of the Trade Act

Plaintiffs next argue that Proclamation 10101 violates the timing provisions of Section 203(e)(7) of the Trade Act.  Section 203(e)(7) prohibits new safeguard duties from being imposed on an article for at least "a period of 2 years beginning on the date on which the previous action terminates" imposed on that article was terminated. 19 U.S.C. § 2253(e)(7)(A)(ii).[6]  Plaintiffs

---

[6] 19 U.S.C. § 2253(e)(7) provides:

    (A)  If an article was the subject of an action under subparagraph (A), (B), (C), or (E) of subsection (a)(3), no new action may be taken under any of those subparagraphs with respect to such article for—

contend that <u>Proclamation 10101</u> violates this section because (1) bifacial solar panels are "articles" for the purposes of Section 203, and (2) the exclusion granted by USTR constitutes the termination of a safeguard duty such that any re-imposition of duties on bifacial solar panels through withdrawal of that exclusion would violate the prohibition on new safeguard measures. Pls.' Resp. at 35. The Government argues that CSPV products generally are the "article" at issue in Section 203, and that the exclusion "did not 'terminate' the safeguard measure as to bifacial products'" but rather "modif[ied] the HTS provisions" created by <u>Proclamation 9693</u> to exclude a specific product from the safeguard measure. Defs.' Resp. to the Court's Questions at 8.

The court concludes that the relevant article for purposes of Section 203's cooling-off period is CSPV products generally, and not bifacial solar panels specifically. The word "article" in this section refers back to its use in Section 201, which establishes the President's authority to impose safeguard duties "[i]f the [ITC] determines . . . that an article is being imported in the United States in such increased quantities as to be a substantial cause of serious injury." 19 U.S.C. § 2251(a). Here, the ITC determined that "crystalline silicon photovoltaic cells . . . are being

---

      (i)  a period beginning on the date on which the previous action terminates that is equal to the period in which the previous action was in effect, or

      (ii) a period of 2 years beginning on the date on which the previous action terminates, whichever is greater.

  (B)  Notwithstanding subparagraph (A), if the previous action under subparagraph (A), (B), (C), or (E) of subsection (a)(3) with respect to an article was in effect for a period of 180 days or less, the President may take a new action under any of those subparagraphs with respect to such article if—

      (i)  at least 1 year has elapsed since the previous action went into effect; and

      (ii) an action described in any of those subparagraphs has not been taken with respect to such article more than twice in the 5-year period immediately preceding the date on which the new action with respect to such article first becomes effective.

imported into the United States in such increased quantities as to be a substantial cause of injury to the domestic industry producing an article like or directly competitive with the imported article." Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products), Investigation No. TA-201-75, USITC Pub. 4739 (Nov. 2017) at 1. It is clear that the ITC considered the imported "article" at issue here to be all CSPV products, and not bifacial products specifically. Accordingly, the court finds that Section 203(c)(7)'s cooling-off period does not apply to bifacial panels specifically, but rather to CSPV products as a whole.[7]

The court further concludes that the exclusion of bifacial solar panels is not a "termination" for the purposes of Section 203(e)(7). The President in Proclamation 9693 authorized USTR to "exclude . . . particular product[s] from the safeguard measure" and to "modify or terminate any such determination." Proclamation 9693, 83 Fed. Reg. at 3,544. The President did not, however, delegate the authority to terminate the safeguard measure, which is the action that would trigger the limitations of Section 203(e)(7). Accordingly, no action that would trigger Section 203(e)(7)'s cooling-off period -- i.e., a termination of a safeguard measure -- was undertaken through the issuance of the exclusion. Furthermore, interpreting the exclusion of bifacial panels as a termination of the safeguard measure with respect to a specific "article" would run counter to

---

[7] Plaintiffs further argue that bifacial solar panels constitute an article for the purposes of 203(e)(7), and that failing to consider bifacial panels (rather than CSPV panels generally) a qualifying article would "allow safeguard duties to be immediately re-imposed on products following the termination of a safeguard measure as long as the domestic industry slightly modifies the definition of the article for which relief is sought." Pls.' Resp. at 35. Such a loophole, Plaintiffs contend, runs counter to the purpose of the statute. Pls.' Br. at 36. However, as Defendants expressly acknowledge in their responses to the court's questions before oral argument, "imposition of a safeguard measure against any subsequent entry of an overlapping product before the cooling-off period has passed would result [in] a 'new action . . . taken . . . with respect to such article'" and accordingly would be in violation of Section 203. Defs.' Resp. to the Court's Questions at 7–8 (quoting 19 U.S.C. § 2253(e)(7)(A)). As Plaintiffs' basis for deeming bifacial solar panels an article for purposes of the cooling-off period has therefore been mooted, the court declines to further address Plaintiffs' argument here.

Congressional intent.  First, as set out above, bifacial solar panels are not an article for purposes

of Section 203.  Second, as the Government notes, viewing a withdrawn exclusion as a termination

subject to Section 203's two-year limitation on new safeguards would require a separate cooling-

off period with respect to every excluded "article," which would in turn give rise to repeated "mini-

ITC investigations into separate subsets of the original 'article'" as each excluded product became

eligible for the re-imposition of safeguards.  Defs.' Br. at 22.  The Government asserts that

"Congress did not intend such a piecemeal approach to the protections of the safeguard statute,"

and the court agrees.  Id.    For the reasons set forth above, the court therefore concludes that

Proclamation 10101's withdrawal of the exclusion was not in violation of Section 203(7)(e).

### III.    *Proclamation 10101 Does Not Violate Section 201 of the Trade Act*

The parties also dispute whether action taken under Section 201 of the Trade Act requires

the President to weigh the economic and social benefits of the alterations in Proclamation 10101

against the costs.  Section 201(a) imposes a requirement that the President weigh the costs and

benefits of a safeguard measure before imposing it:

> If the United States International Trade Commission (hereinafter referred to in this
> part as the "Commission") determines under [Section 202(b)] of this title that an
> article is being imported into the United States in such increased quantities as to
> be a substantial cause of serious injury, or the threat thereof, to the domestic
> industry producing an article like or directly competitive with the imported article,
> the President, in accordance with this part, shall take all appropriate and feasible
> action within his power which the President determines will facilitate efforts by
> the domestic industry to make a positive adjustment to import competition and
> provide greater economic and social benefits than costs.

19 U.S.C. § 2251(a).  The Government argues that the President's initial explicit weighing of the

economic and social costs in Proclamation 9693 is sufficient to comply with the requirements of

the statute,[8] and maintains that the weighing of economic and social costs is only expressly required under Section 201(a) and Section 203(a)(2) -- which govern the initial implementation of safeguard duties -- and not under Section 204, which governs the alterations at issue here.  Defs.' Br. at 22–24.  Therefore, according to the Government, "there is no statutory basis for appending additional requirements onto Section 204 determinations." Defs.' Reply at 33.

Plaintiffs, however, contend that this determination must be made for Proclamation 10101 as well.  First, Plaintiffs argue that Proclamation 9693 weighed the costs and benefits of a different tariff rate: 15% in the fourth year, rather than 18%.  Pls.' Resp. at 39–42.  Second, Plaintiffs argue that all changes to safeguard duties require the President to weigh social and economic costs and benefits.  Id. at 40.  They maintain that the President acknowledged as much in Proclamation 9693, which read in part that changes could be made "to facilitate efforts by the domestic industry to make a positive adjustment to import competition and to provide greater economic and social benefits than costs."  Id. at 40–41 (quoting Proclamation 9693, 83 Fed. Reg. at 3,542).  Furthermore, Plaintiffs argue that Section 201 of the Trade Act, which contains the requirement to weigh social and economic costs and benefits, provides "the overarching rule for safeguard duties," and therefore "sets the parameters for all actions taken pursuant to the entire safeguard statute," including the amendment of safeguard measures.  Pls.' Reply at 21.  They claim that the Government's interpretation of Section 204 "would create an exception . . . that would swallow the rule," and therefore should be rejected.  Id. (citing Schwegmann Bros. v. Calvert Distillers

---

[8] The relevant portion of the proclamation reads, "I have determined that this safeguard measure will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs."  Proclamation 9693, 83 Fed. Reg. at 3,542.

Corp., 341 U.S. 384, 389 (1951) (rejecting statutory interpretation under which "the exception

swallows the proviso and destroys its practical effectiveness)).

    The court concludes that the President was required to weigh the costs and benefits of his

alterations to the safeguards imposed by Proclamation 9693, and further concludes that the

President met this requirement. On the first issue, the court agrees with Plaintiffs that failing to

apply Section 201's requirement to weigh costs and benefits throughout the safeguard statute risks

permitting absurd results, wherein "the President could impose a safeguard duty of one percent on

certain CSPV products under Section 201 (after concluding that the costs of doing so did not

outweigh the benefits), but then use Section 204 to increase the safeguard duty to 50 percent . . .

without ever considering whether the benefits of doing so exceed the costs."  Pls.' Resp. at 41.

Such a scenario would allow any Section 204 exception to swallow the Section 201 rule and would

thus "destroy its practical effectiveness." Schwegmann 341 U.S. at 389. Accordingly, it is

appropriate to read a baseline requirement to weigh social and economic costs and benefits into

the statute as a whole.

    With respect to the second issue, the court finds that the President considered, in

compliance with the statute, the costs and benefits of his alterations to the safeguards imposed by

Proclamation 9693.  In Proclamation 10101 the President determined that "that the exclusion of

bifacial panels from application of the safeguard tariff has impaired and is likely to continue to

impair the effectiveness of the action I proclaimed in Proclamation 9693," and that "the exclusion

of bifacial panels from application of the safeguard tariffs has impaired the effectiveness of the 4-

year action I proclaimed in Proclamation 9693, and that to achieve the full remedial effect

envisaged for that action, it is necessary to adjust the duty rate of the safeguard tariff for the fourth

year of the safeguard measure to 18 percent."  85 Fed. Reg. at 65,640.  By determining that the

bifacial exclusion "impaired" the action taken under <u>Proclamation 9693</u>, which was itself deemed

necessary to "facilitate efforts by the domestic industry to make a positive adjustment to import

competition and provide greater economic and social benefits than costs," the President weighed

the necessity of <u>Proclamation 10101</u>'s alterations.  <u>Id.</u>; <u>see</u> <u>Proclamation 9693</u>, 83 Fed. Reg. at

3,542.  Furthermore, by referring back to the purpose of the safeguards issued by <u>Proclamation</u>

<u>9693</u> and thus to that proclamation's express consideration of the economic and social costs and

benefits of the safeguard measures, the President evinced his general consideration of the costs

and benefits of the changes.  As there is no requirement in either Section 201(a) or Section

204(b)(1)(B) that the President set forth his analysis in specific detail, the court concludes that the

assessment of costs and benefits apparent here satisfies the statutory requirement.

**IV.**     ___Proclamation 10101 *Violates the Substantive Requirements of § 204(b)(1)(B) of*___
            ___*the Trade Act*___

Finally, Plaintiffs argue that <u>Proclamation 10101</u> fails to comply substantively with Section

204(b)(1)(B) because it restricts, rather than liberalizes, trade.  As set out above, Section 204(b)

provides for the "reduction, modification, and termination" of a safeguard action, and specifically

states that:

(1)     Action taken under [Section 203] may be reduced, modified, or terminated by
        the President . . . if the President—

                [ . . . ]

(B)     determines, after a majority of the representatives of the domestic industry
        submits to the President a petition requesting such reduction, modification, or
        termination on such basis, that the domestic industry has made a positive
        adjustment to import competition.

19 U.S.C. § 2254(b)(1).  The court concludes that, by interpreting "modification" to permit the

expansion or upward adjustment of safeguard measures, <u>Proclamation 10101</u> clearly misconstrues

the meaning of the statute.  Accordingly, <u>Proclamation 10101</u>'s withdrawal of the exclusion must

be set aside as a "clear misconstruction of the governing statute," resulting in "action outside delegated authority." <u>Silfab</u>, 892 F.3d at 1346 (quoting <u>Maple Leaf Fish Co.</u>, 762 F.2d at 89).

Plaintiffs contend that only trade-liberalizing modifications are permitted under 204(b)(1)(B) because "[i]t runs counter to logic and congressional intent to <u>increase</u> trade restrictions when 'the domestic industry has made a positive adjustment to import competition.'" Pls.' Resp. at 25 (emphasis in original).  Plaintiffs further contend that in the Uruguay Round Agreement on Safeguards, Congress sought to implement existing United States law, and the fact that the resultant agreement only permits trade liberalizing modifications reflects the congressional intent that Section 204(b)(1)(B) also only permit trade liberalizing modifications.  <u>Id.</u> at 27–28. Plaintiffs note that "[t]he [Statement of Administrative Action] further explains that '[t]he Uruguay Round Agreement on Safeguards (the Agreement) incorporates many concepts taken directly from section 201. These include criteria regarding . . . degressivity (progressive liberalization of safeguard restrictions).'"  <u>Id.</u> (citing H.R. Rep. No. 103-316, 286, <u>as reprinted in</u> 1994 U.S.C.C.A.N. 4040, 4262).  Accordingly, Plaintiffs argue, <u>Proclamation 10101</u> should be set aside.

The Government claims that Section 204(b)(1)(B) is not limited to trade liberalizing measures, and in fact permits the President to increase safeguard duties.  In support of their position they argue that, because safeguards may be reduced, modified, or terminated by the President under Section 204, reading modification to permit only "actions that reduce safeguard protections would make 'modification' coterminous with . . . 'reduction', and therefore render 'modification' superfluous." Defs.' Br. at 13.  The Government also cites to legislative history in support of their argument, noting that "an earlier Senate amendment stated that, upon receipt of the 'ITC monitoring report, the President may reduce, modify (but not increase), or terminate any action . . . . .'" <u>Id.</u> at 14–15.  The Government argues that the omission of the parenthetical "but not increase"

in the final version of the act indicates that Congress intended to permit increases because "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." <u>Russello v. United States</u>, 464 U.S. 16, 23–24 (1983); <u>see</u> <u>id.</u>  Accordingly, the Government argues, <u>Proclamation 10101</u> is lawful under 204(b)(1)(B).

The question underlying this dispute is the meaning of "modify" as used in 204(b)(1)(B). How that question is resolved is informed by basic principles of statutory interpretation.  <u>See generally</u>, Robert A. Katzmann, JUDGING STATUTES (2014).  The court begins with the principle that statutory language should be interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment." <u>Bostock v. Clayton County</u>, 140 S. Ct. 1731, 1738 (2020).  An appeal to the dictionary is therefore illustrative.  In its verb form -- as it is used in 204(b)(1) -- "modify" is defined as "to make less extreme."  <u>See</u> "Modify," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/modify (last visited Nov. 9, 2021) Similarly, in its noun form -- as it is used in the section title, and in 204(b)(1)(B) -- "modification" is defined as "the limiting of a statement." <u>See</u> "Modification," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/modification (last visited Nov. 9, 2021). Secondarily, "modification" is defined as "the making of a limited change in something." <u>Id.</u>  The definition of the verb (as well as the first definition of the noun) favors Plaintiffs' interpretation: that the statute's provision for modification permits only changes that limit or moderate the existing safeguard measures.  On the other hand, the second definition of "modification" favors the Government's interpretation: that both trade-liberalizing and trade-restricting changes to existing safeguard duties are authorized by the statute.  Defs.' Resp. to the Court's Questions at 3.

Accordingly, the court turns next to the statute as a whole.  Courts may look "to the broader structure of the [statute] to determine the meaning" of specific language.  King v. Burwell, 576 U.S. 473, 492 (2015).  Where, as here, the terminology of the statute is ambiguous, it is all the more important to read disputed provisions "in their context and with a view to their place in the overall statutory scheme."  Utility Air Reg. Grp. v. EPA, 573 U.S. 302, 311 (2014) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000)).

Safeguard measures are intended to "facilitate efforts by the domestic industry to make a positive adjustment to import competition" while providing "greater economic and social benefits than costs."  19 U.S.C. § 2251(a).  As Plaintiffs correctly note, "to strike that balance, the statute contains an intricate framework of investigations, consultations, reports, [and] weighing of factors."  Pls.' Resp. at 26.  This framework includes specific instructions for the investigation of alleged harms by the ITC, including the assessment of enumerated factors favoring a finding of serious injury and the holding of public hearings on both the risk of injury and proposed adjustment plans.  19 U.S.C. § 2252(b), (e).  In order to ultimately authorize any safeguard measures, the President must also comply with a variety of interpretive and substantive requirements, as well as specific deadlines for both further investigation and the proclamation of relief.  See generally, 19 U.S.C. § 2253.  The measures implemented go on to face both ongoing review and strict time limitations.  19 U.S.C. § 2253(e)(7); 2253(a).

Interpreting Section 204(b)(1)(B) to permit both trade-restricting and trade-liberalizing modifications would run counter to this detailed statutory scheme.  Under such a view of the statute, the President would be permitted to increase safeguard measures without complying with the statutory requirements necessary to initially impose those safeguards.  Adjustment of safeguard measures under 204(b)(1)(B) requires only that the President consider a midterm report by the ITC

on the "developments with respect to the domestic industry, including the progress and specific efforts . . . to make a positive adjustment to import competition." U.S.C. § 2254(a)(1)–(3), (b). There is no indication in the statute that Congress intended Section 204 to provide a loophole for the institution of harsher safeguards without the standard procedural restrictions. Conversely, there is every indication that the section was intended to provide an escape hatch from those safeguards where domestic industry has adequately adapted to import competition. Section 204(b)(1)(A), for example, contemplates that safeguards might be reduced or terminated where "the domestic industry has not made adequate efforts" to adjust to competition, or where "the effectiveness of the action . . . has been impaired by changed economic circumstances" which "warrant . . . reduction, or termination." 19 U.S.C. § 2254(b)(1)(A)(i)–(ii). The court therefore concludes that 204(b)(1)(B) must be read to authorize only trade-liberalizing modifications to safeguard measures, because interpreting the statute to permit trade-restricting modifications would undermine the broader statutory scheme. See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.") (citations omitted).

In light of the above, the court need not consider the legislative history arguments advanced by either side. See Bostock, 140 S. Ct. at 1749 ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.") (quoting Milner v. Department of Navy, 562 U.S. 562, 574 (2011)). Even in the event, however, that the court did proceed to consideration of the legislative history Plaintiffs still prevail, as that history is not decisive. For example, it is easy to imagine a scenario where a trade-liberalizing modification would require an "increase" of

sorts (the President might increase a previously instituted quota) and the Government's arguments

to the contrary are not dispositive.[9]

Because Section 204(b)(1)(B) permits only trade-liberalizing modifications to existing

safeguard measures, the court concludes that <u>Proclamation 10101</u>'s withdrawal of the exclusion

of bifacial solar panels and increase of the safeguard duties on CSPV modules constituted both a

clear misconstruction the statute and action outside the President's delegated authority.  85 Fed.

Reg. at 65,640–42; <u>Maple Leaf Fish Co.</u>, 762 F.2d at 89.  This conclusion is rooted in the statutory

---

[9] In support of its legislative history argument, the Government points primarily to the fact that "(but not increase)" was included in an earlier version of the statute in support of their position. Defs.' Reply at 28–29. And indeed, as already noted earlier in this opinion, "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." <u>Russello</u>, 464 U.S. at 23–24 (citations omitted). This presumption, however, is not irrebuttable, and Plaintiffs offer convincing alternative explanations.

Procedurally, Plaintiffs suggest the "but not increase" language was dropped as "a byproduct of combining different provisions addressing different situations using different language into a single provision." Pls.' Resp. to Oral Arg. Questions at 1–2. The "but not increase" language did not disappear during deliberations within a single house of Congress, but rather as a result of combining a similar provision from the Senate with one from the House. <u>See</u> H.R. Rep. No. 100-576, 687–88 (1988), <u>as reprinted in</u> 1988 U.S.C.C.A.N. 1547, 1720–21. This indicates that the deleted language may not carry the presumptive meaning argued for by the Government.

Practically, moreover, the "but not increase" language may have been deleted from the final version of the statute in order to give the President flexibility to make trade-liberalizing increases to existing safeguard duties. An increase in a quota, for example, would be a trade-liberalizing modification permitted under the operative language of Section 204(b)(1)(B) that would perhaps have been barred had the "but not increase" language not been deleted.

Furthermore, there is legislative history supporting Plaintiffs' view that "modify" should be read to permit only trade-liberalizing changes. In particular, the Uruguay Round Agreement on Safeguards, a multilateral treaty negotiated in the 1980s which only permits trade liberalizing modifications, was explicitly negotiated to reflect existing United States law. <u>See</u> H.R. Rep. No. 103–316, 286 (1994), <u>as reprinted in</u> 1994 U.S.C.C.A.N. at 4262 ("The Uruguay Round Agreement on Safeguards (the Agreement) incorporates many concepts taken directly from section 201. These include criteria regarding . . . degressivity (progressive liberalization of safeguard restrictions).") As such, the limitations on trade-restricting action incorporated in the Uruguay Round Agreement seem to reflect Congress's intent that the originating statute, including Section 204(b)(1)(B), also only permit trade-liberalizing modifications. Accordingly, even the legislative history supports Plaintiffs' view that "modify" only permits trade-liberalizing changes to safeguard measures.

scheme.  That is not to say that, in another context, in a different statute, "modify" could not be read differently, or indeed as the Government argues.  To be sure, Congress is free to revise the statute now before the court to permit upward modifications.  Nevertheless, in this context, and without such revision of the law, the Government's argument cannot succeed.  Accordingly, the court grants Plaintiffs' motion for summary judgment and finds that the proclamation must be set aside.

**CONCLUSION**

Ultimately, while Proclamation 10101 complied with the procedural requirements of the safeguard statute, it nevertheless clearly misconstrued the reach of Section 204(b)(1)(B) of the Trade Act, and thus constituted an action outside the President's delegated authority.  Neither the statute nor the statutory scheme supports interpreting Section 204(b)(1)(B) to permit increased restrictions on trade. Accordingly, the court grants Plaintiff's motion for summary judgment, and sets aside Proclamation 10101 on the basis that trade-restricting modifications are not permitted under the authority granted to the President by Section 204(b)(1)(B).  The Government is enjoined from enforcing Proclamation 10101, including by modifying the Harmonized Tariff Schedule of the United States, and Plaintiff shall be refunded all safeguard duties collected pursuant to Proclamation 10101, with interest.

SO ORDERED.

                                                          /s/   Gary S. Katzmann
                                                           Gary S. Katzmann, Judge


 Dated:  November 16, 2021
              New York, New York